IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 12CV869

JOHN NIEMI,
ROBERT NAEGELE, III, and
JESPER PARNEVIK

      Plaintiffs,

v.

MICHAEL FRANK BURGESS,
ERWIN LASSHOFER
INNOVATIS GMBH,
INNOVATIS IMMOBILIEN GMBH,
INNOVATIS ASSET MANAGEMENT SA,
LEXINGTON CAPITAL & PROPERTY INVESTMENTS, LLC, and
BARRY FUNT

      Defendants.

---

## ORDER GRANTING PRELIMINARY INJUNCTION

---

     The case is before the Court on plaintiffs' motion for a preliminary injunction.  The Court took the case under advisement at the conclusion of an evidentiary hearing on May 25, 2012 in order to consider a number of cases that the parties argued affected the Court's authority to issue the specific relief sought.

**Case History**

     On April 4, 2012 plaintiffs filed their Complaint [docket #1] and a motion for leave to restrict public access to the names of the parties until 72 hours after they notify the Court that the defendants have been served with the Complaint and, if granted, a temporary restraining order [#2].  The Complaint, as discussed below, asserted that defendants had engaged in a fraudulent

scheme in violation of federal and state racketeering laws. The motion asserted that if the defendants were to become aware of the Complaint before service was accomplished, they would have an opportunity to secrete assets fraudulently obtained from plaintiffs into offshore accounts beyond the Court's reach. Based upon the detailed allegations in the 61-parge Complaint, which had been verified by plaintiff John Niemi, the Court issued plaintiffs' tendered order permitting them to file the Complaint, an ex parte motion for a temporary restraining order; and an ex parte motion for service abroad under temporary "seal." [#5].

Following an ex parte hearing on April 16, 2012, the Court granted in part and denied in part plaintiffs' motion for a temporary restraining order and directed plaintiffs to submit a revised form of order consistent with the Court's ruling. [#13]. The Court also ordered plaintiffs to post a $10,000 cash bond, which they did on the same day. [#14]. On April 17 the Court issued an order temporarily restraining the Lasshofer defendants (Erwin Lasshofer and the three Innovatis entities, also referred to herein as the "Innovatis defendants") and associated persons from "dissipating, destroying, concealing, altering, secreting, or otherwise disposing of any assets." [#16]. The temporary restraining order further ordered the Lasshofer defendants, who are based in Austria, to take steps to "repatriate" to Colorado assets appropriated from the plaintiffs that are held by those defendants outside the District of Colorado; to repatriate other assets necessary to satisfy a judgment (which order the present order substantially modifies); and to hold in trust such repatriated assets. The order also authorized certain expedited discovery, including document subpoenas to be served on financial institutions believed to hold assets of the Lasshofer defendants. On April 18, 2012 the Court issued a "Letter of Request for International Judicial Assistance" to the Austrian Federal Minister of Justice requesting assistance in accomplishing service of the Complaint on the Lasshofer defendants. [#18].

On May 2, 2012 the Court *sua sponte* lifted the public access restriction on the pleadings, noted that the temporary restraining order had expired on May 1, 2012, and directed the parties to schedule a preliminary injunction hearing.  [#22].  On May 3, 2012 the Court granted the Lasshofer defendants' motion for leave to make a special appearance in order to challenge the Court's orders issued on April 17, 2012. [#24].  The Court held a status conference on May 4, 2012, in which for the first time the Lasshofer defendants were represented by counsel.  The Court renewed the temporary restraining order pending a preliminary injunction hearing but excluded $150,000 from the temporary asset freeze -- $50,000 to retain counsel and $100,000 for Mr. Lasshofer to use for business expenses.  [#25].

The preliminary injunction hearing was held on May 25, 2012.  Based upon findings and conclusions delivered orally at the hearing, the Court found that it has personal jurisdiction over the Lasshofer defendants under Colorado's "long-arm" statute, C.R.S. § 13-1-124, and under the due process clause of the United States Constitution.  The Court further found that a forum selection clause in a certain Loan Agreement, discussed below, did not require that the Court either transfer the case to a court in New York or dismiss the case for improper venue.  [#46].  Although not recorded in the foregoing minute order, the Court also freed an additional $25,000 from the temporary restraining order for purposes of payment of defense counsel.[1]

