# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 12-CV-869-RBJ

JOHN NIEMI,
ROBERT NAEGELE, III, and
JESPER PARNEVIK,

      Plaintiffs,

v.

MICHAEL FRANK BURGESS,
ERWIN LASSHOFER,
INNOVATIS GMBH,
INNOVATIS IMMOBILIEN GMBH,
INNOVATIS ASSET MANAGEMENT
SA,
LEXINGTON CAPITAL & PROPERTY
INVESTMENTS, LLC, and
BARRY FUNT,

      Defendants,

CREDIT SUISSE A.G.,

      Nominal Defendant.

_____

## AMENDED COMPLAINT

_____

    Plaintiffs John Niemi, Robert Naegele, III, and Jesper Parnevik, for their

Complaint and claim for relief against Defendants Michael Frank Burgess, Innovatis

GmbH, Innovatis Immobilien GmbH, Erwin Lasshofer, Lexington Capital & Property

Investments, LLC, and Barry Funt, and Nominal Defendant Credit Suisse A.G., state and allege as follows:

## INTRODUCTION

1.      This case arises from the unlawful operations of Prosperity International, LLC ("Prosperity"), a formerly ongoing interstate and international racketeering enterprise which fraudulently induced borrowers, including Plaintiffs, to make payments to certain of the Defendants. These payments were ostensibly to fund underwriting, to pay commitment fees, or to provide upfront collateral for loans for large developments, but the Defendants never intended to make the loans, and the payments actually enriched Defendants alone and maintained the unlawful operations of their racketeering enterprise.

2.      Prosperity operated as a Florida Limited Liability Company, incorporated and managed by Defendant Michael Frank Burgess. On May 4, 2011, Burgess pleaded guilty to Conspiracy to Commit Wire Fraud and Money Laundering for conduct undertaken in his capacity as manager of Prosperity. Plaintiffs John Niemi, Robert Naegele, III, and Jesper Parnevik were among Burgess's victims. On September 23, 2011, while attempting to flee the country before his sentencing hearing, Burgess was apprehended by the US Secret Service. He was ordered to pay more than $94,000,000 in restitution and sentenced to a prison term of 180-months—the maximum penalty for his crimes.

2

3.      The unnamed co-conspirators in the federal criminal indictment of Burgess are former-Prosperity affiliates Erwin Lasshofer and his companies Innovatis GmbH, Innovatis Immobilien GmbH, and Innovatis Asset Management SA (collectively, "Innovatis"), each named as a defendant herein. Burgess admitted at his sentencing hearing that he committed the crimes in concert with Lasshofer and his companies. Burgess and Lasshofer were business partners and shared assets. On August 11, 2011, the federal judge presiding over Burgess's criminal case issued a Preliminary Order of Forfeiture against the Credit Suisse bank account of Innovatis Asset Management S.A.

4.      As agents for Prosperity, Defendants Lexington Capital & Property Investments, LLC ("Lexington"), and Barry Funt, founder and managing member of Essex Investment Partners, LLC ("Essex"), were also parties to Prosperity's racketeering enterprise. Working in concert with Burgess, Lasshofer, and the Innovatis entities, they wrongfully induced borrowers including Plaintiffs to enter into fraudulent loan agreements with Prosperity, and to make payments in pursuit of or pursuant to those loan agreements.

## THE PARTIES

5.      Plaintiff John Niemi is an individual domiciled in the State of Colorado. He is a self-employed, award-winning real estate developer specializing in luxury residential developments. In 2006, Niemi began working in affiliation

3

with Fairmont Hotels and Resorts on a large-scale development project in Breckenridge, Colorado, which came to be known as the Fairmont Breckenridge. The Fairmont Breckenridge was a joint-venture of Niemi, Plaintiff Naegele, and Plaintiff Parnevik. In conducting the business of the joint-venture, Niemi acted an agent for Naegele and Parnevik. Detailed plans for the formerly viable project appear on the Fairmont Breckenridge website, located at http://fairmontbreckenridge.com/.

6.      Plaintiff Robert Naegele, III is an individual domiciled in the State of Colorado. He is an entrepreneur, investor, and philanthropist, and a longtime investor in Niemi's real estate development projects. Naegele was a joint-venturer in the Fairmont Breckenridge. In conducting the business of the joint-venture, Niemi acted as Naegele's agent.

7.      Plaintiff Jesper Parnevik is a Swedish national with a home in the State of Florida. He is a professional golfer and businessman. Parnevik was a joint-venturer in the Fairmont Breckenridge. In conducting the business of the joint-venture, Niemi acted as Parnevik's agent.

8.      Defendant Michael Frank Burgess is an individual in the custody of the United States Government, having been sentenced on November 23, 2011 to 180 months in federal prison for Conspiracy to Commit Wire Fraud and Money Laundering. Plaintiffs were among Burgess's victims, and this lawsuit arises, in

4

part, from Burgess's crimes. Burgess was the manager of Prosperity International LLC ("Prosperity"), a now-dissolved Orlando-based Florida Limited Liability Company that purported to "utilize more than 100 years of combined experience to deliver the absolute best in real estate development and project financing solutions." Prosperity maintained a website from December 2006 until July 2010 at www.prosperity-international.com. Burgess was also the Secretary of Innovatis, Inc., a now-dissolved Orlando-based Florida corporation and former-member of the Innovatis Group.

9.      Defendant Erwin Lasshofer is an individual domiciled in Salzburg, Austria. Lasshofer is the managing director and sole beneficial owner of Defendants Innovatis GmbH and Innovatis Immobilien GmbH, both affiliated members of the Innovatis Group and both registered at the same address in Salzburg, Austria. Lasshofer is also a co-founder and board member of Defendant Innovatis Asset Management SA, a Panamanian member of the Innovatis Group. Before dissolving US-Innovatis-Group-member Innovatis, Inc., Lasshofer was the company's President.

10.      Defendants Innovatis GmbH, Innovatis Immobilien GmbH, and Innovatis Asset Management SA (collectively, "Innovatis") are members of the Innovatis Group, a collection of affiliated entities from around the world purporting to provide asset management and consulting services. Both Innovatis

5

GmbH and Innovatis Immobilien GmbH are wholly-owned and managed by
Lasshofer, and are located at Aigner Strasse 4a, 5020, Salzburg, Austria. Innovatis
Asset Management SA was co-founded by Lasshofer, who now sits on its Board
of Directors. Innovatis Asset Management SA is based in Marbella, Panama. For
more than four years, the Innovatis Group had a U.S. member—Innovatis, Inc.,
formerly a Florida corporation. Innovatis, Inc. operated from an office in Orlando,
Florida, approximately five minutes from Prosperity's office. Lasshofer was the
President of Innovatis, Inc. and Burgess was the Secretary. Following Burgess's
arrest in the summer of 2010, Lasshofer filed Articles of Dissolution for Innovatis,
Inc. with the Florida Secretary of State. The Innovatis Group maintains a website
at www.innovatis-organization.com. A flashing banner on the Innovatis Group
homepage reads, "We offer Innovatis products and investment solutions with a
high level of security for our clients." For a period ranging from at least as early as
February 2009 until April 2010, Prosperity was listed as a "Partner" on the
Innovatis website.

11.     Defendant Lexington Capital & Property Investments, LLC
("Lexington") is a Kentucky Limited Liability Company with its principal place of
business in Lexington, Kentucky. Lexington represented itself as the exclusive
underwriter for Prosperity, and purported to underwrite the Fairmont Breckenridge
development project for a Prosperity loan.

12.     Lexington incorporated in Florida as a Foreign Limited Liability Company in January 2006, but fell out of current status in September 2009. Shortly thereafter, Lexington began operating as Argentum Capital International, LLC ("Argentum"). Argentum was incorporated in Florida on December 29, 2008 and dissolved following Burgess's arrest, just days after the dissolution of Innovatis, Inc. Argentum had the same employees as Lexington and operated out of the same office as Lexington, in Naples, Florida. In company documents, Lexington referred to Argentum as an "affiliated partner and representative" of Lexington.

13.     Defendant Barry Funt is an individual domiciled in the State of New Jersey. He was a founder, registered agent, member, principal, manager, and President of Essex Investment Partners, LLC ("Essex"), a New Jersey Limited Liability Corporation with its principal place of business located at Funt's residence, 6 Post Lane, Livingston, New Jersey 07039. Essex was an alter ego of Funt. Essex purported to work as the exclusive loan administrator and escrow agent for Prosperity on a number of projects, including the Fairmont Breckenridge. Funt cancelled Essex's corporate status shortly after Burgess entered into a plea agreement in the above-mentioned criminal case.

14.     Nominal Defendant Credit Suisse A.G. ("Credit Suisse") is a financial services company headquartered at Paradeplatz 8 ZEURICH 8070

Switzerland (Zurich, Switzerland). The Lasshofer Defendants have at least twelve

bank accounts at Credit Suisse (together, "Lasshofer Credit Suisse Accounts"),

including Innovatis Asset Management S.A. account number 0835-1128069-12.

Millions of dollars of fraud proceeds, including funds wrongfully appropriated

from Plaintiffs, have been deposited into the Lasshofer Credit Suisse Accounts by

or at the instruction of the Defendants.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§

1331, 1332,and 1367.

16.     This Court has personal jurisdiction over Defendants because

Defendants' racketeering activities were purposefully directed at Colorado

resident Niemi and his Colorado real estate development project, and because

Plaintiffs' injuries arose in Colorado as a foreseeable consequence of Defendants'

racketeering activities.

17.     This Court has personal jurisdiction over Nominal Defendant Credit

Suisse because Credit Suisse had sufficient minimum contacts with Colorado.

Credit Suisse employees set up Credit Suisse Safekeeping account number

1128069-15-3 ("Safekeeping Account"), a subaccount of Innovatis Asset

Management S.A. account number 0835-1128069-12. The Safekeeping Account

was held in the name, and for the benefit, of Niemi's Colorado business, Mesa

8

Homes. Credit Suisse employees subsequently provided Colorado resident Niemi with documentation regarding the Safekeeping Account.

18.     Venue is proper in the United States District Court, District of Colorado, pursuant to U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the District of Colorado, and because the real estate development project upon which this action is based is located entirely within the District of Colorado.

## FACTUAL ALLEGATIONS

19.     In late 2006, Niemi used a combination of $42,000,000 in debt and equity to purchase two properties in Breckenridge, Colorado to be developed in affiliation with Fairmont Hotels and Resorts. One of the properties was located along the Blue River shoreline (the "River property"), and the other was located on the mountainside in the Shock Hill neighborhood (the "Shock Hill property") (together, the "Fairmont Breckenridge").

