IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-CV-869-RBJ

JOHN NIEMI,
ROBERT NAEGELE, III, and
JESPER PARNEVIK,

      Plaintiffs,

v.

MICHAEL FRANK BURGESS,
ERWIN LASSHOFER,
INNOVATIS GMBH,
INNOVATIS IMMOBILIEN GMBH,
INNOVATIS ASSET MANAGEMENT SA,
LEXINGTON CAPITAL & PROPERTY INVESTMENTS, LLC, and
BARRY FUNT,

      Defendants,

CREDIT SUISSE A.G.,

      Nominal Defendant.


DECLARATION OF DRS. PETER REICHART AND ANDREA MEIER

We, Dr. Peter Reichart and Dr. Andrea Meier, declare the following:


I.      BACKGROUND AND QUALIFICATIONS

1      We are members of the bar of the Canton of Zurich, Switzerland and attorneys-at-law with the Zurich law firm Wartmann & Merker. Our practice focuses on international and national litigation. Our resumes and CVs are attached as Exhibit A.

2      We submit this declaration in support of Credit Suisse AG's ("**CS AG**") Opposition to Plaintiffs' Motion for Preliminary Injunction in this action. It is our understand-

Exhibit 3

ing that Plaintiffs are seeking an order from the United States District Court in the District of Colorado which requires CS AG to transfer all monies belonging to the Lasshofer Defendants in CS AG's (or any of its subsidiaries' or agents') possession, including, but not limited to Innovatis's account with CS AG in Switzerland, to an escrow account in Colorado and to provide Plaintiffs with an accounting of all of the Lasshofer Defendants' assets held by CS AG (or any of its subsidiaries' or agents') (the **"Requested Injunction"**).

3   The Requested Injunction would require the transfer of and disclosure of information relating to assets allegedly held by CS AG in Switzerland.

4   CS AG is domiciled in and incorporated under the laws of Switzerland.

5   The Requested Injunction raises two main issues under Swiss law: (i) whether a Swiss court would recognize the Requested Injunction as having effect in Switzerland and (ii), if not, the ramifications for CS AG and its officers and employees if CS AG nevertheless complied with such order. The Requested Injunction also implicates Swiss law prohibitions on taking evidence in Switzerland, which affects CS AG's ability to present evidence in this U.S. forum. Each issue is discussed herein.

6   In our opinion, for the reasons set forth below, complying with the Requested Injunction would place CS AG and its employees in violation of Swiss laws, which carry civil, administrative and criminal penalties.

## II.   EFFECT OF A U.S. INJUNCTIVE ORDER IN SWITZERLAND

### A.   Principle of territoriality excludes extraterritorial effect of a U.S.-ordered injunction in Switzerland

7   In view of the principle of territoriality, foreign judgments do not have legal effect within Switzerland unless they are granted such effect by a competent Swiss court (see, e.g., BERTI/DÄPPEN, Basel Commentary to the Swiss Private International

Law, Article 25 N 40; SIEHR, Das Internationale Privatrecht der Schweiz, 2002, 4). As a consequence, for the Requested Injunction to have legal effect in Switzerland, the order must be recognized and declared enforceable by the competent Swiss court upon application of the interested party. Article 28 of the Swiss Private International Law Act (**"PILA"**) provides as follows:

> *Article 28[1]*
>
> *II. Enforcement*
>
> *A decision recognized under Articles 25 to 27 shall be declared enforceable upon application by the interested party.*

8    Recognition and enforcement are subject to several conditions (see below para. 9 et seq.).

## B.    Recognition and enforcement of a U.S.-ordered injunction in Switzerland

9    The recognition and enforcement proceedings regarding a foreign decision are governed by Articles 25 et seq. PILA. Article 25 provides as follows:

> *Article 25[2]*
>
> *I. Recognition*
>
> *1. General rule*
>
> *A foreign decision shall be recognized in Switzerland:*
>
> *a. If the judicial or administrative authorities of the State in which the decision was rendered had jurisdiction;*
>
> *b. If no ordinary appeal can be lodged against the decision or the decision is final; and*
>
> *c. If there are no grounds for refusal under Article 27.*

10    In view of Article 25 lit b. PILA, the most distinguished Swiss legal commentators submit that orders for interim relief cannot be recognized under Article 25 et seq. PILA for lack of finality (see, e.g. DASSER, Jusletter 19 January 2004, N 17; GEHRI,

---

[1]    Unofficial translation.
[2]    Unofficial translation.

