**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge R. Brooke Jackson**

Civil Action No. 12-cv-869-RBJ

JOHN NIEMI,
ROBERT NAEGELE, III, and
JESPER PARNEVIK,

       Plaintiffs,

v.

MICHAEL FRANK BURGESS,
ERWIN LASSHOFER,
INNOVATIS GMBH,
INNOVATIS IMMOBILIEN GMBH,
INNOVATIS ASSET MANAGEMENT SA,
LEXINGTON CAPITAL & PROPERTY
INVESTMENTS, LLC, and
BARRY FUNT,

       Defendants,

CREDIT SUISSE A.G.,

       Nominal Defendant.

---

**PLAINTIFFS' REPLY TO CREDIT SUISSE AG'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST CREDIT
SUISSE AG**

**INTRODUCTION**

The brief submitted by Credit Suisse AG ("Credit Suisse") in response to Plaintiffs'
Motion for Preliminary Injunction explains how Credit Suisse employee Jonathan
Trounce knowingly and intentionally collaborated with Lasshofer to induce and
encourage John Niemi's reliance on Lasshofer's fraudulent funding scheme, thereby
demonstrating why this Court has personal jurisdiction over Credit Suisse.

In essence, Credit Suisse admits that its employee participated in a conference call
and discussed two specific and relevant topics with Plaintiffs at the Lasshofer
Defendants' direction. Credit Suisse acknowledges that the purpose of the call was to
discuss a so-called "Safekeeping Account" to protect Plaintiffs and their Colorado real-
estate project. And Credit Suisse admits that the purpose of the Safekeeping Account was
to protect Plaintiffs from precisely the harm that this lawsuit seeks to redress—the
lenders' failure to perform as promised. Moreover, the involvement of Credit Suisse itself
lent the fraudulent funding scheme the appearance of legitimacy.

In sum, the facts, viewed in light of applicable case law, demonstrate that this Court
has specific jurisdiction over Credit Suisse.

## FACTS

In its brief and the Declaration of Jonathan Trounce[1], Credit Suisse provides additional *support* for this Court's exercise of specific jurisdiction over Credit Suisse. In particular, Credit Suisse and Trounce reveal that in advance of the November 24, 2009 conference call with Niemi and Michael Burgess, Lasshofer and Trounce agreed upon the conference call's content. (*See* Response Brief (Dkt. 121) at 3 ("Mr. Trounce participated in the call at the direction of Innovatis.").) Lasshofer told Trounce what to say to Niemi. (*Id.* at 8 (citing "Trounce Decl. ¶ 15" for proposition that "Defendant Innovatis, the account holder, instructed Mr. Trounce to participate in the conference call and authorized him to discuss only two specific topics—that the Safekeeping Account had been opened and that the account held securities valued at €4 million"); *id.* at 12 (stating that "the contacts were directed by the actual defendants to this action").) Trounce, acting in his capacity as a Credit Suisse employee, decided to make the requested representations to Niemi. (*See id.* at 8-9.)

Credit Suisse also admits, in its recent filing, that it prepared the Safekeeping Account Position document (Dkt. 85-6), accessible via internet. (*See* Response Brief (Dkt. 121) at 3 ("The two documents relating to the subaccount to which Plaintiff Niemi points may well have been sent by Credit Suisse . . . .").) On this document, Credit Suisse

---

[1]    Trounce's Declaration is undated. As such, it fails to comply with 28 U.S.C. ¶ 1746, which requires that unsworn declarations must be "dated" to be valid. *See Lentz v. Spanky's Rest. II, Inc.*, 491 F. Supp. 2d 663, 670 (N.D. Tex. 2007) (stating that declaration that is "undated in any form or fashion" is "invalid as a 28 U.S.C. § 1746 declaration").