---

[1] Defendants have raised the question whether service was properly accomplished, most recently but indirectly in their post-hearing response brief in which they request that the Court free up funds with which they can contest service.  The issue was not addressed in the hearing nor has it been squarely presented to the Court or briefed.  The Court entered an ex parte temporary restraining order without service.  The Court was satisfied that service was sufficiently accomplished within the meaning Fed. R. Civ. P. 4(f) to permit the Court to consider a preliminary injunction.  Service by letter rogatory apparently has not yet been completed.  However, the time required to complete that process would defeat the purpose of a preliminary injunction.  What cannot be denied is that the defendants received the Complaint and other documents, are fully aware of all proceedings, and have vigorously defended against the entry of a preliminary injunction.  I note that while considering defendant's argument that a forum selection clause required that the party dismiss the case or transfer venue to New York, the Court asked whether defendants were prepared to acknowledge personal jurisdiction, venue and proper service in New York.  Counsel responded that he was not authorized to answer that question.  Without disrespecting any procedure of Austrian law regarding service of process or otherwise, the fact remains that the situation called for injunctive relief

**FINDINGS OF FACT**

At the outset, I note that the Lasshofer defendants elected not to present any evidence other than counsel's cross-examination of the plaintiffs and introduction through the plaintiffs of certain documents. That put the Court in the position of resolving the issues based on the verified complaint; the testimony of the three plaintiffs; and exhibits admitted during the hearing. I do not find that to be particularly satisfying. As the foregoing recitation of the history of this case reflects, there has been a whirlwind of activity on the part of the plaintiffs, including requests for extraordinary equitable relief, presented in a very short period of time. I would like to have heard "the other side of the story" and, at a minimum, to have received more evidence concerning defendants' assets and the impact of the relief sought on their business operations. However, defendants had no obligation to present evidence, and the burden of establishing entitlement to a preliminary injunction rests squarely with the plaintiffs.

The Court finds that the following facts have been established to a preponderance of the evidence for purposes of preliminary injunctive relief. In 2006 plaintiff John Niemi purchased two properties in Breckenridge, Colorado on which he intended to construct an upscale development. The Fairmont hotel chain learned about the properties and the proposed development, was impressed by its potential, contacted Mr. Niemi, and agreed to have its brand on what became known as the Fairmont Breckenridge project.

The properties were purchased for some $42 million in debt and equity. Robert Naegele, III, a businessman who lives in Carbondale, Colorado and Jesper Parnevik, a professional golfer who lives in Florida, are friends of Mr. Niemi. According to their testimony, Mr. Naegele invested $2.5 million (in cash and loan guarantees) and Mr. Parnevik invested $4.5 million

---

and the defendants were, as a practical matter, notified and fully involved in the case. I am satisfied at this point to proceed forward with an equitable order.

(including funds invested by family members and friends) in the project.  Mr. Niemi's initial investment was not indicated, but he testified that he today has a negative net worth of approximately $35 million because of debt he incurred from the project.

The development was to be divided into two phases.  In Phase I, which occurred between 2006 and 2009, homes were constructed on the "River property."  Despite the downturn in the economy and the real estate market during those years, the project was very successful.  All completed homes were sold; closings were scheduled on homes not yet built; and altogether sales and executed contracts generated some $80 million in "committed cash revenue."  Mr. Niemi incurred expenses exceeding $24 million and personally guaranteed all Phase I loans.

In the spring of 2009 Mr. Niemi set about the process of securing financing to repay all Phase I loans and to fund work required to completed Phase II.  He determined that the amount needed would be in the range of $200 to $220 million.  He had discussions with several banks and other potential sources, all of whom indicated that they would only be in a position to consider funding for one or the other of the two properties but not both.  However, a realtor put Mr. Niemi in touch with Prosperity International, LLC, a now-dissolved Florida limited liability company, and its principal Michael F. Burgess.  Unbeknownst to Mr. Niemi at the time, that is when the problems that have led to this lawsuit began.

Mr. Burgess, who today is serving a 15-year sentence in federal prison for conspiracy to commit wife fraud and money laundering, indicated that Prosperity, in conjunction with a partner company Innovatis, had the ability to finance the entire project.  Between June and December 2009 Prosperity (assisted by defendant Lexington Capital & Property Investments, an entity closely affiliated with Mr. Burgess) conducted what appeared to be unusually thorough "due diligence."  Mr. Burgess required Mr. Niemi to pay to Prosperity a $180,000 loan commitment

fee and to agree to confidentiality terms that prohibited Mr. Niemi from discussing the project with other potential lenders as conditions for the issuance of a loan commitment. A loan commitment was issued on September 25, 2009. Mr. Niemi was by then completely tied to Prosperity for the financing necessary to pay debts incurred in Phase I and to complete the project in Phase II.

Mr. Burgess had indicated that funding could begin in November 2009. That did not occur, and Mr. Niemi temporarily halted work on the Fairmont Breckenridge project pending completion of the formal financing agreement.

Up to this point the participation of Erwin Lasshofer appears to have been essentially behind the scenes. Mr. Lasshofer resides in Salzburg, Austria. He owns and manages Innovatis GmbH and Innovatis Immobilien GmbH, both of which are likewise located in Salzburg. Innovatis Asset Management, another Lasshofer entity, is based in Panama. There was an Innovatis Group member in the United States, Innovatis, Inc., of which Mr. Lasshofer was the President, but it has since been dissolved. Prosperity was listed on the Innovatis Group website during parts of 2009 and 2010 as a "Partner" of the Group.