20.     All land acquisition and development loans were personally guaranteed by Niemi.

21.     Phase I of development began in late 2006 and lasted nearly three years.

80160-0001/LEGAL24249937.1

22.     During Phase I, Niemi incurred expenses in excess of $24,000,000 for planning, architecture, design, entitlement, infrastructure, marketing, sales and initial vertical construction costs.

23.     All Phase I loans were personally guaranteed by Niemi.

24.     Every home completed on the River property was sold before the end of Phase I, and more closings were scheduled on homes not yet built.

25.     These sales, combined with fully executed contracts and reservations for condominium units at Shock Hill, generated approximately $80,000,000 in committed cash revenue.

26.     In the spring of 2008, after just two years under development, the appraised value of the Fairmont Breckenridge had increased by more than 40%, to approximately $60,000,000.

27.     The same 2008 appraisal estimated that upon completion, the future market value of the Fairmont Breckenridge in fee simple (that is, land only and without an estimation of the revenue stream from operations) would approach $200,000,000.

28.     As the Fairmont Breckenridge neared the end of Phase I, Niemi was in compliance with the terms of all of the existing loans and he had prepaid interest in place.

29.     In outstanding financial condition and with promising property appraisals in hand, Niemi began the customary process of working to secure consolidated Phase II construction financing in the spring of 2009.

30.     Based on the success of Phase I, Niemi set out to obtain financing in an amount sufficient to repay all Phase I loans and to fund all work required to complete the Fairmont Breckenridge. He determined that amount to be between $200,000,000 and $220,000,000.

31.     In consultation with his Phase I lenders, Niemi engaged in active discussions with various financing sources, including The Private Bank, Corus Bank, Wells Fargo, Pacific National, Silverleaf Financial, IMH Financial and M & I Bank, among others. These entities were considering funding either the River property project to completion or the Shock Hill property project to completion, but not both. To proceed with this group of entities, Niemi would need to work with two different lenders.

32.     All of these discussions were put on hold when Niemi was introduced to Prosperity in June 2009.

33.     Unlike the other financing sources Niemi was considering, Prosperity represented that in conjunction with its partner company Innovatis, it had the ability to provide financing sufficient to satisfy all Phase I loans and to fund the completion of the entire Fairmont Breckenridge project with a single,

11

consolidated construction and take-out loan. Such a financing arrangement provided financial, administrative, and other benefits.

34.     Based on these representations, Niemi focused his efforts on securing Phase II funding from Prosperity and Innovatis.

35.     Over the next several months, Burgess and Lasshofer each repeatedly represented that Prosperity and Innovatis were willing, able, and intending to fund the Phase II loan.

36.     But neither Burgess nor Lasshofer ever actually intended that Prosperity and Innovatis would fund the completion of the Fairmont Breckenridge.

37.     Instead, Burgess, Lasshofer and Innovatis engaged in an elaborate scheme designed to defraud Plaintiffs out of millions of dollars, and they enlisted the help of other Defendants to successfully carry out their plan.

**A.      In return for payments from Prosperity, Lexington and Essex defrauded Plaintiffs into believing that Prosperity and Innovatis were legitimate lenders.**

38.     As part of the scheme, Burgess subjected Niemi and the Fairmont Breckenridge to what seemed to be a rigorous underwriting and loan application process. To do this, he enlisted the help of Lexington (a.k.a. Argentum) and Essex/Funt. This charade was intended to trick Niemi into believing that Prosperity was a legitimate lender.

39.     Representing itself as the "exclusive underwriter[ ] for Private Equity Fund[ ] Prosperity International, part of the Innovatis Group of

12

Companies," Lexington purported to undertake extensive due diligence on the Fairmont Breckenridge project.

40.     Before starting these due diligence efforts, Lexington required Niemi to sign a Confidentiality, Non-Disclosure and Non-Circumvention Agreement prohibiting Niemi from further pursuing alternative lending opportunities.

41.     From mid-June to mid-August 2009, Lexington purported to meticulously assess the eligibility of the Fairmont Breckenridge project for a Prosperity loan and required Niemi to submit a detailed project financing application, financial models including a project budget, cash-flow analysis, and exit strategy, an appraisal and feasibility study, site plans, building permits, business plans, an environmental study, and other documents. All told, Niemi submitted more than 1,000 pages for Lexington's use and analysis on Prosperity's and Innovatis's behalf.

42.     At Burgess's direction, representatives from Lexington traveled to Denver and spent an entire day with Niemi discussing the project, and also spent countless additional hours with Niemi's employees over the phone and by email, reviewing and cross-checking financial data and other information.

43.     Emails were sent from Niemi or his employees to Lexington almost daily to tweak pro formas and perfect other minutia on the pretense that such precision was required by Prosperity and its partner, Innovatis.

13

44.     Of the roughly one dozen underwriting processes Niemi had participated in to obtain project funding, Lexington's was the most rigorous review of a real estate development project Niemi had ever experienced.

45.     This rigor leant an air of legitimacy to Prosperity as a lender for large-scale projects.

46.     By a letter dated August 17, 2009, Nick Crane of Lexington informed Niemi that "based on the preliminary due diligence," Prosperity had a "great interest in funding [the] project."

47.     Explaining the post-diligence underwriting process, Crane indicated that the next step in the financing approval process involved working with Prosperity's loan administrator, Essex, to negotiate the terms of a project loan request. Upon receipt of that request, Crane explained, Prosperity would respond with a Commitment Letter provisionally promising to fund the Fairmont Breckenridge to completion.

48.     In an email sent on August 4, 2009 at 10:02 pm, Crane informed Niemi that he could not obtain lender references or otherwise "look up [Prosperity]'s skirt" until after the issuance of a Commitment Letter, but advised Niemi to "please keep in mind that [Prosperity's underwriting protocol] is a structured and proven process."

14

49.     To satisfy Niemi's requests for confirmation of Prosperity's legitimacy and ability to fund the Phase II Fairmont Breckenridge loan, Crane directed Niemi to Reuters, explaining, "What I can do in [the] place [of providing references] is give you the ISIN id #'s for Bloomberg and Reuters, to look up the lender – Innovatis ... A company goes through a rigorous investigation prior to being issued these ID's."

50.     Over the next month, Niemi and Essex exchanged several drafts of a project loan request, with Lexington's assistance.

51.     Niemi and his employees and contractors had numerous telephone conversations with Essex managing member Barry Funt regarding project budgets, construction management oversight, the loan-funding process, monthly draw procedures, and escrow-account details.

52.     During at least one of these conversations, Funt referenced other projects he worked on with Prosperity.

53.     News archives confirm that in late 2007 and early 2008, Funt worked with Prosperity to purportedly craft a loan for the construction of a theme park in Memphis, Tennessee.

54.     In a January 25, 2008 article in the Memphis Daily News, Funt assured readers that Prosperity would weather the then-impending economic

storm. He explained, "Prosperity is a private company. ... They have really no exposure to subprime or the other stuff you hear about."

55.     It is now known that Funt has never worked with Prosperity on a real estate development project that Prosperity actually funded.

56.     Speaking in his capacity as Prosperity's agent, and purporting to speak from experience, Funt, repeatedly represented to Niemi that Prosperity and Innovatis were legitimate lenders.

57.     At the same time, Lexington was also taking measures to reassure Niemi of the legitimacy of Prosperity and Innovatis.

58.     In early fall 2009, Lexington introduced Niemi to references for Prosperity and Innovatis, including the Chief Financial Officer of Plymouth Rock Studios.

59.     Like Niemi, Plymouth Rock Studios was in the process of being underwritten for a Prosperity loan for hundreds of millions of dollars.

60.     Lexington arranged a call between Niemi's lawyer, Scott Duval, and counsel for Plymouth Rock Studios, who represented that his law firm had conducted standard due diligence and that he believed Prosperity and Innovatis were legitimate lenders.

61.     It has since been established in federal judicial proceedings that, like Niemi, Plymouth Rock Studios was defrauded out of millions of dollars in a scheme devised and executed by certain of the Defendants.

62.     Specifically, in his 2011 plea agreement, Burgess admitted that among the dozens of wire transfers made pursuant to and in furtherance of the criminal conspiracy to which he pleaded guilty, was a $3,500,000 transfer from Plymouth Rock Studios to the Innovatis Asset Management S.A. account number 0835-1128069-12 at Credit Suisse.

63.     Burgess acknowledged in 2011 that following the transfer, Plymouth Rock Studios demanded (without success) that its funds be returned. On at least one occasion, representatives for Plymouth Rock Studios spoke with Lasshofer himself in this regard.

64.     In late September 2009, Niemi, after repeated assurances from Lexington, Essex, and others of the legitimacy of Prosperity and Innovatis, authorized a formal request, on Essex letterhead for a $220,000,000 construction loan, which was submitted to Prosperity by Lexington.

65.     Burgess insisted that the loan request include a provision requiring Niemi to pay Prosperity a $180,000 loan commitment fee, ostensibly to fund the completion of the underwriting process.

66.     Burgess also required that the loan request contain a confidentiality clause prohibiting Niemi from discussing any aspect of the Fairmont Breckenridge project with any other potential lenders.

67.     Prosperity accepted the terms of the funding request and issued its Commitment Letter on September 25, 2009.

68.     Niemi, in turn, wired Prosperity's $180,000 commitment fee to an Essex account at JP Morgan on October 5, 2009.

69.     Lexington and Essex were paid by Prosperity from the proceeds of this interstate wire transfer.

**B.     With the help of Lasshofer and Innovatis, and to their mutual benefit, Burgess defrauded Plaintiffs out of $2,000,000 and locked Niemi into a contract that cost Plaintiffs the Fairmont Breckenridge.**

70.     Upon Prosperity's receipt of the commitment fee, Prosperity's lawyers began working with Niemi's lawyer, Scott Duval, to draft and finalize the Phase II loan documents.

71.     At that time, Burgess became more involved in day-to-day communications with Niemi, relying less on Lexington and Essex as intermediaries.

72.     In these early communications with Niemi, Burgess indicated that loan disbursements could begin as early as November 10, 2009.

73.     Niemi understood that among the terms of the Prosperity loan agreement would be a requirement that he make a large upfront payment to Innovatis before the disbursement of any loan proceeds.

74.     Accordingly, Niemi informed his existing lenders that he had received a stand-alone construction commitment that required a large upfront fee, and that this fee would exhaust his existing operating capital.