– 4 –

SZZP 4/2006, 410; JAMETTI GREINER, ZBJV 1994, 655; SCHNYDER/LIATOWITSCH, Internationales Privat- und Zivilverfahrensrecht, 2nd ed, 2006, N 379; SPÜHLER/MEYER, Einführung ins internationale Zivilprozessrecht, 2001, 85; STAEHELIN, BJM 1989, 180; STAEHELIN/STAEHELIN/GROLIMUND, Zivilprozessrecht, 2008, § 28 N 21; WALTER, Internationales Zivilprozessrecht der Schweiz, 4th ed., 2007, 388; KAUFMANN-KOHLER, SJ 1997, 563). The Swiss Federal Tribunal has not decided the issue so far, but noted *obiter dictum* that the presumably prevailing opinion among commentators denies the possibility of enforcement of orders regarding interim measures under Article 25 PILA (Decision of March 18, 2004, 5P.252/2003, E. 3.3).

11    From a Swiss law perspective, the Requested Injunction would constitute an order for interim relief. Under Swiss law, all relief not aimed at solving a legal dispute in a final manner, but rather to protect a party's legal position during court proceedings until the matter is finally determined, is considered interim relief, including all measures for asset protection (see, e.g., Decision of the Swiss Federal Tribunal ["**DFT**"] 129 III 626, E. 5.2.3; 136 III 200, E. 2.3.2; Isaak MEIER, Grundlagen des einstweiligen Rechtsschutzes im Schweizerischen Privatrecht und Zivilverfahrensrecht, 1983, 7; KOFMEL EHRENZELLER, Der vorläufige Rechtsschutz im internationalen Verhältnis, 2003, 24 et seq.). Consequently, the Federal Tribunal qualifies a court-ordered measure for the freezing of assets to secure a claim (the so-called "*Arrest*" according to Article 271 et seq. of the Swiss Debt Enforcement and Bankruptcy Act) as an interim measure because "*it shall prevent the debtor from disposing of his assets in an attempt to diminish the assets available to the creditor and to satisfy his claim*[3]" (DFT 130 III 661, E. 1.3; see also DFT 133 III 589, E. 1). In view of this, any interim relief granted by a U.S. court aimed at the securing/freezing of assets to secure a claim, whether it is a temporary or final

---

[3]    In German: *"[…], die den Schuldner daran hindern soll, über sein Vermögen zu verfügen und es einer künftigen Vollstreckung seines Gläubigers zu entziehen."*

- 5 –

injunctive order, would be considered interim relief. Therefore, such order would not be enforceable in Switzerland under the prevailing opinion.

12   Even if one were to affirm the enforceability of orders for interim relief under the PILA, in our opinion, the Requested Injunction would not be enforceable in Switzerland due to the "*indirect jurisdiction*" test of Article 26 PILA (see Article 25 lit. a. PILA). According to this test, a decision may only be recognized if the jurisdiction of the foreign court is considered proper as defined under Article 26, which states (emphasis added):

> *Article 26[4]*
>
> *2. Jurisdiction of foreign authorities*
>
> *The foreign authorities have jurisdiction:*
>
> **a. If a provision of this Code so provides or, in the absence of such a provision, the defendant was domiciled in the State in which the decision was rendered**;
>
> *b. If, in the case of pecuniary claims, the parties have submitted by an agreement valid under this Code to the jurisdiction of the authority that rendered the decision;*
>
> *c. If, in the case of pecuniary claims, the defendant proceeded to the merits without objecting to jurisdiction; or*
>
> *d. If, in the case of a counter-claim, the authority which rendered the decision had jurisdiction over the principal claim and there is a factual connection between the principal claim and the counterclaim.*

13   Since CS AG is not domiciled in the U.S., Swiss law would accept the indirect jurisdiction of a U.S. court only if a provision of the PILA expressly provided for such jurisdiction. The only provision pertinent in this context is Article 149 PILA. It provides for indirect jurisdiction of a foreign court in the State of the performance of the characteristic obligation (in the case of contractual obligations), and at the place of the act or the resultant injury (in the case of unjust enrichment

---

[4]   Unofficial translation.

and tort), but in all cases *only if the defendant was not domiciled in Switzerland* (see Article 149 lit. a., e. and f. PILA; emphasis added):