titled the account in the name of "Mesa Homes." (Dkt. 85-6.) Credit Suisse did not place any other name on the Safekeeping Account Position document. This fact conflicts with Trounce's statement that the "portfolio safekeeping account" was set up "in the name of Innovatis re: Mesa Homes." (Trounce Decl. at ¶ 10.) The document, as it now appears, and as it appeared to Niemi when he received it on November 23, 2009, says nothing about Innovatis, even though, as Trounce suggests but does not directly state, Innovatis was a—or the—signatory to the portfolio safekeeping account. (Trounce Decl. at ¶ 7; *but see* Declaration of Michael Frank Burgess dated September 17, 2012 ("Burgess Decl."), filed concurrently, at ¶ 5 (stating that during the November 24, 2009 conference call, the parties discussed "that John Niemi would have joint signatory control of his account together with Erwin Lasshofer of Innovatis so that Niemi could access the account in case of default"); Dkt. 88-1 ("Niemi Decl.") at ¶ 10 ("Trounce said that even though I was located in Colorado, the bonds in the account would be readily accessible.").) Trounce sent the document to Burgess on November 23, 2009, and instructed him to send the document to Niemi to address Niemi's questions, which Niemi later raised during the conference call. (*See* Burgess Decl. at ¶ 4 (stating that after Burgess' conversation with Trounce, "Trounce sent [Burgess] a bank statement showing this bond deposited in the account, and the statement was to be sent to John Niemi and [Burgess] did send it").) The document reported that the Mesa Homes Safekeeping Account contained Top Hedge Bonds in the amount of €4,000,000, or $6,234,045.

A<small>RGUMENT</small>

**I.     Credit Suisse's principal argument—that Plaintiffs cannot assert jurisdiction over it because Plaintiffs have not alleged Credit Suisse is complicit in the Lasshofer Defendants' fraudulent scheme—is illogical.**

Throughout its brief, Credit Suisse argues that because Plaintiffs have not alleged that it engaged in any wrongdoing, personal jurisdiction must be lacking with respect to it. (*See* Response Brief (Dkt. 121) at 2, 3, 4, 14, 15 n.12, 25, 27, 34-35.) This argument is unavailing because, under its logic, a court could never exercise personal jurisdiction over a nominal defendant, as nominal defendants are by definition accused of no wrongdoing. *See Argo Global Special Situations Fund v. Wells Fargo Bank, N.A.*, 810 F. Supp. 2d 906, 912 n.9 (D. Minn. 2011) (noting that "a party, such as Wells Fargo here, against which no wrongdoing is alleged, is only a nominal defendant"). Moreover, as Credit Suisse's factual statements reveal, Credit Suisse's Trounce, acting at Lasshofer's behest, knowingly and intentionally made representations to Plaintiffs that furthered the Lasshofer Defendants' fraud. The mere fact that Plaintiffs have chosen not to allege wrongdoing against Credit Suisse does not preclude this Court from finding personal jurisdiction and ordering the requested relief.

**II.    Credit Suisse's brief and the Declaration of Jonathan Trounce support Plaintiffs' argument that the Court has specific jurisdiction over Credit Suisse.**

In order to establish specific jurisdiction, Plaintiffs must show "purposeful direction," which requires "an intentional action" that has been "expressly aimed at the

forum state" with "knowledge that the brunt of the injury would be felt in the forum state." *Dudnikov v. Chalk & Vermillion Fine Arts*, 514 F.3d 1063, 1072 (10th Cir. 2008).[2]

As the facts disclosed in Credit Suisse's brief demonstrate, Credit Suisse satisfied this test by the materials it prepared for, and the representations it made to, Niemi in Colorado. In multiple ways, Credit Suisse committed intentional acts, directed at Colorado, the effect of which was to (a) purport to protect Plaintiffs from precisely the harm that they allege here; and (b) give Lasshofer legitimacy in Niemi's eyes. *Accord Silver v. Brown*, 382 Fed. App'x 723, 728-30, 2010 WL 2354123, at **5-6 (10th Cir. 2010) (reversing district court order dismissing plaintiff's claims for lack of personal jurisdiction; holding that personal jurisdiction existed on the basis of blog posts because "the posting of the blog was clearly an intentional act," the blog was "expressly aimed" at New Mexico because it "was about a New Mexico resident and a New Mexico company," and defendant knew "the brunt of the injury [to plaintiff] would be felt in New Mexico" because plaintiff "lived in New Mexico and conducted his business from there").