Mr. Burgess told Mr. Niemi to have the architects and contractors resume work on the project, and he assured Mr. Niemi that he and Mr. Lasshofer were committed to funding the loan. In a letter dated November 19, 2009 from Mr. Lasshofer to Mr. Burgess, forwarded to Mr. Niemi's lawyer, Mr. Lasshofer confirmed that Innovatis Asset Management would make certain securities with a face value of more than $550 million available to collateralize various projects under consideration. Ex. 12. One of those projects was the Fairmont Breckenridge project. Mr. Burgess had repeatedly represented during the due diligence process that he could not make a loan commitment without Mr. Lasshofer's approval.

This process culminated in the negotiation of a Loan Agreement dated December 7, 2009 between Azco LLC and Azco II LLC, two Colorado limited liability companies associated with Mr. Niemi, and Prosperity.  Deft. Ex. 8.  This is a 74-page contract plus exhibits, but suffice it to say that Prosperity agreed to provide $220 million in financing for Phase II.  Essex Investment Partners, LLC, characterized by the plaintiffs as Prosperity's loan administrator (whose principal and alleged alter ego is defendant Barry Funt) assisted with the negotiation of the loan agreement.

Among other things Mr. Niemi was required to make a $2 million upfront collateral deposit, which he, Mr. Naegele and Mr. Parnevik provided, bringing the total of the funds provided by the plaintiffs to $2,180,000.  The $2 million collateral deposit was initially supposed to be wired to an Innovatis account at Credit Suisse, according to a record that was admitted as the last page of Ex. 16.  This record was created at Innovatis according to metadata.  This did not occur, and instead, the funds were apparently initially wired to Prosperity's Miami, Florida account in separate payments of $750,000 on December 7 and $1,250,000 on December 10, 2009.  Nevertheless, at least some of the money ended up with Innovatis.  Defense counsel admits that Mr. Burgess sent at least $600,000 of the money to Innovatis and asserts that Innovatis transferred $350,000 of that sum to a Florida law firm for Mr. Burgess' benefit.  Motion [#32] at 7.  However, as discussed below, a Joint Venture Agreement between Prosperity and Innovatis GmbH appears to indicate that the entire $2 million was distributed to Innovatis.

What followed after the Loan Agreement was executed and plaintiffs' funds were received was not the funding of the loan as promised.  A January 21, 2010 disbursement date on the Prosperity loan came and went.  Mr. Niemi missed a scheduled payment to his lenders from

Phase I, and he ban negotiations on possible modification of those loans.  Contractors on site were not being paid.

Mr. Burgess provided excuses for the delays and repeated reassurances that the loan would be funded.  In late January 2010 Mr. Niemi demanded the return of the $2,180,000 pursuant to the default provision in the loan agreement.  According to the verified Complaint, "Burgess and Lasshofer refused to refund the money, and threatened to claim Niemi was in default (although there was no basis for such a claim)."  [#1 at ¶120].

Mr. Burgess or his agents indicated that Mr. Lasshofer was working with his bank, and that "we," meaning Mr. Lasshofer and himself, were doing everything possible to get it done.  He promised to go to Europe and meet with Mr. Lasshofer in order to facilitate a resolution of whatever was holding up funding on the Phase II loan.  Mr. Niemi, by now increasingly concerned, decided to join him.

After enduring several days of waiting in Zurich for Mr. Lasshofer to make himself available, Mr. Niemi finally met with Mr. Lasshofer and Mr. Burgess in Salzburg on February 8, 2010.  Mr. Lasshofer initially said that funding would not begin soon.  He provided "plausible explanations" for the delay.  As the discussions continued, Mr. Niemi indicated that if the loan wasn't going to happen, he wanted his $2,180,000 deposit back so that he could move forward with something else.  According to Mr. Niemi, "they said no."  Mr. Lasshofer said that he would begin making payments as agreed within five weeks.  Mr. Niemi asked, "what if it's more than five weeks?"  Mr. Lasshofer responded that "if it's more than five weeks, I've got bigger problems than that."  He told Mr. Niemi not to worry, because "this is going to get done."  On the following day, over lunch, Mr. Lasshofer again assured Mr. Niemi that he would have the funding within five weeks at the outside.