75.     After reviewing the Prosperity loan commitment documents, Niemi's Phase I lenders agreed to forgo interest payments pending funding of the Phase II loan. They negotiated a payment plan based on the funding schedule in Prosperity's commitment letter and Burgess's representations (repeated by Niemi) that loan disbursements would begin in November 2009.

76.     But negotiations with Burgess stalled, under the now-apparent-pretense of how the loan funding would be secured and the amount of the upfront loan fee. It appeared to Niemi that disbursements would not begin in November 2009 as planned.

77.     On November 11, 2009 at 10:06 pm, Niemi sent Burgess an email stating that he had temporarily halted work on the Fairmont Breckenridge in order to devote himself to finding a mutually-agreeable arrangement for securing and facilitating the loan. He wrote, "This obviously has stalled my ability to keep the

19

project moving forward in the short term, but a comprehensive long term solution with Prosperity will ultimately be the best solution for the project."

78.     In a follow-up phone call between Burgess and Niemi, Burgess responded that Niemi should continue billable work with architects and contractors based on the Prosperity funding schedule in the as-yet-unexecuted loan agreement. Burgess assured Niemi that he and Lasshofer were committed to funding the loan and that the outstanding issues would be resolved in time for Niemi to meet the financial obligations of the Fairmont Breckenridge.

79.     As further confirmation that Prosperity would be able to finance the completion of the Fairmont Breckenridge once a final agreement was reached, Burgess forwarded Niemi's attorney Duval a letter sent to Burgess on November 20, 2009 at 5:32 am by Lasshofer's assistant, Christina Lener. The letter was signed by Lasshofer and dated November 19, 2009. In it, Lasshofer confirmed that Innovatis would make certain "Shamrock securities" valued in excess of $550,000,000 available to Prosperity to use as collateral for funding for various projects.

80.     According to the metadata for this November 19, 2009 letter, it was created at "Innovatis GmBH," the Salzburg-based Innovatis entity wholly owned and managed by Lasshofer.

20

81.     Additional documents confirming the existence and value of the Shamrock securities were subsequently sent to Niemi. Metadata for all of these documents indicates that they were created in Innovatis's Salzburg office.

82.     Throughout negotiations regarding how funding would be secured, Burgess repeatedly represented that he could not make any commitments without Lasshofer's approval.

83.     To address concerns Niemi had about the delay, Burgess and Niemi agreed to meet in person to confirm their near-agreement on the Phase II Fairmont Breckenridge loan. They met at the Jupiter Beach Resort & Spa in Jupiter, Florida on November 20, 2009, and celebrated the occasion with a round of golf and a dinner party at Parnevik's home.

84.     Negotiations continued following this in-person meeting, and with some urgency as Niemi had accrued financial obligations requiring immediate attention.

85.     In a series of emails on November 13, 2009, Burgess proposed that as security for a multimillion dollar upfront payment from Niemi on the Prosperity loan, Prosperity and Innovatis would arrange for $5,000,000 of Top Hedge Bonds held by Innovatis to be placed in the Credit Suisse Safekeeping Account accessible to Niemi in the event of default by Prosperity or Innovatis.

21

86.     Lasshofer requested that Niemi pay a nine-percent fee to Innovatis for providing the security of the Safekeeping Account.

87.     Though the parties had not yet agreed on this scenario, at Lasshofer's instruction, the Safekeeping Account was opened for Niemi at Credit Suisse. The Safekeeping Account was structured as a subaccount of Innovatis's Credit Suisse account, and bore account number 1128069-15-3.

88.     On November 24, 2009, Burgess arranged a conference call between himself, Niemi and Duval, and Jonathan Trounce, a bank officer in the International Wealth Management Group in Credit Suisse's Dubai office. On the call, the parties discussed the logistics of the proposed Safekeeping Account.

89.     Burgess sent Niemi an email at 3:01 pm on November 24, 2009 following the call with Trounce. In that email, Burgess rebuked Niemi for "br[inging] up the question of whether the bank had a [written] control agreement that could be looked at in the unlikely event of a default by Prosperity or Innovatis."

90.     Regarding the account, Lasshofer wrote to Burgess on December 18, 2009 at 5:57 am, "Please tell you[r] client that it is inconvenient enough to open accounts and close it again, and leaves a bad taste and we look like idiots. As you know we double-checked in [advance] if it is acceptable to him and we got the instruction to go ahead."

91.     In early December 2009, Niemi and Prosperity reached an agreement for a $220,000,000 Phase II construction and take-out loan, disbursements to begin on January 21, 2010.

92.     Specifically, they agreed that in return for a $2,000,000 upfront collateral deposit and thirteen consecutive monthly payments of $1,116,667 to be paid from loan proceeds, Prosperity would work with Innovatis to make the Shamrock securities held by Innovatis available for certain "wealth management and trading activities," the proceeds of which would fund the monthly Phase II loan disbursements. By the terms of the agreement, all payments from Niemi were to be wired to Innovatis Asset Management S.A. account number 0835-1128069-12 at Credit Suisse.

93.     Prosperity's lawyers facilitated the execution of a nearly 100-page Loan Agreement on December 7, 2009.

94.     The Loan Agreement identifies Niemi as Borrower and Guarantor, Prosperity as Lender, and Innovatis as Beneficiary.

95.     Niemi, Naegele, and Parnevik provided the capital for the $2,000,000 upfront collateral deposit.

96.     This was the last available operating capital for the project. Once those funds were transferred, Niemi was relying completely and exclusively on

Prosperity loan funds to pay Phase I lenders and project contractors. Each Defendant knew this.

97.     Niemi was originally instructed to wire the upfront collateral deposit to bank officer Trounce at Credit Suisse in Dubai for deposit in Innovatis's account.

98.     Those instructions came in a PDF sent on December 2, 2009 at 12:40 pm, which, according to its metadata, was created by Austria-based Innovatis employee Jean-Pierre Sorichilli.

99.     Due to logistical issues with international money transfers and Burgess's insistence that payment be made without delay, at Burgess's direction Niemi instead wired the funds to a Prosperity account at Chase Bank in Miami, Florida.

100.    On December 7, 2009, Niemi wired $750,000 to Prosperity's Miami, Florida account.

101.    On December 10, 2009, Niemi wired the remaining $1,250,000 to Prosperity's Miami Florida account.

102.    Burgess wired some or all of those funds to Innovatis Asset Management S.A. account number 0835-1128069-12 at Credit Suisse.

103.    Though the Loan Agreement required the funds to be held in escrow pending funding of the loan, Burgess and Lasshofer used the funds sent by Niemi

for, among other things, paying Lexington and Essex/Funt and otherwise advancing their wrongful scheme.

104.    On the morning of December 23, 2009, Niemi and Burgess had a lengthy telephone call during which they discussed the Fairmont Breckenridge construction schedule and a possible press release announcing the loan agreement with Prosperity.

105.    During the call, Burgess instructed Niemi to keep vendors and contractors working over the holidays and authorized Niemi to issue a press release.

106.    Memorializing this conversation, on December 23, 2009 at 2:48 pm, Niemi wrote to Burgess, "Since our call and with your blessing, I have been on the phone communicating with our vendors and contractors and have allowed them to move forward ... As such, they have committed to working over the holidays to ensure we keep on schedule ... Finally, I am drafting a release for the public and will run it by you for your approval."

107.    On January 6, 2010 at 9:38 pm, Burgess represented to Niemi in an email that the credit facility from which preliminary funding would be drawn was in place.

108.    On January 18, 2010, Duval submitted a formal funding request in accordance with the terms of the Loan Agreement, and Lexington—by then

25

operating as Argentum—sent Essex wiring instructions for the contractually scheduled January 21, 2010 loan payment.

109.    Despite having met every condition and fulfilling all of his obligations under the December 7, 2009 Loan Agreement, Niemi would never receive so much as a cent from Prosperity or Innovatis. As a consequence, Plaintiffs would lose the Fairmont Breckenridge and everything they had invested in it.

**C.    After Prosperity defaulted, Burgess and Lasshofer worked in partnership to preserve the fraudulent enterprise.**

110.    Over the next six months, Burgess sent dozens of emails explaining why the loan proceeds would not be delivered as scheduled and promising their imminent release. Burgess repeatedly represented in these emails that he spoke for himself and for Lasshofer and/or that he was passing on information Lasshofer had shared with him.

111.    Though Lasshofer made himself scarce and was often difficult to reach, his occasional communications with Niemi, along with communications from Lasshofer's office that were forwarded to Niemi, made it clear that Lasshofer was aware of the Fairmont Breckenridge and of Innovatis's obligations to Niemi under the Prosperity Loan Agreement.

112.    The first such email Burgess sent came on January 20, 2010 at 5:12 pm, the evening before funding was scheduled to commence. Burgess advised in

26

this email that the funding bank was "finaliz[ing] their compliance so as to allow the funds to be released for [Niemi's] use." He indicated that the funds would be available "within a day or two."

113.    On January 21, 2010, Funt of Essex told Niemi's attorney Duval that he had just spoken with Burgess who stated that Lasshofer was currently at the bank in Zurich trying to determine the trading schedule and timing for disbursements.

114.     Later that afternoon, Duval sent Prosperity a notice of default.

115.    Aware that unwinding the agreement with Prosperity would cost him millions of dollars and leave the Fairmont Breckenridge without Phase II funding to meet its immediate financial obligations, Niemi determined to stay the course, urging Burgess to expeditiously resolve whatever impediments there were to disbursement.

116.    Over the next several days, Burgess acknowledged the hardship caused to Niemi by the delay in funding, blamed Niemi for the delay, blamed Lasshofer's bank, Société Générale, for the delay, and expressed steadfast confidence that funding would commence shortly.

117.    For example, on January 27, 2010 at 12:46 pm, Burgess wrote to Niemi, "I continue to be extremely aware of the situation you are in and we are doing everything in our power to move this as fast as we can."

118.    In most of his communications with Niemi, Burgess used the pronoun "we," referring to himself and Lasshofer.

119.    On January 28, 2010 at 2:57 am, in response to an earlier email from Niemi requesting a firm date for the first disbursement, Burgess wrote, "You know John, if you had [ ] been able to provide us with a $55M instrument as was originally required we would have perhaps been a bit further along with the process."

120.    On January 29, 2010 at 9:30 am, Burgess wrote to Niemi about the status of the funding and the remaining steps required by Lasshofer's bank, Société Générale. He explained, "What is taking place is that the bank has completed their compliance and they are making arrangements for us to be able to utilize the funds."