> *Article 149[5]*
>
> *1 Foreign decisions relating to claims concerning the law of obligations shall be recognized in Switzerland:*
>
> *a. If they were rendered in the State of domicile of the defendant; or*
>
> *b. If they were rendered in the State of habitual residence of the defendant and the claims relate to an activity conducted there.*
>
> *2 A foreign decision shall also be recognized:*
>
> ***a. If a decision relating to a contractual obligation was rendered in the State of performance of the characteristic obligation <u>and the defendant was not domiciled in Switzerland</u>;***
>
> *b. If a decision relating to a claim concerning a consumer contract was rendered at the domicile or place of habitual residence of the consumer and the conditions set forth in Article 120, paragraph 1, are satisfied;*
>
> *c. If a decision relating to a claim concerning an employment contract was rendered at the place where the employee worked or at the place where the business was conducted and the employee was not domiciled in Switzerland;*
>
> *d. If a decision relating to a claim resulting from the operation of a business was rendered at the registered office of that business;*
>
> ***e. If a decision relating to unjust enrichment was rendered at the place of the act or the resultant injury <u>and the defendant was not domiciled in Switzerland</u>; or***
>
> ***f. If a decision relating to a tort was rendered at the place of the act or the resultant injury <u>and the defendant was not domiciled in Switzerland.</u>***

14    CS AG is domiciled in Switzerland. Therefore, in the situation at hand, the PILA does not provide for indirect jurisdiction of a foreign court. It is thus unlikely that the Requested Injunction would be recognized and enforced in Switzerland upon application of the Plaintiffs.

---

[5]    Unofficial translation.

### III.   CRIMINAL AND OTHER SANCTIONS FOR COMPLIANCE WITH THE REQUESTED INJUNCTION

15    If CS AG and its officers and employees were to comply with the Requested Injunction without a Swiss court's declaration of enforceability, which, as set forth above, we do not believe the Plaintiffs could obtain, they would violate Swiss law, including banking secrecy laws, and expose themselves to Swiss prosecution and penalties, incarceration, and regulatory action (see below para. 16 et seq.).

### A.   Misappropriation (Article 138 PC)

16    Article 138 of the Swiss Penal Code (**"PC"**) provides for criminal sanctions (custodial sentence up to ten years) for misappropriating entrusted property or financial assets:

> *Article 138[6]*
>
> *Misappropriation*
>
> *1.   Any person who for his own or another's unlawful gain appropriates moveable property belonging to another but entrusted to him,*
>
> *any person who makes unlawful use of financial assets entrusted to him for his own or another's benefit,*
>
> *shall be liable to a custodial sentence not exceeding five years or to a monetary penalty. [...]*
>
> *2.   Any person who commits the foregoing offence in his capacity as a member of a public authority, or as a public official, guardian, adviser, professional asset manager, or in the practice of a profession or a trade or the execution of a commercial transaction for which he has been authorised by a public authority, shall be liable to a custodial sentence not exceeding ten years or to a monetary penalty.*

---

[6]    Unofficial translation provided by the Federal Authorities of the Swiss Confederation on http://www.admin.ch/ch/e/rs/3.html.

17      According to the Swiss Federal Tribunal, "*entrusted assets*" are assets which were handed over with the restriction not to use the assets for own purposes, but to keep them at the disposal of the principal or to use them for a purpose designated by the principal (see, e.g., DFT 80 IV 55; 99 IV 202; 101 IV 163; 106 IV 357; 120 IV 119; 129 IV 259). It is sufficient that the person entrusted with the assets is able to dispose of the assets without the participation of the principal. If that element is fulfilled, assets are considered as "*entrusted*" irrespective of whether the principal is still able to dispose of the funds himself or has waived his own authority to dispose of the funds (see DFT 109 IV 32; 119 IV 128). Hence, the Swiss Federal Tribunal found that assets on a bank account had been entrusted to a person who had been given power of attorney on the account to make transactions while the account holder continued to be able to dispose of the assets himself (DFT 109 IV 27, 32).

18      The Swiss Federal Tribunal has repeatedly confirmed that assets held on bank accounts and securities deposited with a bank are "*entrusted*" to the bank within the meaning of Article 138 PC (see Decision 6B_199/2011 of April 10, 2012, E. 5.3.3; 6S.709/2000 of May 26, 2003, E. 5.3.2; DFT 120 IV 182, E. 1b). The bank and its officers and employees are subject to a duty to preserve the value of the assets based on the contractual relationship with the customer (Decision 6B_199/2011 of April 10, 2012, E. 5.3.3).