---

[2]     Credit Suisse argues that to establish specific jurisdiction, Plaintiffs must "demonstrate that Credit Suisse purposefully availed itself of acting in Colorado or solicited Plaintiffs' business." (Response Brief (Dkt. 121) at 7.) This is not the test. The "purposeful availment" test does not require that Credit Suisse purposefully avail itself of *acting in* Colorado or *soliciting* Plaintiffs' business, but rather that it purposefully direct its activities *towards* Colorado with "knowledge that the brunt of the injury would be felt in the forum state." *Dudnikov*, 514 F.3d at 1072.

### A.    At Lasshofer's behest, Credit Suisse employee Trounce agreed to make representations to Niemi in Colorado that Trounce had reason to know would significantly impact Plaintiffs' Colorado venture.

Trounce's Declaration confirms that Trounce cooperated with Lasshofer to induce

Niemi's reliance on Lasshofer's fraudulent funding scheme. (*See* Trounce Decl. at ¶¶ 8,

10, 14, 15, 16.) The representations Credit Suisse made to Niemi at Lasshofer's behest

"had a rather direct and an unmistakeably foreseeable effect" in Colorado, making

personal jurisdiction proper. *SEC v. Unifund Sal*, 910 F.2d 1028, 1033 (2d Cir. 1990).

Before the November 24, 2009 conference call, Lasshofer contacted Trounce to tell him

to make particular representations, and refrain from disclosing certain information, to

Niemi. Trounce and Credit Suisse both acknowledge that Trounce and Lasshofer together

orchestrated the occurrence and arranged the content of the call. (*See* Trounce Decl. at ¶

15.) Careful prearrangement was necessary because of the effect the call was to have on

Niemi's decisions and his Colorado business. Indeed, Trounce concedes that he

understood the significance of the representations he made to Niemi. (*See id.* at ¶ 16

("Being authorized by Innovatis to disclose the existence of the Safekeeping Account, I

made certain that my disclosure on the subject of the account designation was not

misleading.").)

Trounce sought to avoid being misleading (*see id.*) because, in addition to

appreciating the significance of the information he conveyed, Trounce knew that the

representations he made to Niemi in Colorado gave rise to potential liability for Credit

Suisse. The minimum contacts necessary to establish personal jurisdiction exist if "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Trounce's statement suggests that he knew, and feared, that Credit Suisse might be sued in Colorado as a result of statements he made during the conference call.

Credit Suisse's efforts to reach out and affect a Colorado business venture make the instant case distinguishable from *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292 (10th Cir. 1999), upon which Credit Suisse places chief reliance in contesting specific jurisdiction. Purposeful availment was found to be lacking in *Soma* because defendant did not make any unique contacts with plaintiff in its home State of Utah. *Id.* at 1299. Plaintiffs had "not demonstrated that [defendant] solicited [plaintiff's] business," which would have constituted "some evidence suggesting purposeful availment." *Id.* (quoting *Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1076 (10th Cir. 1995)). The banking relationship between plaintiff and defendant bank in *Soma* as likely arose "because of [plaintiff's] unilateral decision to select [defendant] as its bank." *Id.* The defendant bank in *Soma* passively served as the bank of plaintiffs' choosing and did not contribute to the alleged breach of contract through any conduct specifically targeted at the forum state. The instant case is distinguishable because Credit Suisse, acting along

with and at the behest of Lasshofer, reached out to Colorado to deliver a message that induced Niemi's reliance on Lasshofer and the fraudulent lending arrangement. This is purposeful direction.

### B.   By undertaking to make representations to Niemi in Colorado that Lasshofer could have made himself, Credit Suisse vouched for Lasshofer's legitimacy.

Personal jurisdiction has been found to exist where one party facilitates fraud by "vouching" for another's legitimacy, as Credit Suisse did for Lasshofer. *See CGC Holding Co., LLC v. Hutchens*, 824 F. Supp. 2d 1193, 1206 (D. Colo. 2011) (finding personal jurisdiction over defendant who "vouched for [the defendant], vouched for companies associated with [the defendant], and promoted the application process" in "communications initiated by him and communications to him initiated by others"); *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001) (finding personal jurisdiction over defendant who participated in phone conversation "designed to convince [plaintiff] to make the $650,000 loan," sent loan documents and stock certificates containing misstatements to plaintiff, and misrepresented the nature of plaintiff's security)[3]; *Cleft of the Rock Found. v. Wilson*, 992 F. Supp. 574, 584 (E.D.N.Y. 1998) (basing denial of motion to dismiss for lack of personal jurisdiction in part on fact that one defendant