After that meeting Mr. Niemi asked his attorney to request a copy of an agreement that formalized the relationship between Prosperity and Innovatis.  Mr. Burgess provided him with a copy of a "Joint Venture Agreement" between Innovatis GmbH, "represented by Mr. Erwin Lasshofer, and Prosperity, "represented by Michael F. Burgess."  Ex. 30.  The Joint Venture Agreement is dated February 28, 2010.  Paragraph 2 of the Joint Venture Agreement indicates that Mr. Lasshofer had arranged a $554 "deed of pledge" to the account of Innovatis Asset Management.  Paragraph 5 confirms that Mr. Burgess had arranged for "clients" including "Breckenridge" to pay various sums to the Innovatis Asset Management account.  The amount said to have been paid by Breckenridge is $2 million.  The paragraph further relates that $110 million of the $554 million deed of pledge has been allocated to Breckenridge.  Paragraph 7 indicates that Mr. Lasshofer and Mr. Burgess will share gross proceeds of their projects on a 50-50 basis.  An attached "List of Transactions" shows Breckenridge as funding needs of $220 million.

The language of the document is rather obscure in terms of explaining the relationship of the deposits such as that of Breckenridge to the ultimate funding of the promised loan.  However, in addition to formally documenting a relationship among Mr. Lasshofer, Mr. Burgess and their respective companies, the document is evidence that Mr. Niemi's $2 million deposit was placed in an Innovatis account and is directly related to the participation in the project of Mr. Lasshofer.  Mr. Lasshofer later claimed that the Joint Venture Agreement was manufactured by Mr. Burgess.  However, metadata shows that the document was created in Mr. Lasshofer's Salzburg office by an Innovatis employee named Sorichilli.

Mr. Burgess' assurances that funding was coming, indeed imminently coming, continued through June 25, 2010.  Among other communications, on May 12, 2010 Mr. Burgess sent Mr.

Niemi a memorandum signed by Mr. Lasshofer confirming that Mr. Burgess had instructed Innovatis to transfer $1,650,000 to Mr. Niemi's account in Colorado.  Metadata shows that his memorandum was created by Innovatis employee Sorichilli.  On June 1, 2010 Mr. Burgess emailed Mr. Niemi that he was traveling to Munich to meet with Mr. Lasshofer and work with him on obtaining the funding.  On June 6, 2010 Mr. Burgess wrote that he had spoken with Mr. Lasshofer who said he was working with Mr. Sorichilli on documents necessary to affect a transfer.  On June 15, 2010 Mr. Burgess indicated that he was waiting for Mr. Lasshofer to advise him of the finalization of the requirements, which he expected to complete that day.  On June 17, 2010 Mr. Burgess sent Mr. Niemi another memorandum signed by Lasshofer authorizing a transfer of funds, once again created by Mr. Sorichilli according to metadata.  On June 25, 2010 Mr. Burgess told Mr. Niemi that everything was complete, and funding would begin the following week.

Despite all these promises, no funding was ever provided.  On June 26, 2010 Mr. Burgess was detained by the U.S. Secret Service for what became his indictment, conviction and sentencing for conspiracy to commit wire fraud and money laundering.  According to Mr. Niemi, after Mr. Burgess' arrest, Mr. Lasshofer became more communicative, expressing concerns about who was working with the government on the matter.  Mr. Lasshofer suggested that Mr. Burgess' arrest would delay the funding of the loan, which he said was supposed to have happened during the following week.  But Mr. Lasshofer continued to promise that the loan would be funded and said that he would go to Zurich to work things out with his bank.  He told Mr. Niemi to "hang tight."

Nothing ever came of it.  No funds were ever provided.  The Phase I lenders foreclosed on the Fairmont Breckenridge properties.  Plaintiffs allege that $38 million in loans went into default, and $19 million in equity was lost.  Complaint ¶¶ 188, 190.

Plaintiffs' hearing exhibit 85 purports to summarize the damages they have sustained as a result of the fraud perpetrated upon them by the defendants.  The document reflects that plaintiffs claim to have sustained damages totaling $153,004,819 before trebling, consisting of (1) lost profits of $80 million; (2) the loss of the Shock Hill property with an appraised value of $37.1 million; (3) the loss of the River Duplex property with an appraised value of $12 million; (4) cash outlays and loans due for land purchases, architecture, marketing , taxes and legal expenses of $8,113,077; (5) another cash outlay of $2.8 million; (6), (7) loan amounts personally guaranteed totaling $10 million; (8) the $2,180,000 paid to Prosperity; and (9) accounts payable for subcontractor fees, legal, accounting and marketing totaling $1,111,742.

As indicated above, Mr. Burgess eventually pled guilty to conspiracy to commit wire fraud and to money laundering.  He was sentenced to 15 years in federal prison.  He was ordered to pay restitution to 15 victims in the total amount of $94,945,718.47.  Of that amount $45,990,300, nearly half, was for damage caused in connection with the Fairmont Breckenridge development.