121.    Niemi demanded the return of the $2,180,000 paid in pursuit of and pursuant to the Prosperity loan—monies to which he was entitled under the default provision of the December 7, 2009 Loan Agreement. Niemi believes that if he had been able to receive his money back, he could have made interest payments to his Phase I lenders for the next couple of years.

122.    But Burgess and Lasshofer refused to refund the money, and threatened to claim Niemi was in default (although there was no basis for such a claim).

123.     Meanwhile, Niemi's existing lenders became concerned by Prosperity's failure to make the January 21, 2010 payment. Having forgone interest so that Niemi could make the upfront payment to Prosperity, they were relying on the Phase II loan disbursement to be paid.

124.     Niemi and Prosperity and their respective attorneys began negotiating a loan modification agreement in the last days of January 2010.

125.     Meanwhile, Burgess continued to reassure Niemi that funding was imminent.

126.     Burgess told Niemi that to better understand the problem and see to its prompt resolution, he would travel to Europe to meet with Lasshofer and his bankers. He promised that he would not return to the United States until funding commenced.

127.     Unmoved by Burgess's promises, contractually bound by the Prosperity Loan Agreement not to work with other lenders to obtain alternative financing, without the time or money for a lawsuit, and in desperate need of funds to stave off creditors and keep the Fairmont Breckenridge afloat, Niemi decided to join Burgess on his trip.

128.     Niemi was under the impression that the trip would last a few days, and that he and Burgess would meet with Lasshofer and his banking contacts

immediately upon arrival to facilitate a resolution of whatever the obstacle was to funding the Phase II loan.

129.    Burgess and Niemi met in Zurich, Switzerland on Tuesday, February 2, 2010. They spent nearly a week in Zurich without meeting with anyone. Burgess made an excuse each day as to why there were no meetings, chief among them that Lasshofer was in Salzburg, Austria and was unable to travel to Zurich.

130.    On Saturday, February 6, 2010, over dinner with Burgess at their hotel in Zurich, Niemi demanded a meeting with Lasshofer.

131.    On Monday, February 8, 2010, Niemi and Burgess made the six-hour drive from Zurich to Salzburg to meet Lasshofer. Niemi and Burgess arrived at a hotel in Salzburg early that evening to meet with Lasshofer. Burgess and Lasshofer spoke privately for thirty minutes before inviting Niemi to join them in a hotel room.

132.    Once in the room, Niemi spoke with Lasshofer and Burgess for more than three hours. During their meeting, both Lasshofer and Burgess acknowledged the hardship caused to Niemi by their failure to provide funding as promised. Lasshofer and Burgess also acknowledged that Niemi had paid them $2,000,000 for the right to the beneficial use of Innovatis-held Shamrock securities, which, by the terms of the Prosperity Loan Agreement, Lasshofer was contractually obligated to monetize and trade to facilitate loan payments to Niemi.

133.    Lasshofer provided Niemi with a plausible explanation for why the Innovatis-held securities had not been and could not soon be liquidated as planned and required under the Loan Agreement. Specifically, he said that the bank changed its compliance protocol, and that more stringent requirements were causing delays in the securities-liquidation process. He also said that the issuing and receiving banks were not communicating efficiently with one another, and that as a consequence, it took longer than expected for him to establish the line of credit collateralized by the Innovatis-held securities. Essentially, he claimed that he was at the mercy of the banks, and that he was doing everything he could to speed up their bureaucratic processes.

134.    Although Lasshofer was adamant that the funds would not be immediately available, he was equally adamant that the funding would "absolutely begin, at the latest, within five weeks."

135.    Lasshofer personally assured Niemi of this, and outlined three possible ways to obtain funds within that timeframe while he continued working with his bank, Société Générale, to leverage the securities and free up capital for the "wealth management and trading activities" that would generate the revenue from which the Fairmont Breckenridge loan disbursements would be paid.

31

136.    At the conclusion of the meeting, Lasshofer apologized to Niemi and they shook hands as he reiterated his promise to make funds available within five weeks.

137.    Niemi and Burgess met with Lasshofer at his office the next morning and then joined Lasshofer and his staff for lunch.

138.    Burgess was familiar with the Innovatis staff and he was on a first-name basis with everyone in the Innovatis office.

139.    During the meeting and at lunch, Lasshofer again reassured Niemi of his commitment to fund the loan and told him that an interim plan would be finalized by that Friday, February 12, 2010.

140.    After lunch, Niemi and Burgess returned to Zurich to await word from Lasshofer.

141.    On Wednesday, February 10, 2010, Burgess complained of stomach pains. He told Niemi that his doctor requested that he return to the United States the following morning because he might have colon cancer and needed immediate care.

142.    Also on February 10, 2010, Niemi received a letter from David W. Shaklee, Vice President of Fairmont. The letter read, in relevant part, as follows:

> I hope your trip is successful, but, frankly I can't keep pushing back the schedule with Toronto. We appreciate the effort you and your team put in to secure a loan with Prosperity, but, it is clear that they have not met contractual

dates and not come through according to your agreement. I cannot continue to try and explain to corporate why there are delays ... The quality of your work on the river site is extraordinary, but [the Fairmont Breckenridge project] is not feasible without the Shock Hill Lodge site ... You need to provide a definitive resolution to your financing or we will have to opt out of our Licensing Agreement ... That said, I hope you return in a position to satisfy lenders and hold to your construction schedule.

143.    Before Burgess departed from Zurich on February 11, 2010, he assured Niemi that he would remain in communication with Lasshofer to confirm that interim financing arrangements had been finalized and that loan funds were in place.

144.    Neither Burgess nor Lasshofer contacted Niemi on February 12, 2010 as promised.

145.    Niemi remained in Zurich through the weekend but heard nothing from either Lasshofer or Burgess.

146.    On Monday, February 15, 2010, after spending 13 days in Europe without getting the funds promised to him by Burgess, Lasshofer, and Innovatis, Niemi was forced to leave Zurich to meet with Fairmont about the status of the project.

147.    Replying to a pre-departure email from Niemi, on February 15, 2010 at 5:41 am, Lasshofer, copying Burgess, advised Niemi to "keep in contact with [Burgess], as he will ensure that you are always up-to-date."

148.    On February 16, 2010, Duval sent Prosperity a letter stating that due

33

to the delay in loan funding, the Fairmont Breckenridge project was on the verge of falling apart. Duvall explained that sponsors, contractors and clients were threatening to withdraw and demanding assurances that the Prosperity funds would materialize soon.

149.    On February 17, 2010 at 1:34 pm, Burgess sent Niemi a letter entitled "Milestone Critical Path," intended for sponsors, creditors and clients to assuage concerns about whether the funds would materialize.

150.    The final version of the Milestone Critical Path letter, dated February 25, 2010, concludes by stating that Prosperity "expects with full faith and confidence the imminent release of the cash facility and hence, the commencement of the funding exercise."

151.    Niemi and Prosperity entered into a Loan Modification Agreement negotiated with the help of Lexington (operating as Argentum) and Essex/Funt on March 9, 2010. The agreement called on Prosperity to make its first payment to Niemi in three-installments to commence no later than March 19, 2010, and to be paid-in-full no later than March 30, 2010.

152.    March 19, 2010 came and went without any loan payments.

153.    In an email sent on March 23, 2010 at 9:58am, Burgess represented that Prosperity and Innovatis had "secure[d] a credit facility at the funding bank," Société Générale.

154.    On March 25, 2010 at 6:30 am, Burgess advised Niemi by email that "everything [was] progressing," and attached a transaction flow chart to "provide a better understanding of what [Prosperity and Innovatis were] able to accomplish."

155.    According to the flow chart's metadata, it was created by Austrian Innovatis employee Sorichilli.

156.    On Friday, March 26, 2010, Burgess represented to Niemi during a phone call that, early the following week, Lasshofer would take all remaining steps required to enable payment. He predicted that some amount of funding could be disbursed by the March 30, 2010 deadline set forth in the Amended Loan Agreement.

157.    At Niemi's request, on March 27, 2010 at 9:49 am, Burgess sent Duval a joint-venture agreement between Burgess and Lasshofer as proof that Prosperity was working alongside Innovatis to procure funding for the Fairmont Breckenridge project.

158.    Paragraph Five of the joint venture agreement confirms that in pursuit of their common business purpose to fund the Fairmont Breckenridge

construction loan, Burgess arranged for Niemi to pay $2,000,000 to Innovatis Asset Management S.A. account number 0835-1128069-12 at Credit Suisse.

159.   Paragraph Seven of the joint venture agreement provides that Burgess and Lasshofer will share in the gross proceeds of their venture 50:50.

160.   Lasshofer later claimed, in a July 1, 2011 e-mail time-stamped 10:18 am, that the joint venture agreement was manufactured by Burgess.

161.   The metadata for the joint-venture agreement indicates that the document was created in Lasshofer's Salzburg office by Innovatis employee Sorichilli.

162.   This joint-venture agreement is one of several that Burgess and Lasshofer executed over the course of their twelve-year business relationship.

163.   On March 29, 2010 at 6:37 pm, Burgess sent Niemi an email representing that he had orchestrated a complex transaction, the result of which would be a swift transfer of $2,000,000 to Niemi.

164.   On March 30, 2010 at 1:35 pm, Burgess represented that pre-transfer transactions were in progress and that the funding was hours from completion.

165.   But March 30, 2010—like every funding deadline before it—passed without funding.

166.   On April 2, 2010, Burgess left Niemi a voicemail in which he stated that he was so confident that the impending $2,000,000 transfer would materialize,

36

Niemi should begin scheduling meetings with his creditors with the promise that, by April 8, 2010, he would have cash in hand to begin paying down debt.

167.   On April 6, 2010 at 9:34 pm, Burgess sent Niemi documents purporting to demonstrate that the series of pre-transfer transactions necessary to enable a $2,000,000 payment to Niemi were in process and that funding was forthcoming.

168.   On April 9, 2010 at 4:20 pm, Burgess informed Niemi that he had received word that by midday April 12, 2010, all of the pre-transfer transactions would be complete. He wrote, "I think we are there!!"

169.   On April 14, 2010 at 1:24 pm, Burgess told Niemi he believed the funds would be available the following day.

170.   On April 15, 2010 at 10:55 pm, he made the same representation.

171.   Duval sent Prosperity a second default notice on April 22, 2010, demanding the return of the commitment fee and upfront collateral payment pursuant to the default provision of the Loan Agreement.

172.   On April 30, 2010 at 10:35 am, Burgess committed to make four loan payments over the course of the coming six weeks. Specifically, he committed to release $3,000,000 on May 5, 2010; $3,000,000 on May 12, 2010; $3,000,000 on May 26, 2010; a payment of $9.1 million on June 10, 2010.