19      The duty to preserve the value of the assets is breached if the person entrusted with the assets makes use of them in an unlawful way for his or a third person's benefit. The conduct must clearly show his intention to frustrate the principal's claim to the assets (DFT 121 IV 25; 129 IV 259). Furthermore, the person must act with the intention to unlawfully enrich himself or a third party (DFT 74 IV 30; 77 IV 12; 81 IV 28, 234; 105 IV 34; 118 IV 34).

20      Misappropriation further requires that the principal has suffered damage due to the other person's unlawful use of the funds. However, the requirement is satisfied as a

matter of course if a person has made use of the entrusted assets in an unlawful way because such conduct puts at risk the principals' claim and thus reduces its value (RIEDO, AJP 12 (2003) 1483).

21    In a decision of May 20, 1994 (DFT 120 IV 184), the Swiss Federal Tribunal reaffirmed that employees of a bank who are responsible for the management of client assets fall within the scope of Article 138 para. 2 PC, which provides for a custodial sentence of up to 10 years.

22    We understand that the funds in question, if any, are kept by CS AG in its capacity as an account holding bank. Because the Requested Injunction would not have legal effect in Switzerland (above para. 7), CS AG would have no legitimate title to dispose of such assets. If CS AG nevertheless complied with the Requested Injunction and transferred the Defendants' assets, if any, to a U.S. escrow account, such transfer would constitute unlawful use, and CS AG's officers and employees could be subject to criminal prosecution for breach of Article 138 PC. Based on Article 301 of the Swiss Federal Code of Criminal Procedure ("**CCP**"), any person has the right to file a criminal complaint with the criminal authorities. The criminal authorities will have to open an investigation if there are sufficient indications to support a suspicion that someone has committed an offense (see below para. 23). We understand that Innovatis has already reserved the right to file a criminal complaint for misappropriation should CS AG comply with an order of the U.S. District Court for the District of Colorado. However, even without such a complaint, the Swiss criminal authorities prosecute such an offense *ex officio*, i.e. on their own initiative.

23    The decision to prosecute a violation of Article 138 PC is not within the discretion of the prosecuting authority. Article 7 CCP provides that if there are sufficient indications to support a suspicion that someone has committed an offense, the prosecuting authority is required by law to bring a case. Such indications may follow from information and reports of the police, from a criminal complaint or

- 10 –

from the prosecuting authority's own investigations (see Article 309 CCP). Only in very limited circumstances not applicable here (outlined in Article 8 CCP) is prosecution in the discretion of the prosecuting authority.

**B.**   **Unlawful activities on behalf of a foreign state (Article 271 PC)**

**1.**   **Overview**

24   Switzerland prohibits activities of an official nature on behalf of a foreign state on Swiss territory. This prohibition is enforced with criminal sanctions set forth in Article 271 PC:

> *Article 271[7]*
>
> *Unlawful activities on behalf of a foreign state*
>
> *1.  Any person who carries out activities on behalf of a foreign state on Swiss territory without lawful authority, where such activities are the responsibility of a public authority or public official,*
>
> *any person who carries out such activities for a foreign party or organisation,*
>
> *any person who encourages such activities,*
>
> *shall be liable to a custodial sentence not exceeding three years or to a monetary penalty, or in serious cases to a custodial sentence of not less than one year.*

25   Article 271 PC protects the interests of the Swiss state. Thus, while Innovatis could file a criminal complaint against CS AG or its employees for violation of Article 271 (see above para. 22), the Swiss criminal authorities will prosecute any offenses *ex officio*, i.e. irrespective of a criminal complaint. The decision to prosecute a violation of Article 271 PC is not within the discretion of the prosecuting authority (see above para. 23).

26   Since 1984, there have been 29 convictions of violations of Article 271.[8]

---

[7]   Unofficial translation provided by the Federal Authorities of the Swiss Confederation on http://www.admin.ch/ch/e/rs/3.html.