---

[3]     Credit Suisse attempts to distinguish *CGC Holding*, *Lewis*, and other cases cited by Plaintiffs only by pointing out that "Plaintiffs here have not even alleged, let alone proven by a preponderance of the evidence, that Credit Suisse engaged in wrongdoing." (Response Brief (Dkt. 121) at 15 n.12.) As noted *infra*, this argument fails because, although Plaintiffs have not stated a claim for damages against Credit Suisse, this does not preclude Plaintiffs from arguing, as they do, that Credit Suisse was "a participant in tortious conduct that was directed at Colorado." *CGC Holding*, 824 F. Supp. 2d at 1206.

communicated with plaintiffs in a manner "designed to vouch for [other] Defendants' *bona fides*, to assuage Plaintiffs' concerns about being repaid, to convince them to continue to 'play ball' with Defendants") (internal quotation marks omitted). Credit Suisse knowingly used its name and reputation to give Lasshofer the appearance of legitimacy. Indeed, the information Lasshofer instructed Trounce to provide to Niemi could have been conveyed by Lasshofer himself. According to Credit Suisse's brief, "Defendant Innovatis, the account holder, instructed Mr. Trounce to participate in the conference call and authorized him to discuss only two specific topics—that the Safekeeping Account had been opened and that the account held securities valued at €4 million." (Response Brief (Dkt. 121) at 8.) As Trounce knew or should have known, Lasshofer asked him, a Credit Suisse representative, to make statements to Niemi in Colorado because Lasshofer wanted the Credit Suisse name behind his fraudulent funding scheme. Lasshofer could have made the representations he asked Trounce to make; Lasshofer just could not have made them as convincingly.

Though it is not essential to the issue of personal jurisdiction, Trounce's representations induced Niemi to trust Lasshofer and his lending structure, contrary to Credit Suisse's contentions. (Response Brief (Dkt. 121) at 9.) The conference call, especially when combined with the Safekeeping Account Position document, quelled Plaintiffs' misgivings about entering into the loan relationship. (Niemi Decl. at ¶ 10; *see also* Burgess Decl. at ¶ 5.) Credit Suisse opened the subaccount at the time Plaintiffs

entered into the fraudulent Loan Agreement and took the irreversible step of wiring the last of their operating capital to Innovatis to obtain funding for their project. (Niemi Decl. at ¶ 13.)

    **C.**    **Credit Suisse employee Trounce assured Niemi that the Safekeeping Account was set up to protect Plaintiffs in the event of Defendants' default, his contentions to the contrary notwithstanding.**

Although Credit Suisse now attempts to claim that Innovatis had sole ownership of and control over the subaccount (*see* Trounce Decl. at ¶¶ 10-11), the Safekeeping Account Position document that Credit Suisse prepared and directed Burgess to send to Niemi does not mention Innovatis at all. (Dkt. 85-6.) Instead, it suggests that its securities were held for the benefit of Mesa Homes. (*Id.*) Both Burgess and Niemi have explained that Trounce's representations to Niemi during the conference call were consistent with the suggestion created by the Safekeeping Account Position document, namely, that the subaccount would protect Niemi in the event of default. (Niemi Decl. at ¶ 10; Burgess Decl. at ¶ 5.) This conclusion is bolstered by Credit Suisse's inclusion on the document of the market value in U.S. dollars of the securities in the subaccount. Credit Suisse included value in U.S. dollars as well as value in euros because the document was prepared for and directed to Niemi.

Trounce additionally claims that, acting on Lasshofer's orders, he "did not assure Mr. Niemi that the Safekeeping Account could be relied on in the event of a default." (Trounce Decl. at ¶ 16.) Trounce's Declaration is contradicted on this point by the

Declarations of both Niemi (at ¶ 10) and Burgess (at ¶ 5). Moreover, Trounce's

Declaration lacks credibility, because, as Trounce notes, Swiss banking secrecy laws

require him to obtain the consent of Lasshofer before divulging "any information

provided by the client to the bank on personal or financial matters." (Reichart and Meier

Decl. at ¶ 35; *see also* Trounce Decl. at ¶ 8 n.1 (stating that, due to "Swiss banking

secrecy laws, . . . my ability to respond to the allegations of Plaintiffs' Motion for

Preliminary Injunction and supporting papers in a United States forum is substantially

limited absent consent of the account holder (which was not provided here other than as

described below)").) Just as they communicated in advance of and coordinated the

November 24, 2009 conference call, Trounce (or a different Credit Suisse employee)

allowed Lasshofer to determine the content of Trounce's Declaration. In any event,

questions regarding credibility should be resolved in favor of Plaintiffs' jurisdictional

arguments to enable Plaintiffs to litigate the merits of their claims. *See Proctor v.