Mr. Burgess and Mr. Lasshofer have subsequently engaged in finger pointing.  In their initial motion in this case seeking leave to appear specially, the Innovatis defendants declared that "[t]he allegations in this lawsuit arise from Plaintiffs' business relationship with a con man, Michael Frank Burgess."  [#21].  In contrast, at his sentencing hearing Mr. Burgess indicated that he had followed everything that his "associate partner" (Mr. Lasshofer) had instructed him to do, and he offered to provide the court with assistance that might lead to the arrest of the directors of

Innovatis Asset Management whom, he said, deliberately misled investors and took their money into their various investment schemes.  Complaint ¶¶206-07.

Following the entry of Mr. Burgess' guilty plea, the Florida court apparently issued an Order of Forfeiture.  I have not seen the order, but the court is said to have found that the government was entitled to possession of Credit Suisse bank account number 0835-1128069-12 in the name of Innovatis Management S.A.  Mr. Burgess is reported to have admitted in connection with his criminal case that the account contains at least $6,800,000, and that these funds were wire fraud proceeds.  The Florida court presumably found good cause to order forfeiture of the account.  This Court presently does not know the identity of the individual or individuals who deposited funds to that Innovatis account.  However, according to testimony admitted without objection at the preliminary injunction hearing, the U.S. Attorney's Office in Florida considered Mr. Lasshofer to be an unnamed or unindicted co-conspirator with Mr. Burgess.  The original lead attorney for the government told Mr. Niemi that he thought that Mr. Lasshofer was in charge of everything.

Mr. Lasshofer has not been indicted.  According to defendants' motion for leave to appear specially, the Innovatis defendants negotiated a civil settlement with the U.S. Attorney's Office in Orlando in which they agreed that the government could take $3 million from the forfeited funds, and the government agreed that it would not pursue any additional money from the Innovatis defendants.  [#21 at 2].  Plaintiffs' counsel advised this Court during the preliminary injunction hearing that plaintiffs object to the settlement on several grounds, including that (1) half of the settlement funds are going to the government, seemingly not a fraud victim; (2) Mr. Niemi is not getting a proportional or fair share of the portion of the settlement earmarked for victims; (3) the remaining funds in the forfeited account, said to be at least $3.8

million would be removed from the custody of the court and released to Mr. Lasshofer; and (4) the U.S. Attorney's Office promised to consult with victims before approving a settlement but did not.  Defense counsel has indicated that the payment of the settlement funds has been held up by this Court's temporary restraining order; that the Court will be hearing from the U.S. Attorney's office if it does not release the funds; and that the $3.8 million belongs to third parties who have invested through Innovatis.  The latter claim was not supported by evidence.

Defendants have observed that plaintiffs waited some 21 months before filing this lawsuit.  According to Mr. Niemi, the delay resulted in large part from the insistence of the U.S. Attorney's Office in Florida that they not contact anyone related to the matter while the Burgess investigation was in progress.  Mr. Niemi testified that he was hopeful that the government would pursue Mr. Lasshofer, just as it was pursuing Mr. Burgess, but that these hopes were finally dashed when a government attorney told him that the government was "not in the business of chasing millions on behalf of millionaires."

Plaintiffs assert 17 claims for relief.  The first four counts assert violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d).  The fifth through eighth counts assert violations of the Colorado Organized Crime and Control Act ("COCCA"), C.R.S. § 18-17-104(3).  The remaining counts assert claims based upon civil conspiracy, conversion, state statutory rights in stolen property, common law fraud, negligent misrepresentation, breach of contract, unjust enrichment, and an accounting.

### CONCLUSIONS OF LAW (including additional Findings of Fact)

When asked during the hearing to indicate what relief they were seeking by way of a preliminary injunction, plaintiffs through counsel indicated that they want an order requiring the Lasshofer/Innovatis defendants to repatriate $150 million, apparently meaning to transfer $150

million to a trust located in Colorado; to freeze these defendants' assets; and to order an accounting. Plaintiffs allowed as how the defendants could be permitted to have funds necessary to operate their business, but no one provided any information about what that would require. Plaintiffs are limited by the fact that no disclosures have been made, and no discovery has been obtained. Defendants volunteered nothing about their financial status beyond counsel's proclamation that the plaintiffs' actions have already "seriously harmed the Innovatis Defendants." [#21 at 4]. Similarly, no information was provided regarding plaintiffs ability to post a bond if such extraordinary relief were granted on more than the temporary basis reflected in the temporary restraining order.

Providing a temporary restraining order of the breadth requested and largely granted in this case, based upon a verified complaint, is one thing. As discussed below, there is little question but that the plaintiffs have been defrauded of $2,180,000. There is also little question that the plaintiffs have sustained losses, perhaps crippling losses, well in excess of that amount. The Court was (and is) satisfied that the Lasshofer defendants played a major role in the debacle. Based upon what was presented in plaintiffs' initial package of filings, I was willing temporarily to try to freeze assets in order to preserve the status quo until both parties had the opportunity to be heard.