173.   On May 12, 2010 at 10:16 am, Burgess asked Niemi for "the correct Swiftcode for [his] account at First Bank of Colorado." That evening at 8:16 pm Burgess sent Niemi a memorandum signed by Lasshofer, confirming that Innovatis had received Burgess's instruction to transfer $1,650,000 to Niemi's account at First Bank of Colorado.

174.   According to the metadata, the memorandum was created by Innovatis employee Sorichilli.

175.    On June 1, 2010 at 9:18 am, Burgess sent Niemi a lengthy email stating, among other things, that he was travelling to Munich where he would meet with Lasshofer and continue working with him to obtain funding for the Fairmont Breckenridge.

176.   On June 6, 2010 at 9:11 am, Burgess wrote that he spoke with Lasshofer who indicated that he was working with Sorichilli to collect and transmit the documents necessary to affect a transfer. Burgess relayed that "[Lasshofer] expects the last remaining items [would] be finalized tomorrow."

177.   On June 15, 2010 at 12:59 pm, Burgess indicated that he expected "everything ... to be finalized today" and that he was waiting for Lasshofer to "advise [him] of the finalization of the requirements."

80160-0001/LEGAL24249937.1

178.    Another memorandum authorizing a transfer signed by Lasshofer was sent from Burgess to Niemi on June 17, 2010. According to the metadata, the memorandum was created by Lasshofer employee Sorichilli.

179.    On June 25, 2010, Burgess called Niemi claiming that he had everything completed, was returning to the United States the following day, and that funding would commence the following week.

180.    Burgess was detained by the US Secret Service the following day, June 26, 2010.

**D.    Even after Burgess was arrested, Lasshofer continued to fraudulently represent that the loan proceeds were forthcoming.**

181.    The scheme did not end with Burgess's arrest. Rather, Lasshofer continued to represent that the loan was in process and payment forthcoming.

182.    In the weeks immediately following Burgess's arrest, the once-scarce and difficult-to-reach Lasshofer was suddenly readily available to speak with Niemi and Duval. He even initiated communications with Niemi and Duval on occasion, asking several times whether they had been in touch with prosecutors, what was said during those conversations, and seeking details about the nature of the case against Burgess.

183.    During a June 29, 2010 telephone call between Lasshofer and Niemi, Lasshofer said that at the time of Burgess's arrest, funding had been ready and was scheduled for imminent disbursement. He claimed that Burgess's detention would

cause a delay, if not a fatal problem to the process. Lasshofer told Niemi that he was going to Zurich to try to work something out with the bank.

184.    On July 1, 2010 at 10:35 am, Lasshofer asked Niemi's counsel, Duval, to send him a copy of the transfer slip needed to affect a transfer of funds to Niemi.

185.    Later that day, July 1, 2010 at 2:24 pm, Lasshofer wrote to Duval, "I already spoke many times with the banks this evening and will continue tomorrow and probably visit them personally next week trying to minimize damage."

186.    Lasshofer's last communication with Niemi took place on July 10, 2010 by telephone. At all times during the conversation, Lasshofer acknowledged his responsibility to Niemi, assuring him that he was doing his best to obtain funding.

**E.     Defendants' fraud cost Plaintiffs upwards of $150,000,000.**

187.    As a result of the conspiracy to defraud Niemi, the entire Fairmont Breckenridge project failed.

188.    Fairmont withdrew its sponsorship of the project after Burgess's indictment.

189.    On July 2, 2010, JP Morgan foreclosed on the River property.

190.    On September 29, 2010, United Western Bank scheduled foreclosure on the Shock Hill property.

191.    Over the course of 2010, $38,000,000 of loans personally guaranteed

40

by Plaintiffs went into default, giving rise to collections actions and other legal proceedings.

192.   By the end of 2010, all purchase agreements and reservation commitments, which combined represented $80,000,000 of revenue, had been cancelled.

193.   Besides losing the $19,000,000 of equity invested in the project and the value of work completed on the project to-date, the value of projected revenue—estimated at some $300,000,000—was irretrievably lost.

194.   Niemi's credit was destroyed, he took out a third-mortgage on his family home, drained his personal savings, and wound up on the verge of bankruptcy.

195.   All told, given these and other injuries, Plaintiffs were damaged in excess of $150,000,000 by Defendants' wrongdoing.

**F.   Burgess was indicted, convicted, and given the maximum penalty of 15 years in federal prison for his role in the racketeering enterprise.**

196.   After being detained by the US Secret Service on June 26, 2010, Burgess was arrested on June 28, 2010.

197.   He was initially charged with one count of Conspiracy to Commit Wire Fraud and several counts of Wire Fraud, all in violation of 18 U.S.C. § 1343, and also with several counts of Money Laundering in violation of 18 U.S.C. § 1957.

41

198.   In its indictment, the United States alleged that Burgess acted in concert with a co-conspirator.

199.   The Assistant U.S. Attorney handling the matter told Niemi that the co-conspirator referenced in the indictment was Lasshofer.

200.   Burgess's work with Innovatis is expressly referenced throughout the indictment.

201.   On May 4, 2011, Burgess pleaded guilty to one count of Conspiracy to Commit Wire Fraud and one count of Money Laundering. As part of the plea agreement, Burgess admitted to:

a.   Establishing entities which were used to solicit clients allegedly to assist them in obtaining financing for large-scale projects;

b.   Establishing a website that contained false claims of large projects in which Prosperity assisted businesses in obtaining funding for large-scale real estate projects;

c.   Claiming that he was able to obtain funding from a major international bank for large-scale projects;

d.   Having clients wire transfer funds to bank accounts which he and his co-conspirators controlled;

e.   Falsely stating to clients that at least a large portion of the money paid by the client would be held in an escrow account;

f.   Claiming that a letter of credit or bank guarantee would be delivered to the client within approximately fourteen days of receiving funds from the client;

g.   Paying commissions to Prosperity brokers;

h.   Requiring clients to sign a contract which included as one of its provisions that the agreement was confidential and that the client was not allowed to

42

contact or have any communication with banks, bank officers, law firms, and/or brokerage firms that were to be involved in the agreed upon financing;

i.    Not obtaining any loans for clients;

j.    Not generally returning clients' funds which were to have been held in escrow;

k.    Sending e-mails to clients in which the e-mails falsely claimed that payments to the clients were delayed due to problems not attributable to Burgess; and

l.    Performing acts and making statements to hide and conceal the purpose of the conspiracy and the acts committed in furtherance thereof.

202.   Burgess also admitted in the plea agreement that in furtherance of the conspiracy, on or about the following dates, he sent Niemi ("J.D.N.") or his representatives (the attorney, Duval, or "S.W.D.") the following fraudulent interstate e-mails and received from Niemi or his representatives the following wire transfers:

| Date | Description |
|------|-------------|
| 1/20/2010 | E-mail dated January 20, 2010 from Michael F. Burgess to S.W.D. |
| 1/27/2010 | E-mail dated January 27, 2010 from Michal F. Burgess copied to S.W.D. |
| 10/5/2009 | Wire Transfer of $180,000 from victim J.D.N. to JPM Chase account, number xxxxx5475 |
| 12/7/09 | Wire Transfer of $750,000 from victim J.D.N. to JPM Chase account, number xxxxxx9953 |
| 12/10/09 | Wire Transfer of $1,250,000 from victim J.D.N. to JPM Chase account, number xxxxx9953 |
| 11/17/09 | E-mail dated November 17, 2009 from Michael F. Burgess to S.W.D. |
| 1/20/2010 | E-mail dated January 20, 2010 from Michael F. Burgess to S.W.D. |

43

| 5/13/2010 | E-mail dated May 13, 2010 from Michael F. Burgess to victim J.D.N. |
| 11/17/09 | E-mail dated November 17, 2009 from Michael F. Burgess to S.W.D. |
| 11/22/09 | E-mail dated November 22, 2009 from Michael F. Burgess to S.W.D. |
| 11/25/09 | E-mail dated November 25, 2009 from Michael F. Burgess to S.W.D. |
| 12/2/09 | E-mail dated December 2, 2009 from Michael F. Burgess to S.W.D. |
| 12/15/09 | E-mail dated December 15, 2009 from Michael F. Burgess to S.W.D. |

203.    Each of the emails in the table above, all of the emails previously referenced in this Complaint, and numerous other email transmissions were caused by, and foreseeable to, Defendants' scheme.

204.    Defendants' scheme caused numerous documents to be mailed by U.S. Mail to facilitate the scheme. These mailings included, without limitation bank statements, notices and updates to Fairmont Breckenridge investors and lot owners, business correspondence between Plaintiffs and Fairmont Breckenridge sponsors and contractors, and other mailings.

205.    Burgess admitted as part of his plea agreement that at least $6,800,000 in wire-fraud proceeds were deposited into Innovatis Asset Management S.A. account number 0835-1128069-12 at Credit Suisse. Following the entry of Burgess's guilty plea, the District Court for the Middle District of

44

Florida entered a preliminary order of forfeiture against those contents of the Lasshofer Credit Suisse Accounts that were proceeds of Burgess's fraud.

206.   At his November 23, 2011 sentencing hearing, Burgess was sentenced to the maximum prison term of 180 months, followed by a three-year term of supervised release, and 25 hours of community service.

207.   Burgess was court-ordered to make restitution to 15 victims in an amount totaling $94,945,718.47.

208.   For the out-of-pocket damage Burgess caused in connection with the Fairmont Breckenridge development, he was ordered to make restitution in the amount of $45,990,300.

209.   Addressing the court, Burgess implicated Lasshofer, saying, "From the outset I never believed the offense would escalate to the level that it did. I was very trusting with all those I had been working with over the past four years, and especially my associate partner for the past 11 to 12 years. I knowingly followed everything that this associate partner instructed me to do even though I was told by others to be more weary [sic] of my association with him."

210.   If there were any ambiguity as to whom Burgess was referring, it was clarified when he stated, "I would also like to provide any additional assistance to the Court which may lead to the arrest of the directors of Innovatis Asset Management who have deliberately misled investors and are continuing to

45

take funds into their various investment schemes located in the Bahamas, Switzerland, and the island of Guernsey."

211.   Elaborating further, Burgess said, "They have utilized bonds which have been secured by our victims' funds to use as collateral to provide comfort to other investors who have placed considerable funds into accounts so that Innovatis is in different banks."