- 11 –

**2.** **Taking of evidence in Switzerland**

27    Prohibited activities include the taking of evidence in Switzerland without intergovernmental assistance. Switzerland adheres to the civil law view that the taking of evidence is essentially a judicial function reserved to domestic courts or authorities (see DFT 114 IV 130, E. 2c). Thus, it is the sovereign and exclusive right of the Swiss authorities to compel a party to release documents located in Switzerland or to take depositions from persons residing in Switzerland. Any unilateral attempt of a foreign court or a party to a proceeding abroad to take evidence in Switzerland without the participation or consent of the Swiss authorities is regarded as an infringement of Swiss sovereignty and falls within the scope of Article 271 PC. In order to compel a person in Switzerland to produce documents and/or information, it is mandatory that a foreign court (on its own motion or upon the application of a party) uses the channels of international legal assistance and submits a request to the competent Swiss authorities to exercise their judicial power. The pertinent requirements are set forth in the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, concluded on 18 March 1970 (http://www.hcch.net/index_en.php?act=conventions.text&cid=82; the **"Hague Convention"**).

28    The use of legal assistance proceedings allows the Swiss authorities to verify, *inter alia*, that the requirements for granting legal assistance are met and that the rights of affected third parties (e.g. holders of trade or any other financial secrets) are safeguarded.

29    Swiss law and practice allow a party to the proceedings to voluntarily submit evidence already in its possession to the court in support of its pleadings, provided, however, that the disclosure does not violate third party secrecy rights and data

---

[8]    See Federal Office of Statistics, Verurteilungen wegen Straftaten nach dem Strafgesetzbuch (StGB), seit 1984 [Convictions for Offenses Under the Criminal Code since 1984], http://www.bfs.admin.ch/bfs/portal/de/index/themen/19/03/03/key/straftaten/delikte_im_einzelnen.html.

protection laws (see DFT 114 IV 131; HOPF, Basel Commentary to the Swiss Penal Code, Article 271 N 15). In contrast thereto, a request for the production of documents/information to a Swiss third-party records custodian must be made, under Swiss law, by a Swiss authority. Compliance of the Swiss records custodian with a foreign order compelling the production of such documents/information other than by virtue of legal assistance would amount to a violation of Article 271 PC (see Guidelines to International Judicial Assistance in Civil Matters, 3[th] ed. 2003, Federal Office of Justice, p. 23; http://www.rhf.admin.ch/etc/medialib/data/rhf. Par.0064.File.tmp/wegl-ziv-e.pdf).

30    In the case at hand, the Requested Injunction would be addressed to CS AG, a corporation domiciled in Switzerland. The order would relate to documents/information located in Switzerland held by CS AG as custodian of the bank accounts and the corresponding records. Under such circumstances, complying with the order other than by virtue of legal assistance proceedings – i.e. in response to a request for legal assistance under the Hague Convention approved by the Swiss authorities – would expose CS AG's officers and employees to the risk of prosecution under Article 271 PC.

**3.    Compliance with a foreign order regarding the protection of assets**

31    Likewise, a Swiss bank is barred under Article 271 PC from complying with a foreign court order to transfer assets of a client to an escrow account abroad in order to secure a plaintiff's claim. The issuance of an order for protecting assets located in Switzerland is, from a Swiss law perspective, an official act reserved to the competent Swiss courts or authorities. Any unilateral attempt of a foreign court to freeze or secure assets in Switzerland would be viewed as an infringement of Swiss sovereignty and would violate Article 271 PC. If a party wants to obtain an asset protection order regarding assets located in Switzerland, it has to either request recognition and enforcement of an order obtained abroad (see above para. 9

et seq.) or apply directly to a Swiss court for the granting of an asset preservation order.

32    Consequently, according to Article 271 para. 3 PC, if a bank complies with an order of a foreign court to transfer client assets that has not been declared enforceable in Switzerland (and assuming that the bank acts without the permission of the account holder), it has engaged in unlawful activities of a foreign state on Swiss territory.

33    In the present case, if CS AG were to comply with a U.S. court order requiring the transfer of assets of the Defendants to an escrow account in Colorado, CS AG's officers and employees are likely to be prosecuted under Article 271 PC.


C.    **Swiss Banking Secrecy**

1.    **Scope and legal basis**

34    Although there is no statutory definition thereof, the concept of banking secrecy can be defined as the professional discretion which banks, their employees, officers and certain third parties must observe in regard to the financial and personal affairs of their clients.

35    Banking secrecy covers all information entrusted by the client and/or discovered or learned by the bank in the conduct of business activities. This includes, *inter alia*, the existence of an account relationship between the bank and its clients, the type of accounts held and any transactions involving the bank, any information provided by the client to the bank on personal or financial matters, and any further information that could facilitate the determination of the client's identity or other confidential information about the client (see DFT 137 II 431, 437; Emch/Renz/Arpagaus, Das schweizerische Bankgeschäft, 7th ed., 2011, N 470).