Morrissey*, No. 95-1937, 1996 U.S. App. LEXIS 25712, at *13, 1996 WL 555302, at *5

(4th Cir. Oct. 1, 1996) (noting "fundamental policy favoring adjudications on the merits

over dismissals" on grounds of "improper venue and defects in personal jurisdiction").

### D. Credit Suisse's argument that the closing of the Safekeeping Account defeats personal jurisdiction is incorrect.

Credit Suisse emphasizes that the account was ultimately closed. (Response Brief

(Dkt. 121) at 9.) This is irrelevant. *First*, it defies logic that a defendant can obviate

jurisdiction by closing a bank account, especially where the bank account was established

to prevent the identical harm alleged in the underlying litigation. *Second*, the harm had already been done. Plaintiffs decided after the fact not to use the subaccount because Niemi's further research indicated that the bonds were less liquid than Trounce had led him to believe, Lasshofer had demanded that Plaintiffs pay a 9% fee to keep the subaccount open, and "a lot had occurred" between the time of the conference call and late December 2009, specifically, the Defendants had established interim funding and required Plaintiffs to wire their Collateral Deposit to a different account than that stated in the Agreement. (*See* 5/25/2012 Prelim. Inj. H'ring. Tr. at 20:13-25.)

## II.   Credit Suisse does not refute Plaintiffs' alternative personal jurisdiction arguments.

Because the facts disclosed by Credit Suisse establish the existence of specific jurisdiction, Plaintiffs need not rely on their alternative theories of jurisdiction. Nevertheless, it must be noted that Credit Suisse fails to defeat these alternative theories.

### A.   Credit Suisse does not defeat Plaintiffs' assertion that personal jurisdiction exists under Fed. R. Civ. P. 4(k)(2).

Credit Suisse does not offer a refutation of Plaintiffs' argument that personal jurisdiction exists under Fed. R. Civ. P. 4(k)(2). Instead, Credit Suisse cites a case setting forth, in a footnote, the Ninth Circuit's rule regarding applicability of RICO's nationwide service provisions. *Brown v. Gen. Steel Domestic Sales, LLC*, No. CV08-00779 MMM (SHX), 2008 WL 2128057, at *12 n.53 (C.D. Cal. May 19, 2008). In the only other case cited by Credit Suisse, decided before Fed. R. Civ. P. 4(k)(2) existed, the Southern

District of New York denied a motion to dismiss for lack of personal jurisdiction. *Como v. Commerce Oil Co., Inc.*, No. 84 CIV. 0506 (JFK), 1988 WL 48678, at *2 (S.D.N.Y. May 10, 1988). Fed. R. Civ. P. 4(k)(2) confers jurisdiction over Credit Suisse to the extent Credit Suisse "is not amenable to service under the [Colorado] long-arm statute," as this is a "federal-question case" involving RICO claims, based in part on representations made to Plaintiffs by Lasshofer and Credit Suisse. *CGC Holding*, 824 F. Supp. 2d at 1200.

**B.   Credit Suisse does not defeat Plaintiffs' assertion that general jurisdiction exists.**

Though Credit Suisse cites several cases where courts declined to find general jurisdiction over defendants, it fails to explain why these holdings should guide this Court's general jurisdiction analysis. Contrary to Credit Suisse's contentions, Plaintiffs' factual assertions, if borne out by discovery obtained from Credit Suisse (requests for which are pending) and testimony at the upcoming evidentiary hearing, are more than sufficient to establish general jurisdiction. *See Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, No. 00-5965 (JCL), 2005 U.S. Dist. LEXIS 16857, at *23-24, 2005 WL 3658006, at *7 (D.N.J. June 7, 2005) (finding general jurisdiction over entity with offices conducting business in United States; holding that it is not "a requirement that a foreign defendant exercise direct control over the onshore agents"; noting that defendant "deliberately markets and promotes itself as part of an integrated global network"). As Plaintiffs argued in their Preliminary Injunction Motion, and Credit