The issuance of a preliminary injunction is a different matter. The defendants have challenged the Court's authority to issue any injunctive relief, let alone the relief plaintiffs seek. They have raised legitimate issues, to which I now turn.

### The Court's Authority to Issue a Preliminary Injunction

Relying heavily on *Grupo Mexicano de Desarrollo, S.A.,* 527 U.S. 308 (1999), defendants argue that the Court has no authority to issue a preliminary injunction freezing assets

in advance of plaintiffs' obtaining a judgment on the merits.  I disagree, but it requires some explanation.

The question presented in *Grupo* in the Court's words was "whether, in an action for money damages, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed." *Grupo,* 527 U.S. at 310.  The majority answered that question "no."  Plaintiffs do in effect claim an equitable interest in the $2,180,000 that they paid and have not been reimbursed.  That is the essence of their unjust enrichment claim.  However, *Grupo* assuredly does not authorize an assets freeze beyond those funds.

Significantly, however, *Grupo* was decided as a matter of federal law.  In fact, in a footnote, the Court noted that the petitioners had argued for the first time before the Supreme Court that the availability of an injunction should not be determined under Federal Rule 65 but should instead be determined by the law of the forum state.  *Id.* at 319 n.3.  The Court declined to consider the argument, because it was neither raised nor considered below.

In the present case, however, plaintiffs have sought injunctive relief under state law, specifically COCCA, as they may do.  *See* Fed. R. Civ. P. 64.  Another judge of this Court, and ultimately the Tenth Circuit Court of Appeals, had occasion to consider the issue presented here in *Federal Deposit Insurance Corporation v. Antonio,* 843 F.2d 1311 (10th Cir. 1988).  The case arose from an alleged scheme to defraud a bank.  As here, the plaintiff brought claims under RICO, COCCA and various common law theories.  As here, plaintiffs sought treble damages and attorney's fees.  Similarly to the present case, the plaintiffs were concerned about dissipation of assets prior to a judgment and sought a preliminary injunction requiring the defendants to account for their assets and to refrain from dissipating or disposing of any assets.  The trial court

entered the injunction.  The injunction was not limited to assets traceable to the unlawful conduct.

In analyzing a court's authority to freeze assets, particularly assets not traceable to the unlawful conduct, both the trial and appellate courts relied on Colorado law, again specifically COCCA.  The circuit expressly did not consider "the injunction's validity under traditional equitable doctrines or under RICO."  *Antonio,* 843 F.2d at 1313.  It recognized that "[i]n many respects the provisions of COCCA parallel those of the federal RICO statute.  But the language relating to pretrial injunctive relief is broader in COCCA than in RICO."  *Ibid.*

The trial court noted that, if found liable, defendants would have to reach into assets that might not be traceable to the unlawful conduct to pay damages, particularly treble damages.  However, "[t]o uphold the integrity of this remedy, courts may need to ensure the postjudgment availability of assets not related to the illegal conduct."  *Antonio,* 843 F.2d at 1313.  Noting defendants' argument that the injunction offended traditional equitable principles as applied in the federal courts, the court stated, "Mosko's resort to federal law is irrelevant, however, since Fed. R. Civ. P. 64 requires us to look exclusively to state law in shaping this particular remedy."  *Id.* at 1314.

*Antonio* is pre-*Grupo,* but it is not inconsistent with *Grupo.*  Judge Babcock of this Court cited *Antonio* in the course of shaping a preliminary injunction that froze a defendant's assets in a post-*Grupo* case, *National Union Fire Ins. Co. v. Kozeny,* 115 F. Supp. 3d 1231, 1239-42 (D. Colo. 2000)(also relying on COCCA).  Defendants cite two orders issued by my colleague Judge Blackburn.  *In re Quest Communications International, Inc. Securities Litigation,* 243 F. Supp. 2d 1179 (D. Colo. 2003); and *S.E.C. v. Universal Consulting Resources, LLC,* 2010 WL

4873733 (D. Colo. Nov. 23, 2010).  I do not find either case to be inconsistent with *Antonio*.

Both cases were decided under federal law.

The Court concludes that it does have the authority to issue an injunction of the type

requested.  The questions remaining are (1) whether the plaintiffs have established their

entitlement to an injunction, and (2) if so, what is the proper scope of the injunction.

### Plaintiffs' Entitlement to a Preliminary Injunction

Injunctive relief is available for violations of COCCA:

> Any aggrieved person may institute a proceeding under subsection (1) of this
> section.  In such proceeding, relief shall be granted in conformity with the
> principles that govern the granting of injunctive relief from threatened loss or
> damage in other civil cases; except that no showing of special or irreparable
> damage to the person shall have to be made.  Upon the execution of proper bond
> against damages of an injunction improvidently granted and a showing of
> immediate danger of significant loss or damage, a temporary restraining order and
> a preliminary injunction may be issued in any such action before a final
> determination on the merits.