## CLAIMS FOR RELIEF

212.   Paragraphs 1 through 208 are incorporated in these claims for relief as if stated therein.

## FIRST CLAIM FOR RELIEF
**(Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c))**
Against Defendant Erwin Lasshofer, Innovatis GmbH, Innovatis Immobilien GmbH, and
Innovatis Asset Management SA

213.   At all relevant times, Plaintiffs were persons within the meaning of RICO, 18 U.S.C. § 1961(3).

214.   At all relevant times, Defendant Erwin Lasshofer, Innovatis GmbH, Innovatis Immobilien GmbH, and Innovatis Asset Management SA were persons within the meaning of RICO, 18 U.S.C. § 1961(3).

215.   Lasshofer owned, managed, and coordinated the activities of entities comprising the Innovatis Group, including Innovatis GmbH, Innovatis Immobilien GmbH, and Innovatis Asset Management SA.

216.   As alleged above, for a period of at least three years, the Innovatis

46

Group was operated for the purposes of (a) wrongfully inducing Plaintiffs and others to enter into fraudulent loan agreements; (b) wrongfully converting funds transferred by Plaintiffs and others in pursuit of or pursuant to those loan agreements; and (c) appropriating those ill-gotten funds for personal uses and to operate the fraudulent scheme. The Innovatis Group was an enterprise within the meaning of RICO, 18 U.S.C. § 1961(4).

217.    The Innovatis Group is separate and distinct from the individual defendants that participate in it and direct its affairs.

218.    At all relevant times, the enterprise was engaged in and its activities affected interstate and foreign commerce within the meaning of RICO, 18 U.S.C. § 1962(a).

219.    As alleged above, for a period of at least three years, these defendants conducted or participated in, directly or indirectly, the conduct of the enterprise's affairs through a pattern of ongoing racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c). Specifically, at all relevant times, these defendants engaged in racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(1) by engaging in the acts set forth above. The acts set forth above constitute violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C §

1956 (money laundering). These defendants each committed or aided and abetted the commission of two or more of these acts of racketeering activity.

220.    These acts of racketeering activity constituted a pattern of racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(5). The acts alleged relate to each other by virtue of common participants, a common victim industry (borrowers for large-scale projects), a common method of commission (through fraudulent misrepresentations, and by reference to documents intended to induce borrowers to rely on the legitimacy of the enterprise), and the common purpose and common result of misappropriating millions of dollars of borrowers' funds in order to enrich Defendants and operate the unlawful racketeering enterprise.

221.    Plaintiffs have been injured as a result of these defendants' violation of RICO, 18 U.S.C. § 1962(c).

222.    Plaintiffs are entitled to damages proximately caused by this violation of 18 U.S.C. § 1962(c). Plaintiffs are also entitled to treble damages, interest, and reasonable attorney's fees and costs under RICO, 18 U.S.C. § 1964(c).

**SECOND CLAIM FOR RELIEF**
**(Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c))**
Against Defendants Michael Frank Burgess, Lexington Capital & Property
Investments, LLC, and Barry Funt

48

223.   At all relevant times, Plaintiffs were persons within the meaning of RICO, 18 U.S.C. § 1961(3).

224.   At all relevant times, Defendants Michael Burgess, Lexington Capital & Property Investments, LLC, and Barry Funt were persons within the meaning of RICO, 18 U.S.C. § 1961(3).

225.   Burgess owned, operated, and managed Prosperity International, LLC.

226.   Lexington and Funt acted under Burgess's direction as alleged above.

227.   As alleged above, for a period of at least three years, Prosperity was operated for the purposes of (a) wrongfully inducing Plaintiffs and others to enter into fraudulent loan agreements; (b) wrongfully converting funds transferred by Plaintiffs and others in pursuit of or pursuant to those loan agreements; and (c) appropriating those ill-gotten funds for personal uses and to operate the fraudulent scheme. Prosperity was an enterprise within the meaning of RICO, 18 U.S.C. § 1961(4).

228.    Prosperity International, LLC is separate and distinct from the individual defendants that participate in it and direct its affairs.

229.    At all relevant times, the enterprise was engaged in and its activities affected interstate and foreign commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

230.    As alleged above, for a period of at least three years, these defendants conducted or participated in, directly or indirectly, the conduct of the enterprise's affairs through a pattern of ongoing racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c). Specifically, at all relevant times, these defendants engaged in racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(1) by engaging in the acts set forth above. The acts set forth above constitute violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C § 1956 (money laundering). These defendants each committed or aided and abetted the commission of two or more of these acts of racketeering activity.

231.    These acts of racketeering activity constituted a pattern of racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(5). The acts alleged relate to each other by virtue of common participants, a common victim industry (borrowers for large-scale projects), a common method of commission (following a deceptive due diligence process, through fraudulent

50

misrepresentations, and by reference to documents intended to induce borrowers to rely on the legitimacy of the enterprise), and the common purpose and common result of misappropriating millions of dollars of borrowers funds in order to enrich Defendants and operate the unlawful racketeering enterprise.

232.    Plaintiffs have been injured as a result of these defendants' violation of RICO, 18 U.S.C. § 1962(c).

233.    Plaintiffs are entitled to damages proximately caused by Defendants' violation of 18 U.S.C. § 1962(c). Plaintiffs are also entitled to treble damages, interest, and reasonable attorney's fees and costs under RICO, 18 U.S.C. § 1964(c).

### THIRD CLAIM FOR RELIEF
### (Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c))
Against All Defendants

234.    At all relevant times, Plaintiffs were persons within the meaning of RICO, 18 U.S.C. § 1961(3).

235.    At all relevant times, Defendants were persons within the meaning of RICO, 18 U.S.C. § 1961(3).

236.    As alleged above, for a period of at least three years, these defendants formed an association-in-fact for the purposes of (a) wrongfully inducing Plaintiffs and others to enter into fraudulent loan agreements; (b) wrongfully converting funds transferred by Plaintiffs and others in pursuit of or pursuant to those loan agreements; and (c) appropriating those ill-gotten funds for

51

personal uses and to operate the fraudulent scheme. This association-in-fact was an enterprise within the meaning of RICO, 18 U.S.C. § 1961(4).

237.    Lasshofer led this association-in-fact, with Burgess operating as the second-in-command. Lasshofer directed the activities of the Innovatis entities, and Lexington and Funt acted at Burgess's direction as needed facilitate scheme.

238.    This enterprise is separate and distinct from the individual defendants that participate in it and direct its affairs.

239.   At all relevant times, the enterprise was engaged in and its activities affected interstate and foreign commerce within the meaning of RICO, 18 U.S.C. § 1962(d).

240.   As alleged above, for a period of at least three years, these defendants conducted or participated in, directly or indirectly, the conduct of the enterprise's affairs through a pattern of ongoing racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c). Specifically, at all relevant times, Defendants engaged in racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(1) by engaging in the acts set forth above. The acts set forth above constitute violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C § 1956 (money laundering). Defendants each committed or aided and abetted the commission of two or more of these acts of racketeering activity.

241.   These acts of racketeering activity constituted a pattern of racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(5). The acts alleged relate to each other by virtue of common participants, a common victim industry (borrowers for large-scale projects), a common method of commission (following a deceptive due diligence process, through fraudulent misrepresentations, and by reference to documents intended to induce borrowers to rely on the legitimacy of the enterprise), and the common purpose and common

53

result of misappropriating millions of dollars of borrowers funds in order to enrich Defendants and operate the unlawful racketeering enterprise.

242.    Plaintiffs have been injured as a result of Defendants' violation of RICO, 18 U.S.C. § 1962(d).

243.    Plaintiffs are entitled to damages proximately caused by Defendants' violation of 18 U.S.C. § 1962(d). Plaintiffs are also entitled to treble damages, interest, and reasonable attorney's fees and costs under RICO, 18 U.S.C. § 1964(c).

### FOURTH CLAIM FOR RELIEF
**(Racketeer Influenced and Corrupt Organizations Act (RICO),**
**18 U.S.C. § 1962 (d))**
Against All Defendants

244.    At all relevant times, Plaintiffs were persons within the meaning of RICO, 18 U.S.C. § 1961(3).

245.    At all relevant times, Defendants were persons within the meaning of RICO, 18 U.S.C. § 1961(3).

246.    As alleged above, for a period of at least three years, these defendants formed an association-in-fact for the purposes of (a) wrongfully inducing Plaintiffs and others to enter into fraudulent loan agreements; (b) wrongfully converting funds transferred by Plaintiffs and others in pursuit of or pursuant to those loan agreements; and (c) appropriating those ill-gotten funds for personal uses and to operate the fraudulent scheme.

54

247.     Lasshofer led this association-in-fact, with Burgess operating as the second-in-command. Lasshofer directed the activities of the Innovatis entities, and Lexington and Funt acted at Burgess's direction as needed facilitate scheme.

248.     This association-in-fact was an enterprise within the meaning of RICO, 18 U.S.C. § 1961(4).

249.     This enterprise is separate and distinct from the individual defendants that participate in it and direct its affairs.

250.     At all relevant times, the enterprise was engaged in and its activities affected interstate and foreign commerce within the meaning of RICO, 18 U.S.C. § 1962(d).

251.     As alleged above, for a period of at least three years, these defendants conducted or participated in, directly or indirectly, the conduct of the enterprise's affairs through a pattern of ongoing racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c). Specifically, at all relevant times, Defendants engaged in racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(1) by engaging in the acts set forth above. The acts set forth above constitute violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C § 1956 (money laundering). Defendants each committed or aided and abetted the commission of two or more of these acts of racketeering activity.

252.    These acts of racketeering activity constituted a pattern of racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(5). The acts alleged relate to each other by virtue of common participants, a common victim industry (borrowers for large-scale projects), a common method of commission (following a deceptive due diligence process, through fraudulent misrepresentations, and by reference to documents intended to induce borrowers to rely on the legitimacy of the enterprise), and the common purpose and common result of misappropriating millions of dollars of borrowers funds in order to enrich Defendants and operate the unlawful racketeering enterprise.

253.    Plaintiffs have been injured as a result of Defendants' violation of RICO, 18 U.S.C. § 1962(d).

254.    Plaintiffs are entitled to damages proximately caused by Defendants' violation of 18 U.S.C. § 1962(d). Plaintiffs are also entitled to treble damages, interest, and reasonable attorney's fees and costs under RICO, 18 U.S.C. § 1964(c).