36    There are three different bases for Swiss banking secrecy.

- 14 –

37    Firstly, Swiss banking secrecy results from the provisions of Articles 27 et seq. of the Swiss Civil Code (**"CC"**), which protect a person's right to privacy. If that right is unlawfully infringed, the injured party has the right to apply to the court for protection against all those causing the infringement. Privacy includes economic privacy. The sanctions for violations of Articles 27 et seq. CC are, in essence, orders enjoining a violation of a person's right to privacy or declaratory judgments stating that a violation was illegal.

38    Secondly, Swiss banking secrecy ensues from the contractual relationship between the bank and its client, which in essence is a mandate agreement pursuant to Articles 394 et seq. of the Swiss Code of Obligations (**"CO"**). In a mandate relationship, the agent – i.e. the bank – is liable to the principal – the bank customer – for the diligent and faithful performance of the business entrusted to it, pursuant to Article 398 para. 2 CO. The agent's duty of discretion constitutes an aspect of its contractual obligation of loyalty. A violation of this obligation exposes the bank to liability for any loss suffered by its customer as a result of the breach of banking secrecy.

39    Thirdly, Swiss banking secrecy results from Article 47 of the Swiss Federal Banking Act (**"BA"**). Article 47 reads as follows:

> *Article 47[9]*
>
> *1.  Whoever intentionally:*
>
> *discloses secret information confided to him in his capacity as officer, employee, agent, or liquidator of a bank, as officer or employee of an auditing firm, or if he has acquired knowledge in such capacity,*
>
> *attempts to induce other person to violate the professional secrecy*
>
> *shall be punished with imprisonment of up to three years or monetary penalty.*
>
> *2.  If the act has been committed by negligence, then the penalty shall be a fine of up to 250,000 Swiss Francs.*

---

[9]    Unofficial translation.

*3.  In case of a repetition of such act within five years following the final sentence, the fine shall be a minimum of 45 daily income units.*

*4.  The breach of professional secrecy remains punishable after termination of the public or private employment relationship or practice of the profession.*

*5.  Federal and Cantonal provisions concerning the obligations to testify and to furnish information to a public authority shall remain applicable.*

*6. The prosecution and adjudication of the acts under this article are left to the Cantons. The general provision of the Penal Code are applicable.*

2.  **Criminal and other sanctions for breaching banking secrecy (Article 47 BA *et al.*)**

40    Individuals are criminally liable for violations of Article 47 BA. Because private parties can initiate criminal proceedings in Switzerland, Innovatis could file a criminal complaint against CS AG and/or its employees for violating Article 47 BA, which the Swiss criminal authorities would be required to investigate (see above para. 22 et seq.). Furthermore, as there is a significant public interest in protecting banking secrecy, the Swiss criminal authorities prosecute under Article 47 BA *ex officio*, i.e. irrespective of a complaint of the injured party. The decision to prosecute a violation of Article 47 is not within the discretion of the prosecuting authority (see above para. 23).

41    Between 1993 and 2009, there have been 48 convictions for violations of Article 47.[10]

42    In addition to the criminal sanctions provided for in Article 47 BA, any violation of banking secrecy would expose the bank and its officers and/or employees to administrative sanctions by the Swiss Financial Market Supervisory Authority

---

[10]    The Swiss Federal Office for Statistics has not updated this statistic for post-1996 cases, but has provided this information in its amicus brief submitted in the case of *United States of America vs. UBS AG*, as cited in para. 57 below.

("**FINMA**"). FINMA sanctions can be taken against the bank and its officers and/or employees. They can go so far as (i) an injunction against an individual to continue to hold or resume a leading position in a financial institution and (ii) administrative sanctions against the bank, including withdrawal of the banking license if FINMA comes to the conclusion that the bank is no longer fulfilling the "*fit and proper business*" requirement.

43   The civil liability for loss caused to a bank customer as a result of a violation of banking secrecy by its officers and employees is on both the bank as a legal entity as well as the acting individual.

44   In the present case, banking secrecy prohibits CS AG from disclosing any information regarding potential bank accounts of the Defendants with CS AG, including the existence of an account relationship and any transactions (above para. 35). This prevents CS AG from providing an accounting of the Defendants' assets allegedly held by CS AG and from disclosing any information on the amount of the funds currently held in these accounts, if any. As a consequence, any employee or officer of CS AG who discloses such information commits a criminal offense due to a breach of Article 47 BA.