Suisse does not dispute, Credit Suisse AG markets itself as an "integrated bank" with a "global structure," and the Credit Suisse AG Board of Directors appoints Divisional CEOs, each of whom is responsible for "the operational management of the businesses and subsidiaries allocated to his Division." (Preliminary Injunction Motion (Dkt. 106) at 29-31.) Rather than defeat Plaintiffs' general jurisdiction argument, Credit Suisse only invokes the obscurity of the Credit Suisse organizational structure.

**III.   Plaintiffs' requested relief should not be denied on comity grounds, because compliance with the requested preliminary injunction would not violate Swiss law; even if it did, however, this Court would not be precluded from ordering the relief.**

Credit Suisse's argument that the requested preliminary injunction should be denied on comity grounds fails. Credit Suisse attempts to stretch various provisions of Swiss law to establish that Credit Suisse's compliance with the requested preliminary injunction would subject it to possible "civil, administrative and criminal penalties." (Reichart and Meier Decl. at ¶ 6.) [4] None of the many Swiss legal provisions cited by Reichart and Meier support their conclusion that Credit Suisse would violate Swiss law if it were to escrow in Colorado the funds it holds for the Lasshofer Defendants' benefit, as the requested preliminary injunction would require.

The argument that escrowing funds would constitute misappropriation in violation of Article 138 PC fails for two reasons. First, misappropriation does not exist unless one

---

[4]   The credentials of Peter Reichart and Andrea Meier are unknown because their resumes and CVs, which they declared were attached as Exhibit A to their Declaration (Reichart and Meier Decl. at ¶ 1), were not attached to their Declaration.

"act[s] with the intention to . . . enrich himself or a third party." (Reichart and Meier Decl. at ¶ 19.) If Credit Suisse were to escrow funds in compliance with this Court's Orders, it would not act to enrich itself or a third party; its intention would be merely to comply with the Court's Orders. Moreover, Credit Suisse would not enrich any party by escrowing funds. The funds would remain Lasshofer's while in escrow. Second, the intended enrichment must be "unlawful." (*Id.*) Reichart and Meier fail to establish that compliance with the requested preliminary injunction would be unlawful, because they cannot state with any assurance that the Order would not be enforceable in Switzerland. (*See* Reichart and Meier Decl. at ¶ 10 (stating that "the Swiss Federal Tribunal has not decided the issue so far, but noted *obiter dictum* that the presumably prevailing opinion among commentators denies the possibility of enforcement of orders regarding interim measures under Article 25 PILA"); *see also id.* at ¶ 31 (asserting that "[i]f a party wants to obtain an asset protection order regarding assets located in Switzerland," it may "request recognition and enforcement of an order obtained abroad").)

The argument that Credit Suisse "is barred under Article 271 PC from complying with a foreign court order to transfer assets of a client to an escrow account abroad" likewise fails. (*Id.* at ¶ 31.) Article 271 proscribes the "carry[ing] out [of] activities on behalf of a foreign state on Swiss territory without lawful authority, where such activities are the responsibility of a public authority or public official." (*Id.* at ¶ 24 (quoting Article 271 PC).) Credit Suisse would not run afoul of this provision by escrowing funds in

Colorado because it would not, in so doing, be undertaking an activity that is the responsibility of a public authority. While granting and enforcing freeze orders may be the responsibility of public authorities, *complying* with a foreign freeze order is not.

All other purported violations of Swiss law occasioned by compliance with the requested preliminary injunction relate to disclosure of confidential information. (*See* Reichart and Meier Decl. at ¶¶ 27, 28, 29, 30, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51.) These arguments are largely mooted by Lasshofer's statement in his August 25, 2012 Declaration that "[a]s of July 25, 2012," Credit Suisse account number 0835-1128069-12 and associated sub-accounts "contained $6,818,556.88," and his further statement that "[n]one of these funds have been transferred between July 25 and the date hereof [August 25, 2012]." (Dkt. 117-1.)