C.R.S. § 18-17-106(6).

Accordingly, entitlement to a preliminary injunction in this case will be considered under

the principles that govern the granting of such relief in other civil cases under Colorado law,

except as modified by COCCA concerning irreparable harm, specifically:

> (1) a reasonable probability of success on the merits; (2) a danger of real,
> immediate, and irreparable injury which may be prevented by injunctive relief; (3)
> that there is no plain, speedy, and adequate remedy at law; (4) that the granting of
> a preliminary injunction will not disserve the public interest; (5) that the balance
> of the equities favors the injunction; and (6) that the injunction will preserve the
> status quo pending a trial on the merits.

*Rathke v. MacFarlane,* 648 P.2d 648, 653-54 (Colo. 1982)(citations omitted).

1.   <u>Reasonable Probability of Success on the Merits</u>.

One must remember that plaintiffs paid $180,000 as a loan origination fee for a loan that was not extended due to no fault on plaintiffs' part.  They paid $2,000,000 for what amounted to a "security deposit" that was not returned.  They apparently sustained substantial additional losses.  Even the Lasshofer defendants accuse Mr. Burgess of being a "con man."  The question is the degree of involvement that Mr. Lasshofer and his entities had in what appears to be fraud.  The evidence has not been fully developed, but based upon the initial indications coming almost entirely from the plaintiffs' side it appears to the Court that the Lasshofer defendants probably have exposure, perhaps substantial exposure.

In specific reference to COCCA, plaintiffs must prove that these defendants are (1) "persons" (2) who knowingly participated, directly or indirectly in an "enterprise" (3) through a "pattern" (4) of "racketeering activity."  C.R.S. § 18-17-104(3).  There is no question but that these defendants are "persons" within the meaning of C.R.S. § 18-17-103(4).

An "enterprise" is "any individual . . . corporation . . . or other legal entity or . . . association, or group of individuals, associated in fact although not a legal entity, and shall include illicit as well as licit enterprises."  C.R.S. 18-17-103(2).  The Court finds that there is a reasonable probability that a jury would determine that the Innovatis defendants, in association with Mr. Burgess and related entities, constituted an "enterprise," e.g., an enterprise operated for the purpose of wrongfully inducing plaintiffs and others (such as Plymouth Rock Studios, *see* Complaint ¶¶56-61) to enter into or to continue in fraudulent loan agreements or wrongfully to retain funds advanced in the expectation of receiving promised loan proceeds.

A "pattern" involves two or more acts, sometimes called "predicate acts," of racketeering activity.  C.R.S. § 18-17-103(3).  "Racketeering activity" means "to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate to commit" conduct that, among other things, is defined as racketeering activity under RICO.  The enterprise operated via telephone, mail and email.  The Court finds that there is a reasonable probability that the Lasshofer defendants will be found to have participated in two or more predicate acts of mail fraud, wire fraud and/or money laundering.

Therefore, the Court finds that plaintiffs have established a reasonable likelihood of success on the merits.

2.   <u>Danger of Real, Immediate, and Irreparable Injury</u>.

COCCA does not require a showing of irreparable injury in order to obtain a preliminary injunction.  *See,* however, the discussion below regarding whether plaintiffs have an adequate remedy at law.

3.   <u>No Plain, Speedy, and Adequate Remedy at Law</u>.

COCCA requires a showing of "immediate danger of significant loss or damage." Plaintiffs contend that without injunctive relief the Lasshofer defendants will secrete or otherwise place their assets beyond the reach of plaintiffs and the Court.  To some extent the nature and extent of the allegedly fraudulent conduct, including the facts that a "co-conspirator" has been convicted and imprisoned and that the Innovatis defendants themselves have had assets forfeited and have agreed to a multimillion dollar settlement, tend to support the contention that plaintiffs' concerns are not unreasonable.  Beyond that, however, there is evidence that Mr. Lasshofer or others associated with the Innovatis Group used and then refused to return the $2,180,000 paid by the plaintiff.  At least $2 million of those funds should have been held in

trust, and all of the funds should have been returned when it became obvious that the loan would not be funded.  Given the totality of circumstances, the Court finds that there is imminent danger of significant loss or damage within the meaning of COCCA, and that plaintiffs do not have an adequate remedy at law.