## FIFTH CLAIM FOR RELIEF
**(Colorado Organized Crime and Control Act (COCCA), C.R.S. § 18-17-104(3))**
Against Defendants Erwin Lasshofer, Innovatis GmbH,
Innovatis Immobilien GmbH, and Innovatis Asset Management SA

255.    At all relevant times, Plaintiffs were persons within the meaning of COCCA, C.R.S. § 18-17-103(4).

80160-0001/LEGAL24249937.1

256.    At all relevant times, Defendants Erwin Lasshofer, Innovatis GmbH, Innovatis Immobilien GmbH, and Innovatis Asset Management SA were persons within the meaning of COCCA, C.R.S. § 18-17-103(4).

257.    Lasshofer owned, managed, and coordinated the activities of entities comprising the Innovatis Group, including Innovatis GmbH, Innovatis Immobilien GmbH, and Innovatis Asset Management SA.

258.    As alleged above, for a period of at least three years, the Innovatis Group operated for the purposes of (a) wrongfully inducing Plaintiffs and others to enter into fraudulent loan agreements; (b) wrongfully converting funds transferred by Plaintiffs and others in pursuit of or pursuant to those loan agreements; and (c) appropriating those ill-gotten funds for personal uses and to operate the fraudulent scheme. The Innovatis Group was an enterprise within the meaning of COCCA, C.R.S. § 18-17-103(2).

259.    The Innovatis Group is separate and distinct from the individual defendants that participate in it and direct its affairs.

260.     At all relevant times, these defendants conducted or participated in, directly or indirectly, the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of COCCA, C.R.S. § 18-17-103(3), in violation of COCCA, C.R.S. § 18- 17-104(1)(a).

261.    Specifically, at all relevant times, these defendants engaged in racketeering activity within the meaning of COCCA, C.R.S. §§ 18-17-103(5) by engaging in the acts set forth above. The acts set forth above constitute violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C § 1956 (money laundering). Defendants each committed or aided and abetted the commission of two or more of these acts of racketeering activity.

262.    These acts of racketeering activity constituted a pattern of racketeering activity within the meaning of COCCA, C.R.S. § 18-17-103(3). The acts alleged relate to each other by virtue of common participants, a common victim industry (borrowers for large-scale projects), a common method of commission (following a deceptive due diligence process, through fraudulent misrepresentations, and by reference to documents intended to induce borrowers to rely on the legitimacy of the enterprise), and the common purpose and common result of misappropriating millions of dollars of borrowers funds in order to enrich Defendants and operate the unlawful racketeering enterprise.

263.    Plaintiffs have been injured as a result of Defendants' violation of COCCA, C.R.S. § 18-17-104(1)(a).

264.    Plaintiffs are entitled to damages proximately caused by Defendants' violation of COCCA, C.R.S. § 18-17-104(1)(a). Plaintiffs are also entitled to treble damages, interest, and reasonable attorney's fees and costs under COCCA, C.R.S. § 18-17-106(7).

### SIXTH CLAIM FOR RELIEF
**(Colorado Organized Crime and Control Act (COCCA), C.R.S. § 18-17-104(3))**
Against Defendants Michael Frank Burgess, Lexington Capital & Property Investments, LLC, and Barry Funt

265.    At all relevant times, Plaintiffs were persons within the meaning of COCCA, C.R.S. § 18-17-103(4).

266.    At all relevant times, Defendants Michael Frank Burgess, Lexington Capital & Property Investments, LLC, and Barry Funt were persons within the meaning of COCCA, C.R.S. § 18-17-103(4).

267.    Burgess owned, operated, and managed Prosperity International, LLC.

268.    Lexington and Funt acted under Burgess's direction as alleged above.

269.    As alleged above, for a period of at least three years, Prosperity International, LLC operated for the purposes of (a) wrongfully inducing Plaintiffs and others to enter into fraudulent loan agreements, and (b) wrongfully converting funds transferred by Plaintiffs and others in pursuit of or pursuant to those loan agreements, and (c) appropriating those ill-gotten funds for personal uses to

59

operate the fraudulent scheme. Prosperity was an enterprise within the meaning of COCCA, C.R.S. § 18-17-103(2).

270.    Prosperity International, LLC is enterprise is separate and distinct from the individual defendants that participate in it and direct its affairs.

271.    At all relevant times, Defendants conducted or participated in, directly or indirectly, the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of COCCA, C.R.S. § 18-17-103(3), in violation of COCCA, C.R.S. § 18- 17-104(3).

272.    Specifically, at all relevant times, Defendants engaged in racketeering activity within the meaning of COCCA, C.R.S. §§ 18-17-103(5) by engaging in the acts set forth above. The acts set forth above constitute violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C § 1956 (money laundering). Defendants each committed or aided and abetted the commission of two or more of these acts of racketeering activity.

273.    These acts of racketeering activity constituted a pattern of racketeering activity within the meaning of COCCA, C.R.S. § 18-17-103(3). The acts alleged relate to each other by virtue of common participants, a common victim industry (borrowers for large-scale projects), a common method of commission (following a deceptive due diligence process, through fraudulent misrepresentations, and by reference to documents intended to induce borrowers

60

to rely on the legitimacy of the enterprise), and the common purpose and common result of misappropriating millions of dollars of borrowers funds in order to enrich Defendants and operate the unlawful racketeering enterprise.

274.   Plaintiffs have been injured as a result of Defendants' violation of COCCA, C.R.S. § 18-17-104(3).

275.   Plaintiffs are entitled to damages proximately caused by Defendants' violation of COCCA, C.R.S. § 18-17-104(3). Plaintiffs are also entitled to treble damages, interest, and reasonable attorney's fees and costs under COCCA, C.R.S. § 18-17-106(7).

## SEVENTH CLAIM FOR RELIEF
### (Colorado Organized Crime and Control Act (COCCA), C.R.S. § 18-17-104(3))
Against All Defendants

276.   At all relevant times, Plaintiffs were persons within the meaning of COCCA, C.R.S. § 18-17-103(4).

277.   At all relevant times, Defendants were persons within the meaning of COCCA, C.R.S. § 18-17-103(4).

278.   As alleged above, for a period of at least three years, these defendants formed an association-in-fact for the purposes of (a) wrongfully inducing Plaintiffs and others to enter into fraudulent loan agreements; (b) wrongfully converting funds transferred by Plaintiffs and others in pursuit of or pursuant to those loan agreements; and (c) appropriating those ill-gotten funds for

61

personal uses and to operate the fraudulent scheme. This association-in-fact was an enterprise within the meaning of COCCA, C.R.S. § 18-17-103(2).

279.   Lasshofer led this association-in-fact, with Burgess operating as the second-in-command. Lasshofer directed the activities of the Innovatis entities, and Lexington and Funt acted at Burgess's direction as needed facilitate scheme.

280.   This enterprise is separate and distinct from the individual defendants that participate in it and direct its affairs.

281.   At all relevant times, Defendants conducted or participated in, directly or indirectly, the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of COCCA, C.R.S. § 18-17-103(3), in violation of COCCA, C.R.S. § 18-17-104(4).

282.   Specifically, at all relevant times, Defendants engaged in racketeering activity within the meaning of COCCA, C.R.S. §§ 18-17-103(5) by engaging in the acts set forth above. The acts set forth above constitute violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C § 1956 (money laundering). Defendants each committed or aided and abetted the commission of two or more of these acts of racketeering activity.

283.   These acts of racketeering activity constituted a pattern of racketeering activity within the meaning of COCCA, C.R.S. § 18-17-103(3). The acts alleged relate to each other by virtue of common participants, a common

victim industry (borrowers for large-scale projects), a common method of commission (following a deceptive due diligence process, through fraudulent misrepresentations, and by reference to documents intended to induce borrowers to rely on the legitimacy of the enterprise), and the common purpose and common result of misappropriating millions of dollars of borrowers funds in order to enrich Defendants and operate the unlawful racketeering enterprise.

284.    Plaintiffs have been injured as a result of Defendants' violation of COCCA, C.R.S. § 18-17-104(4).

285.    Plaintiffs are entitled to damages proximately caused by Defendants' violation of COCCA, C.R.S. § 18-17-104(4). Plaintiffs are also entitled to treble damages, interest, and reasonable attorney's fees and costs under COCCA, C.R.S. § 18-17-106(7).

**EIGHTH CLAIM FOR RELIEF**
**(Colorado Organized Crime and Control Act (COCCA), C.R.S. § 18-17-104(4))**
Against All Defendants

286.    At all relevant times, Plaintiffs were persons within the meaning of COCCA, C.R.S. § 18-17-103(4).

287.    At all relevant times, Defendants were persons within the meaning of COCCA, C.R.S. § 18-17-103(4).

288.    As alleged above, for a period of at least three years, these defendants formed an association-in-fact for the purposes of (a) wrongfully inducing Plaintiffs and others to enter into fraudulent loan agreements; (b)

63

wrongfully converting funds transferred by Plaintiffs and others in pursuit of or pursuant to those loan agreements; and (c) appropriating those ill-gotten funds for personal uses and to operate the fraudulent scheme. This association-in-fact was an enterprise within the meaning of COCCA, C.R.S. § 18-17-103(2).

289.   Lasshofer led this association-in-fact, with Burgess operating as the second-in-command. Lasshofer directed the activities of the Innovatis entities, and Lexington and Funt acted at Burgess's direction as needed facilitate scheme.

290.   This enterprise is separate and distinct from the individual defendants that participate in it and direct its affairs.

291.   At all relevant times, Defendants conducted or participated in, directly or indirectly, the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of COCCA, C.R.S. § 18-17-103(3), in violation of COCCA, C.R.S. § 18- 17-104(4).

292.   Specifically, at all relevant times, Defendants engaged in racketeering activity within the meaning of COCCA, C.R.S. § 18-17-103(5) by engaging in the acts set forth above. The acts set forth above constitute violations of 18 U.S.C. § 1341, 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C § 1956 (money laundering). Defendants each committed or aided and abetted the commission of two or more of these acts of racketeering activity.

293.    These acts of racketeering activity constituted a pattern of racketeering activity within the meaning of COCCA, C.R.S. § 18-17-103(3). The acts alleged relate to each other by virtue of common participants, a common victim industry (borrowers for large-scale projects), a common method of commission (following a deceptive due diligence process, through fraudulent misrepresentations, and by reference to documents intended to induce borrowers to rely on the legitimacy of the enterprise), and the common purpose and common result of misappropriating millions of dollars of borrowers funds in order to enrich Defendants and operate the unlawful racketeering enterprise.

294.    Plaintiffs have been injured as a result of Defendants' violation of COCCA, C.R.S. § 18-17-104(4).

295.    Plaintiffs are entitled to damages proximately caused by Defendants' violation of COCCA, C.R.S. § 18-17-104(4). Plaintiffs are also entitled to treble damages, interest, and reasonable attorney's fees and costs under COCCA, C.R.S. § 18-17-106(7).

**NINTH CLAIM FOR RELIEF**
**(Civil Conspiracy)**
Against All Defendants

296.    Defendants planned and agreed to (a) wrongfully induce Plaintiffs and others to enter into fraudulent loan agreements, and (b) wrongfully convert funds transferred by Plaintiffs and others in order to perpetuate their unlawful scheme.

297.    Defendants Michael Frank Burgess, Erwin Lasshofer, Innovatis GmbH, Innovatis Immobilien GmbH, Innovatis Asset Management, SA, Lexington Capital & Property Investments, LLC, and Essex Investment Partners, LLC, through their words and conduct described above, fraudulently induced Plaintiffs to enter into the December 7, 2009 Loan Agreement and the March 9, 2010 Amendment to Loan Documents, and to make payments to Defendants pursuant thereto.

298.    Defendants Michael Frank Burgess, Erwin Lasshofer, Innovatis GmbH, Innovatis Immobilien GmbH, and Innovatis Asset Management SA never intended to fund or facilitate the funding of the loan as set forth in December 7, 2009 Loan Agreement and March 9, 2010 Amendment of Loan Documents. Instead, as set forth above, these defendants intended to wrongfully convert Plaintiffs funds to perpetuate their unlawful scheme to defraud Plaintiffs and other borrowers.

299.    Plaintiffs were injured as a proximate result of Defendants' conspiracy.

300.    Plaintiffs are entitled to damages proximately caused by Defendants'

conspiracy.

## TENTH CLAIM FOR RELIEF
### (Conversion)
Against All Defendants

301.    Defendants fraudulently and deceptively caused Plaintiffs to transfer

$2,180,000 to bank accounts held by Essex and Prosperity.

302.     Defendants permanently deprived Plaintiffs of use of these funds.

303.    Defendants converted these funds to their own use.

304.    Plaintiffs were injured as a proximate result of Defendants' actions.

305.    Plaintiffs are entitled to damages proximately caused by Defendants'

actions.

## ELEVENTH CLAIM FOR RELIEF
### (Claim for Rights in Stolen Property, C.R.S. § 18-4-405)
Against All Defendants

306.    Defendants fraudulently and deceptively caused Plaintiffs to transfer

$2,180,000 to bank accounts held by Essex and Prosperity.

307.    Defendants each knowingly received a portion of the funds Plaintiffs

transferred.

308.    Defendants received these funds with the intent to permanently

deprive Plaintiffs' of their use or benefit.

309.    Plaintiffs are entitled to recover the funds stolen from them by

Defendants.

67

310.    In addition to recovery of the stolen funds, Plaintiffs are entitled to treble damages and an award of attorneys' fees incurred in recovering the stolen funds.

**TWELFTH CLAIM FOR RELIEF**
**(Common Law Fraud)**
Against All Defendants

311.    Defendants fraudulently misrepresented and concealed material facts from Plaintiffs to relating to, among other things, the December 7, 2009 Loan Agreement and March 9, 2010 Amendment to Loan Documents as described above.

312.     Defendants made these fraudulent misrepresentations and concealments with knowledge of their falsity or ignorance of their truth, and with the intent that Plaintiffs rely upon them.

313.    In doing so, Defendants acted willfully and maliciously and in knowing and reckless disregard for Plaintiffs' rights.

314.    Plaintiffs did rely upon Defendants' fraudulent misrepresentations and concealments by, among other things, entering into the December 7, 2009 Loan Agreement and March 9, 2010 Amendment to Loan Documents.

315.    Plaintiffs' reliance upon Defendants' fraudulent misrepresentations and concealments was reasonable under the circumstances.

316.    Plaintiffs were injured as a consequence of Defendants' fraudulent misrepresentations and concealments.

68

317.   Plaintiffs are entitled to damages proximately caused by Defendants' fraudulent misrepresentations and concealments.

## THIRTEENTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)
Against Defendants Lexington Capital & Property Investments, LLC
and Barry Funt

318.   Defendants Lexington Capital & Property Investments, LLC and Essex Investment Partners, LLC carelessly and negligently made representations about Prosperity as alleged above. These defendants knew, reasonably should have known, or reasonably should have foreseen that their careless and negligent representations misrepresented or concealed material facts.

319.   As the exclusive underwriter and loan administrator for Prosperity, respectively, Defendants Lexington Capital & Property Investments, LLC and Essex Investment Partners, LLC were in a superior position to Plaintiffs to know facts about Prosperity.

320.   Defendants Lexington Capital & Property Investments, LLC and Essex Investment Partners, LLC had a pecuniary interest in facilitating a multimillion dollar loan agreement between Plaintiffs and Prosperity, and in making material misrepresentations and concealments about Prosperity in order to do so.

321.   Defendants Lexington Capital & Property Investments, LLC and Essex Investment Partners, LLC intended their careless and negligent

69

representations as business advice, and knew, reasonably should have known, or reasonably should have foreseen that Plaintiffs would rely upon the material misrepresentations and concealments alleged above in conducting business with Prosperity.

322.    Plaintiffs did rely on the material misrepresentations and concealments supplied by Defendants Lexington Capital & Property Investments, LLC and Essex Investment Partners, LLC in, among other things, entering into the December 7, 2009 Loan Agreement and March 9, 2010 Amendment to Loan Documents with Prosperity.

323.    Plaintiffs were injured as a result of the negligent misrepresentations made by Defendants Lexington Capital & Property Investments, LLC and Essex Investment Partners, LLC about Prosperity.

324.    Plaintiffs are entitled to damages proximately caused by Defendants' actions.

## FOURTEENTH CLAIM FOR RELIEF
### (Breach of Contract)
Against Defendants Michael Frank Burgess, Erwin Lasshofer, Innovatis GmbH, Innovatis Immobilien GmbH, and Innovatis Asset Management SA

325.    Plaintiffs fully performed all of their contractual obligations under the December 7, 2009 Loan Agreement and March 9, 2010 Amendment to Loan Documents.

70

326.    Defendants Burgess, Lasshofer, Innovatis GmbH, Innovatis Immobilien GmbH, and Innovatis Asset Management SA failed to fulfill their contractual obligations under the December 7, 2009 Loan Agreement and March 9, 2010 Amendment to Loan Documents.

327.    Plaintiffs suffered damages as a direct and proximate result of Defendants' breaches of the December 7, 2009 Loan Agreement and March 9, 2010 Amendment to Loan Documents.

328.    Plaintiffs are entitled to damages resulting from these breaches of contract.

## FIFTEENTH CLAIM FOR RELIEF
### (Unjust Enrichment)
Against Defendants Lexington Capital & Property Investments, LLC
and Barry Funt

329.    As a result of Defendants' fraudulent conduct, Plaintiffs conferred benefits upon Defendants Lexington Capital & Property Investments, LLC and Essex Investment Partners, LLC by transferring funds from which Defendants Lexington Capital & Property Investments, LLC and Essex Investment Partners, LLC were paid.

330.    It would be inequitable to allow Defendants Lexington Capital & Property Investments, LLC and Essex Investment Partners, LLC to retain these ill-gotten gains.

71

331.    Plaintiffs are entitled to recover funds wrongfully obtained by Defendants Lexington Capital & Property Investments, LLC and Essex Investment Partners, LLC.

**SIXTEENTH CLAIM FOR RELIEF**
**(Accounting)**
Against Defendants Erwin Lasshofer, Innovatis GmbH,
Innovatis Immobilien GmbH, and Innovatis Asset Management SA

332.    Plaintiffs are entitled to recover damages caused by Defendants' wrongful conduct.

333.    The amount and location of the funds and assets from which a recovery could be paid is unknown to Plaintiffs and cannot be ascertained without a detailed accounting by Defendants of such property.

**SEVENTEENTH CLAIM FOR RELIEF**
**(Transfer of Assets and Other Relief)**
Against Nominal Defendant Credit Suisse

334.    Defendants Lasshofer, Innovatis GmbH, Innovatis Immobilien GmbH, and Innovatis Asset Management SA have refused to comply with this Court's injunctive orders, granted to protect Plaintiffs' ability to collect a potential judgment in this matter and to preserve this Court's ability to grant effective relief.

335.    Credit Suisse holds the Lasshofer Credit Suisse Accounts.

336.    The funds in the Lasshofer Credit Suisse Accounts are subject to the injunctive orders granted by this Court.

337.    As Plaintiffs have been harmed by the failure of Defendant

72

Lasshofer and his entities to abide by this Court's injunctive orders, Plaintiffs are entitled to an order requiring Credit Suisse to relocate the Lasshofer Credit Suisse Accounts to the United States, and to take further action as necessary to give effect to this Court's orders.

## Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that this Court find in favor of Plaintiffs and against Defendants on all claims and enter judgment awarding:

a.      Plaintiffs' actual damages;

b.      Plaintiffs' treble damages pursuant to C.R.S. § 18-4-405, C.R.S. § 18-17-106(7); and 18 U.S.C. § 1964(c);

c.      Reasonable attorneys fees and costs;

d.      Pre- and post-judgment interest;

e.      Relocation of the Lasshofer Credit Suisse Accounts to the United States; and such further relief as the Court deems necessary to facilitate transfer of $2.18 million of funds contained in the accounts to the District of Colorado pursuant to the Court's repatriation order, and to freeze the accounts to satisfy a potential judgment pursuant to the Court's freeze order;

f.      An accounting of all of Defendants' assets; and

g.      Any other relief the Court deems just and proper.

DATED this 24th day of July, 2012

Respectfully submitted,

**PERKINS COIE LLP**

80160-0001/LEGAL24249937.1

*s/ Robert N. Miller*
Robert N. Miller
Stephanie E. Dunn
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255 Telephone:
303.291.2300 Facsimile: 303.291.2400
rmiller@perkinscoie.com
sdunn@perkinscoie.com

And

**ROBINS, KAPLAN, MILLER & CIRESI
L.P.**

Christopher W. Madel
Bruce D. Manning
Lauren E. Schrero
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402 Telephone:
612.349.8500
Facsimile: 612.339.4181 cwmadel@rkmc.com
bdmanning@rkmc.com  leschrero@rkmc.com

ATTORNEYS FOR PLAINTIFFS

Plaintiffs' Addresses:

John Niemi
644 Ruby Trust Way
Castle Rock, CO 80108

Robert Naegele, III,
1104 County Road 112
Carbondale, CO  81623

Jesper Parnevik
17553 S.E. Conch Bar Avenue
Tequesta, FL 33469

74