**D.   Industrial espionage (Article 273 PC)**

45   Disclosing information protected by Swiss financial privacy laws may also constitute an offense under Article 273 PC. Said provision protects Swiss sovereignty and the Swiss economy by prohibiting the disclosure of trade or business secrets to foreign authorities and/or private persons. It is also an *ex officio* offense and the decision to prosecute a violation of Article 273 is not within the discretion of the prosecuting authority (see above para. 23). Article 273 PC provides as follows:

- 17 –

> *Article 273[11]*
>
> *Industrial espionage*
>
> *Any person who obtains a manufacturing or trade secret in order to make it available to an external official agency, a foreign organisation, a private enterprise, or the agents of any of these, or,*
>
> *any person who makes a manufacturing or trade secret available to an external official agency, a foreign organisation, a private enterprise, or the agents of any of these,*
>
> *shall be liable to a custodial sentence not exceeding three years or to a monetary penalty, or in serious cases to a custodial sentence of not less than one year. Any custodial sentence may be combined with a monetary penalty.*

46    Since 1984, there have been 29 convictions of violations of Article 273.[12]

47    Information a company receives from its customers, including information a bank receives from its customers, falls within the scope of the provision. It is well-established that the protection includes the identities, and account and transaction related information of bank customers.

48    The information must have an "*internal relationship*" with Switzerland. This requirement is satisfied if assets on a Swiss bank account are concerned, irrespective of the nationality of the account holder and/or beneficial owner. In a decision of February 6, 1985 (DFT 111 IV 74), the Swiss Federal Tribunal had to examine the case of two UBS bank employees who stole a computer program from UBS that gave the French authorities access to the accounts of French citizens at that bank. The Federal Tribunal qualified the conduct of the two employees as a serious breach of Article 273 PC. It found that not just the financial interests of the bank, but also key national economic interests of Switzerland were jeopardized. The employees were sentenced to imprisonment of 48 and 27 months, respectively.

---

[11]    Unofficial translation provided by the Federal Authorities of the Swiss Confederation on http://www.admin.ch/ch/e/rs/3.html.

[12]    See Federal Office of Statistics, Verurteilungen wegen Straftaten nach dem Strafgesetzbuch (StGB), seit 1984 [Convictions for Offenses Under the Criminal Code since 1984], http://www.bfs.admin.ch/bfs/portal/de/index/themen/19/03/03/key/straftaten/delikte_im_einzelnen.html.

49     Another decision of the Swiss Federal Tribunal of May 3, 1978 (DFT 104 IV 176) dealt with the following facts: Stanley Adams, an employee of the Marketing Group Overseas of F. Hoffmann-La Roche & Co. AG, a pharmacy corporation domiciled in Switzerland, disclosed the content of several confidential company documents to the Commission of the European Communities (**"E.C."**) during a meeting with E.C. officers in Brussels. Before such meeting, he had sent a letter to the E.C. authorities from within Switzerland, had made arrangements for the meeting from within Switzerland, and had taken possession of the company documents within Switzerland. The criminal court of the city of Basel/Switzerland sentenced Adams to imprisonment of 12 months (on probation) for breach of Article 273 PC. The sentence was confirmed by the Court of Appeal and the Swiss Federal Tribunal. Adams had argued that the Swiss courts lacked jurisdiction because disclosure of the company secrets had occurred in Brussels. The Federal Tribunal, however, affirmed the Swiss courts' jurisdiction because Adams had taken the decision to disclose such secrets in Switzerland and had left Switzerland for Brussels with that intention.

50     However, even if the decision to disclose a business secret were formed abroad, the offender would nevertheless be subject to Swiss jurisdiction based on Article 4 PC. In order to protect Swiss trade and business secrets abroad, Article 4 PC extends the jurisdiction of Swiss courts with regard to Article 273 PC to offenses committed abroad. As a result, the case of a witness who testifies before a foreign court and thereby reveals Swiss business secrets falls within the scope of Article 273 in conjunction with Article 4 PC (see HOPF, *op.cit.*, Article 273 N 19).

51     If CS AG's officers or employees were to disclose any information regarding accounts of the Defendants allegedly held with CS AG, they would commit a criminal offense due to a breach of Article 273 PC. The same is true if they testified as witnesses before a U.S. court on issues protected by banking secrecy. This is not altered by the fact that the testimony is provided on U.S. territory since Article 273

PC also applies if a person discloses protected information abroad (above para. 49 et seq.).

**E.      Compulsion from a foreign court does not excuse violation of Swiss law**

52      Article 17 PC provides that a person who carries out an act carrying a criminal penalty in order to save a legal interest of his own or of another from immediate and not otherwise avertable danger, acts lawfully if by doing so he safeguards interests of higher value ("*state of necessity defense*"). Generally, Swiss courts do not excuse violations of Swiss law on the grounds that a party acts in a "*state of necessity*" because it is under compulsion from a foreign court.

53      A decision of the criminal court of the city of Basel/Switzerland dated November 15, 2007, confirms this conclusion. A Swiss banker had been detained in 2003 in Germany for participation in fraudulent activity. On this occasion, documents containing information about 85 clients of a Swiss bank were confiscated from the place of residence of his business partner. The banker had been responsible for managing these clients as an employee of the Swiss bank. During the banker's relatively lengthy period of detention in Germany (several months), he confirmed to the German authorities the accuracy of the confiscated information. This additional information allowed the German authorities to identify and prosecute a number of German bank clients. After the banker returned to Switzerland, the Basel criminal court found him guilty of breaching Article 273 PC and Article 47 BA.

54      The state of necessity defense was expressly rejected by the court, despite recognizing that the banker had been under considerable pressure to cooperate with the German authorities as a result of his detention. The court stated:[13]

---

[13]      See translation in Response of Amicus Curiae Government of Switzerland to Petitioner's June 30 Submission in the case of *United States of America vs. UBS AG*, p.1., as cited in para. 57 below.

> *"Yet we should not forget that the German authorities must have exerted considerable pressure [on the defendant] to disclose information about German investors in Switzerland and he did not offer this information on his own initiative; in addition, the detention lasting several months was also undoubtedly nerve-racking. As with the other crimes he committed for which he has already been sentenced, here, too, however, he put his own interests above all else without there having been an actual necessity."*

55    The conviction was confirmed by the Court of Appeal on April 24, 2009.

56    The decision is in line with the position of the Swiss authorities. The Federal Government of Switzerland took a clear position in 1981 in its answer to a parliamentary interpellation (interpellation Robbiani NR 81.577), where it stated that disproportional threats of sanctions of U.S. authorities against companies or persons which had refused to disclose secrets protected by Swiss law are suited to violate Swiss sovereignty, on the one hand because they are an attempt to force persons who are subject to Swiss law to violate Swiss law, and on the other hand because they are an attempt to create a state of necessity by which the Swiss court shall be hindered to enforce the secrecy provisions under Swiss law.

57    Finally, the fact that the Swiss authorities are serious about not tolerating any violation of Swiss law based on U.S. court orders is confirmed by the amicus brief of the Government of Switzerland filed on April 28, 2009 and its Response to Petitioner's submission filed on July 7, 2009 in the case *United States of America vs. UBS AG* before the U.S. District Court for the Southern District of Florida Miami Division (Case No. 09-20423-CIV-GOLD/MCALILEY). The U.S. Internal Revenue Service had filed a petition to the Court to enforce a "*John Doe*" Summons ordering UBS AG to produce evidence from Switzerland. In its amicus brief, the Government of Switzerland urged the Court to deny the petition to enforce the summons because it would directly violate Swiss law (see Section II p. 13) and would be inconsistent with international comity (see Section IV p. 19). In

its Response, it made clear that it would not tolerate a violation of Swiss law (see p. 3 et seq.):

> *"UBS is unable to comply with the summons without violating Swiss law. The Government of Switzerland will use its legal authority to ensure that the bank cannot be pressured to transmit the information illegally, including if necessary by issuing an order taking effective control of the data at UBS that is the subject of the summons and expressly prohibiting UBS from attempting to comply – similar to what the Government of Switzerland did in reaction to the Marc Rich & Co. case."*

58   For all of the foregoing reasons, the Requested Injunction, if entered by this U.S. Court, would not have legal effect in Switzerland. Consequently, if CS AG were to comply with the Requested Injunction, CS AG, its officers and employees would be in violation of Swiss law.

Pursuant to 28 U.S.C. §1746, we declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 31st day of August, 2012

<div style="margin-left:2em">

*/s Peter Reichart*

_____

Dr. Peter Reichart, Attorney-at-law

*/s Andrea Meier*

_____

Dr. Andrea Meier, Attorney-at-law

</div>

- 22 –