Credit Suisse's argument that compliance with the requested preliminary injunction would violate Swiss law therefore fails. Its invocation of inapplicable provisions of various Swiss codes are "no more than diversionary tactics." *Ohio v. Arthur Andersen & Co.*, 570 F.2d 1370, 1373-74 (10th Cir. 1978) (upholding district court's imposition of sanctions against Swiss party; rejecting general argument that documents ordered produced "were not producible because of Swiss law").

Even if Credit Suisse were able to establish that compliance with the requested preliminary injunction would violate Swiss law, however, it is beyond dispute that this Court may nevertheless order the requested relief. *See Motorola Credit Corp. v. Uzan*,

No. 02 Civ. 666 (JSR) (FM), 2003 U.S. Dist. LEXIS 1215, at *21, 2003 WL 203011, at *7 (S.D.N.Y. Jan. 29, 2003) (ordering defendants to consent to release of foreign bank records; indicating that it refrained from directly ordering Swiss bank to release records because "[i]n these circumstances," the "plaintiffs have not shown an adequate basis" for obtaining this relief); *Minpeco, S.A. v. ContiCommodity Servs., Inc.*, 116 F.R.D. 517, 528 (S.D.N.Y. 1987) (denying motion to compel discovery by Swiss bank defendant only after extensive balancing analysis and primarily because "compliance" was "very likely to yield much material that plaintiffs will not find useful in this litigation").

The funds that Credit Suisse holds for the benefit of the Lasshofer Defendants could be used to satisfy this Court's repatriation Orders. Lasshofer, however, has already threatened Credit Suisse that if it respects this Court's Orders, it will file a criminal complaint against Credit Suisse in Austria. (Response Brief (Dkt. 121) at 31) (quoting Reichart Decl. at ¶ 22.) If the Court declines to Order Plaintiffs' requested relief, Plaintiffs will be left without a remedy for the devastating fraud that the Lasshofer Defendants have perpetrated on them.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a Preliminary Injunction Order in accordance with the proposed Order accompanying Plaintiffs' Preliminary Injunction Motion (Dkt. 106).

Dated this 18th day of September, 2012.

Respectfully submitted,

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

*/s/Christopher W. Madel*
Christopher W. Madel
Bruce D. Manning
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
Telephone: 612-349-8500
Facsimile: 612-339-4181
cwmadel@rkmc.com
bdmanning@rkmc.com

and

Stephanie E. Dunn
Robert N. Miller
**PERKINS COIE LLP**
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Telephone: 303-291-2300
Facsimile: 303-291-2400
rmiller@perkinscoie.com
sdunn@perkinscoie.com

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on September 18, 2012, I electronically filed the foregoing PLAINTIFFS' REPLY TO CREDIT SUISSE AG'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST CREDIT SUISSE AG with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Justine Victoria Beyda**
  jbeyda@cravath.com,mao@cravath.com
- **Kathleen E. Craigmile**
  kec@benningtonjohnson.com,dtb@benningtonjohnson.com,
  man@benningtonjohnson.com,tlp@benningtonjohnson.com,
  afa@benningtonjohnson.com
- **Stephanie Erin Dunn**
  sdunn@perkinscoie.com,sdunn-efile@perkinscoie.com
- **Kevin D. Evans**
  kdevans@s-elaw.com,pdouglass@s-elaw.com,sjoshi@s-elaw.com,
  tbaksay@s-elaw.com
- **Christopher William Madel**
  cwmadel@rkmc.com,dclandis@rkmc.com,dmvanalstine@rkmc.com,
  ELBecker@rkmc.com,arthom@rkmc.com
- **Robert Nolen Miller**
  rmiller@perkinscoie.com,rmiller-efile@perkinscoie.com
- **Julie Anne North**
  jnorth@cravath.com,mao@cravath.com

                              */s/Christopher W. Madel*
                              Christopher W. Madel
                              Bruce D. Manning
                              **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**
                              2800 LaSalle Plaza
                              800 LaSalle Avenue
                              Minneapolis, MN 55402
                              Telephone: 612-349-8500
                              Facsimile: 612-339-4181
                              cwmadel@rkmc.com
                              bdmanning@rkmc.com

                              ATTORNEYS FOR PLAINTIFFS

83369202.1