4.  Public Interest.

There is a public interest in providing victims of fraudulent activity with adequate redress, including injunctive relief, and in preventing dissipation of assets.  As indicated above, defense counsel has suggested that Mr. Lasshofer's "assets" include monies belonging to innocent third party investors.  The Court has no desire to harm innocent third parties, if there are any, but does not have evidence that an order such as that crafted today will do so.  Another element of the "public" consists of other victims of the Lasshofer defendants' misconduct.  The Court does not wish to discriminate in favor of the plaintiffs to the detriment of other victims and will not knowingly do so.  Overall, the Court finds that the public interest is better served by taking prudent and appropriate steps to avoid making a judgment, if obtained, meaningless.

5.  Balance of the Equities.

The equities vis-à-vis other potentially affected portions of the public were addressed above.  With respect to equities favoring the Lasshofer defendants, the Court does not wish to prevent them from carrying on legitimate business, nor does the Court wish to deprive Mr. Lasshofer or his employees from being able to pay reasonable and necessary living expenses. The problem the Court faces is that, in part due to defendants' failure to present evidence on their own behalf, the Court must make decisions somewhat "in the blind."  What the Court does know is that the plaintiffs have been devastated by their losses on the Fairmont Breckenridge project. One need only observe Mr. Niemi's demeanor on the stand and in the courtroom to know the

heavy weight he is bearing, not only from his personal losses but from the debt, monetary and moral, he owes to those whom he invited to invest in the project.  The Court finds that the balance of the equities favors the entry of a properly tailored injunction.

      6.   Preservation of the Status Quo.

This, of course, is the point of the injunction.  If there is a judgment, and the potential is for a substantial judgment in the circumstances, the Court wishes to preserve whatever ability the plaintiffs had before entry of the temporary restraining order and preliminary injunction to collect the judgment.  The Court will attempt to structure injunctive relief to that end.

**Scope of the Injunction**

1.   The Court orders that the Lasshofer defendants "repatriate," i.e., place and maintain in escrow within the State of Colorado, the sum of $2,180,000.  These funds may be deposited either in a federally insured financial institution or in defense counsel's trust account or in the registry of the Court.  The funds may be invested only in safe securities substantially equivalent to United States treasury bonds.  To the extent that interest accrues on such funds, the interest will inure to the benefit of the Lasshofer defendants.

2.   The Court enjoins the Lasshofer defendants from removing any funds from Credit Suisse Bank Account No. 0835-1128069-12 except as indicated below.

3.   The foregoing injunction does not apply to payments to fraud victims as a part of the purported $3,000,000 Florida settlement.

4.   With respect to payment of funds out of the Credit Suisse account to the United States, if the Florida court has approved the entire settlement, or if the Florida court orders that those funds may be disbursed to the United States, this Court will defer to such orders.  Otherwise,

absent more information on the fairness of making payments from funds said to be derived from fraud to what appears to be a non-victim, the Court enjoins such distribution.

5.   The Court enjoins the Lasshofer defendants from transferring, selling, assigning, dissipating, concealing, encumbering, impairing or otherwise disposing of any other assets except as is necessary to pay reasonable and ordinary business expenses (including necessary and reasonable attorney's fees) and to provide for reasonable and ordinary living expenses for Mr. Lasshofer and Innovatis Group employees.

6.   The Court is inclined to appoint a special master to oversee and authorize disbursements of defendants' assets, akin to the procedure approved by the court in *FDIC v. Antonio,* for the purpose of providing some assurance to both parties and to the Court that assets are not being, and have not been, improperly transferred, etc., as per paragraph 5.  A special master might also have a role in overseeing disclosure and discovery of financial information. However, the Court requests that within seven days counsel, after conferring either in person or by telephone, indicate their position on whether a special master is necessary and appropriate, and if so, recommendations regarding potential appointees and payment of the special master's fees and expenses.  The Court expects, of course, full and complete compliance by the Lasshofer defendants with paragraph 5 above, with or without a special master, including during the interim before the appointment of a special master if one is to be appointed.

7.   As a condition of this injunctive relief, the Court orders plaintiffs to post a bond in the amount of $2,010,000.  The $10,000 cash bond presently on file with the Court shall remain in place.  Plaintiffs may satisfy the balance by placing in the registry of the Court a fully executed assignment of the plaintiffs' rights to the first $2,000,000 of whatever judgment on the merits might be obtained in this case, to be used as an offset only in the event that it is determined in the

future that injunctive relief improvidently obtained by the plaintiffs has caused measurable economic injury to the Lasshofer defendants.  The Court finds that the likelihood that plaintiffs will obtain a judgment against the Lasshofer defendants for the return of some or all of the $2,180,000 wrongfully withheld is high, and that structuring a bond in this manner provides good and sufficient security.

8.  The Court will consider further equitable relief if it becomes necessary and appropriate in light of the parties' and the Court's experience in terms of compliance with these orders and cooperation in the disclosure of relevant financial information.

DATED this 1st day of June, 2012.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge