# ATTACHMENT B





Analysis
As of: Feb 26, 2013

**SECURITIES AND EXCHANGE COMMISSION, Plaintiff, -against- ARAGON CAPITAL ADVISORS, LLC, et al., Defendants.**

**07 Civ. 919 (FM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2011 U.S. Dist. LEXIS 82530*

**July 25, 2011, Decided**
**July 26, 2011, Filed**

**PRIOR HISTORY:** *SEC v. Aragon Capital Advisors, LLC, 2011 U.S. Dist. LEXIS 82531 (S.D.N.Y., July 25, 2011)*

**COUNSEL:** [*1] For Securities and Exchange Commission, Plaintiff: Mark K Schonfeld, LEAD ATTORNEY, Securities and Exchange Commission, Northeast Regional Office, New York, NY; Nancy A Brown, LEAD ATTORNEY, Gwen A. Licardo, John J. Graubard, Securities & Exchange Commission (3 WFC), New York, NY; Alexander Javad Janghorbani, Bohdan Stephan Ozaruk, U.S. Securities and Exchange Commission( 3 World Financial), Three World Financial Center, New York, NY.

Zvi Rosenthal, Defendant, Pro se.

Amir Rosenthal, Defendant, Pro se, New York, NY.

Ayal Rosenthal, Defendant, Pro se, Tenafly, NJ.

For Ayal Rosenthal, Defendant: Janeanne Murray, Law Offices of Jane Anne Murray, New York, NY.

Oren Rosenthal, Defendant, Pro se, Los Angeles, CA.

For Oren Rosenthal, Noga Delshad, Efrat Rosenthal, Rivka Rosenthal, Defendants: Barry Huntington Junker, Robert Norman Knuts, LEAD ATTORNEYS, Park & Jensen, L.L.P., New York, NY; Sarah Elizabeth Cox, Allen & Overy, LLP, New York, NY.

For David Heyman, Heyman & Son Investment Partnership LP, Defendants: Gerald B. Lefcourt, LEAD ATTORNEY, Gerald B. Lefcourt, P.C., New York, NY.

For Bahram Delshad, Defendant: Barry A. Bohrer, LEAD ATTORNEY, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, [*2] P.C., New York, NY.

Efrat Rosenthal, Relief Defendant, Pro se. Rivka Rosenthal, Relief Defendant, Pro se.

For Oren Rosenthal, Noga Delshad Rosenthal, Relief Defendants: Robert Norman Knuts, LEAD ATTORNEY, Park & Jensen, L.L.P., New York, NY.

Case 1:12-cv-00869-RBJ  Document 164-2  Filed 02/27/13  USDC Colorado  Page 3 of 11

Page 2
2011 U.S. Dist. LEXIS 82530, *2

**JUDGES:** FRANK MAAS, United States Magistrate Judge.

**OPINION BY:** FRANK MAAS

**OPINION**

**MEMORANDUM DECISION**

FRANK MAAS, United States Magistrate Judge.

**I. Introduction**

On February 8, 2007, the Securities and Exchange Commission ("Commission") commenced this action to hold certain members of the Rosenthal family liable for an insider trading scheme conducted between 2001 and 2005. That scheme involved trading in the securities of Taro Pharmaceuticals ("Taro") based on material, nonpublic information that Zvi Rosenthal, an employee of Taro, obtained through his employment. More than four years later, the Commission now seeks a preliminary injunction that would freeze the defendants' and relief defendants' assets, direct that they repatriate any assets held abroad, and permit limited expedited discovery. For the reasons set forth below, the Commission's application is granted.

On May 24, 2011, defendants Zvi Rosenthal ("Zvi"), Amir Rosenthal ("Amir"), and Oren Rosenthal ("Oren") (collectively, [*3] the "Insider Trading Defendants") and relief defendants Rivka Rosenthal ("Rivka"), Efrat Rosenthal ("Efrat"), and Noga Rosenthal ("Noga") (collectively, the "Relief Defendants," and, together with the Insider Trading Defendants, the "Defendants") were ordered to show cause why an order freezing their assets and directing repatriation of any such assets held abroad should not be entered against them. [1] A temporary restraining order was issued, which froze the assets of each of the Defendants, but permitted the Defendants other than Zvi to "make payments or transfers to third parties, provided that they [were] made in the ordinary course and not in an amount exceeding $3,000 to any payee without prior court approval." (ECF No. 248 ("TRO") ¶ III). [2] Zvi was excluded from the carve-out because he currently is incarcerated. A hearing on the order to show cause was scheduled for June 6, 2011, but subsequently was adjourned to July 11, 2011, on consent, to accommodate the parties.

[1] Ayal Rosenthal ("Ayal"), although still a defendant in this case, was not subject to this order because the Court had entered a separate asset freeze order against him on April 27, 2009. (See ECF No. 161).

[2] The Commission [*4] also unsuccessfully sought expedited discovery concerning the Defendants' assets as part of the TRO. (See TRO at 5-6).

On May 27, 2011, I amended the TRO after holding a telephone conference with counsel for the Commission and counsel for Oren and the Relief Defendants. (See ECF No. 252 ("May 27 Order")). To clarify that the financial institutions where Oren, Efrat, and Noga maintained accounts were not subject to the TRO, the May 27 Order struck their names from Paragraph III of the TRO but directed that

> relief defendants Oren Rosenthal, Efrat Rosenthal, and Noga Delshad Rosenthal and their employees and attorneys, and any other persons in active concert or participation with them having actual notice of the Order, are restrained from making any withdrawals, transfers, pledges, encumbrances, assignments, dissipations, concealments or other disposals of any assets, funds, or other property of any kind whatsoever held by or under the control of Zvi Rosenthal, Amir Rosenthal, Rivka Rosenthal, Oren Rosenthal, Efrat Rosenthal, and Noga Delshad Rosenthal, except that Oren Rosenthal, Efrat Rosenthal, and Noga Delshad Rosenthal may make payments and transfers to third parties in the ordinary [*5] course, provided that no payee or transferee receives assets, funds or property in an amount exceeding $3,000 without prior Court approval.

(Id.). The May 27 Order "[did] not modify [the Court's TRO] . . . with respect to Zvi Rosenthal, Amir Rosenthal, and Rivka Rosenthal." [3] (Id.).

[3] During the May 27 telephone conference, the Commission informed the Court that Rivka had a bank account in the name of a limited liability company that she had failed to disclose to the

Case 1:12-cv-00869-RBJ Document 164-2 Filed 02/27/13 USDC Colorado Page 4 of 11

Page 3
2011 U.S. Dist. LEXIS 82530, *5

Commission during discovery. For that reason, the Court declined to amend the TRO with respect to Rivka.

Following the entry of the TRO, Oren and the Relief Defendants filed opposition papers, (ECF Nos. 258-62), and the Commission filed reply papers (ECF Nos. 263-64). Zvi, who is proceeding pro se, has not filed any papers. Amir, who is also pro se, submitted a declaration in opposition to the Commission's application for a preliminary injunction. (ECF No. 257).

On July 11, 2011, a hearing was held on the Commission's application for a preliminary injunction freezing the Defendants' assets. After hearing argument from the Commission, Amir, Oren, and the Relief Defendants, I reserved decision on the Commission's application [*6] and extended the TRO until that decision was issued. See *SEC v. Unifund SAL, 910 F.2d 1028, 1034 (2d Cir. 1990)* ("nothing in [R]ule *65 of the Federal Rules of Civil Procedure* prevents a district court from continuing a TRO while reserving decision on a motion for a preliminary injunction"). Additionally, the parties attending the conference consented to two-week extension of the TRO. Although Zvi neither attended the conference nor participated by telephone, the remaining parties' consent provided adequate cause to extend the TRO. (See July 11, 2011 Tr. 29, 31).

## II. Relevant Facts and Procedural History

The underlying facts are set forth comprehensively in the Court's prior partial summary judgment decision, *SEC v. Aragon Capital Management, 672 F. Supp. 2d 421 (S.D.N.Y. 2009)*, aff'd in part and vacated in part sub nom. *SEC v. Rosenthal, Nos. 10-1204, 10-1253, 650 F.3d 156, 2011 U.S. App. LEXIS 11684, 2011 WL 2247585; 426 Fed. Appx. 1, 2011 U.S. App. LEXIS 11732, 2011 WL 2271743 (2d Cir. June 9, 2011)*, with which familiarity is assumed. The Commission's allegations also are summarized in the Memorandum Decision and Order regarding the Defendants' motion to dismiss the second amended complaint, which also is being issued today. Accordingly, only the facts necessary to understand [*7] the reasoning underlying this Memorandum Decision are set forth herein.

### A. Entry of Final Judgment

In 2009, the Court found (i) Zvi and Amir liable for insider trading in connection with Taro's second-quarter

2004 earnings announcement, and (ii) Amir liable for insider trading arising out of Taro's announcement in 2001 that the Food and Drug Administration ("FDA") had approved one of its products. *Id. at 433-34.* Thereafter, a final judgment and order of disgorgement was entered with respect to both claims. (ECF No. 168 ("Final Judgment")). The Final Judgment enjoined Zvi from further violations of the securities laws, barred him from acting as an officer or director of a public company, and ordered him to disgorge profits gained and losses avoided in the amount of $1,447,693.95 and to pay $560,457.32 in prejudgment interest, plus a civil penalty of $3,549,596.80 -- a total of $5,557,748.07. (Final Judgment ¶¶ I-IV). With respect to $962,905.58 of the disgorgement and $366,283.72 of the prejudgment interest, Zvi was found to be liable jointly and severally with Amir, and Ayal, Oren, Rivka, and Efrat were found liable for twenty percent of those amounts. (Id. ¶ IV). The twenty percent [*8] for which Ayal, Oren, Rivka, and Efrat each were liable corresponded to the unlawful proceeds that Amir distributed to them from the Aragon Partners account. Ayal, Oren, Rivka, and Efrat consequently each were found liable, jointly and severally with Zvi and Amir, for $192,581.12 in disgorgement and $49,748.60 in prejudgment interest, or a total of $242,329.72. (Id. ¶¶ VI-IX).

The Final Judgment also enjoined Amir from further violations of the securities laws and ordered him to disgorge profits gained and losses avoided in the amount of $1,327,793.06, and to pay $542,643.93 in prejudgment interest, plus a civil penalty of $3,072,199.28. [4] (Id. ¶¶ I-II, V).

> 4 The Final Judgment also imposed a $600,000 civil penalty against Amir pursuant to *Section 21(d)(3) of the Securities Exchange Act of 1934* ("Exchange Act"), *15 U.S.C. § 78u(d)(3)(B)*. The Second Circuit recently vacated that aspect of the Final Judgment. *Rosenthal, 2011 U.S. App. LEXIS 11684, 2011 WL 2247585, at *6.*

Zvi has not made any payments to the Commission. Rivka and Efrat have paid the judgments against them in full. (ECF No. 250 ("Pl.'s Mem.") at 3 n.4). Oren has made partial payment to the Commission. (Id. at 3).

### B. Second Amended Complaint

In November [*9] 2010, the Commission filed a Second Amended Complaint ("SAC"), (ECF No. 202),

which omitted the claims resolved by the partial summary judgment decision and Final Judgment. The Commission further amended the complaint to allege, in relevant part, that (i) Oren violated the securities laws by trading on inside information in his own brokerage account; (ii) Oren and Ayal aided and abetted Amir's and Zvi's violations of the securities laws; and (iii) Noga did not engage in insider trading, but nevertheless improperly received certain proceeds of Amir's and Zvi's fraud. (SAC ¶¶ 15, 111-22, 136-78).

The Commission's present application for a preliminary injunction seeks to ensure that assets are available to satisfy the unpaid portion of the Final Judgment and any future judgment with respect to the claims alleged in the SAC. Thus, the Commission seeks to preserve its ability to collect additional disgorgement, prejudgment interest, and penalties in the following amounts:

| Amir | $7,209,056.16 |
| Zvi | $8,499,063.98 |
| Oren | $847,207.42 |
| Rivka | $285,679.24 |
| Efrat | $401,928.80 |
| Noga | $312,976.74 |

(Decl. of Bohdan Ozaruk, dated May 23, 2011 ("Ozaruk Decl."), Ex. 21).

C. Asset Transfers

1. Zvi

Between July 2006 and November [*10] 2007, through a series of transactions, Zvi transferred to Israel more than 5.6 million shekels (over 1.6 million U.S. dollars as of July 19, 2011). [5] The recipients were Efrat, Yoav Brin (Rivka's brother), and Israeli real estate developers named Shikun Ovdim Ltd. & Shikun & Pituah Israel Ltd. [6] (Id. ¶ 6 & Ex. 5). These transfers occurred both before and after Zvi's guilty plea on February 8, 2007. (See id.). According to the Commission, the Israeli real estate developer "appears to be associated with residential construction in Natanya[,] Israel." (Pl.'s Mem. at 4; see Ozaruk Decl. ¶ 8). Rivka concedes that monies were transferred to an Israeli real estate developer so that she could purchase an apartment in Israel. [7] (Decl. of Rivka, dated June 24, 2011 ("Rivka Decl."), ¶ 5). Rivka still owns that apartment but maintains that she contributed more funds than Zvi did to purchase it, and that her funds came from "an account in Israel." (Id.).

5   The currency conversions in this Memorandum

Decision are based on an Internet conversion calculator.   See   http://www.oanda.com/currency/converter.

6   One of the checks drawn by Zvi was issued to "Yoav Brin, Esq. in trust for Ro." (Decl. of Simona [*11] Suh, dated May 23, 2011 ("Suh Decl."), ¶ 2(*l*)). The Commission surmises that "Ro" stands for Rosenthal.

7   In his 2007 financial disclosure statement to the Commission, Zvi also noted that Rivka owned an apartment in "Natania Israel to be completed in 2009." (Ozaruk Decl. Ex. 8).

More recently, throughout 2010, while Zvi remained incarcerated, there were withdrawals from his IRA accounts to pay for meals, groceries, gasoline, and other expenses. [8] (See ECF No. 267). Rivka does not dispute that these transfers occurred. She explains that she used a credit card linked to the IRA accounts to pay for household and living expenses. (See Rivka Decl. ¶ 1).

8   The IRA account statements reflect payments to such payees as Sears Roebuck, The Home Depot, US Gas and Diesel, Quick Chek Food, Jamba Juice, Trader Joes, Kmart, and Eataly. (See ECF No. 267).

2. Amir and Noga

In 2006, after the government began investigating certain trades in Taro securities, Amir transferred the assets of Aragon Partners ("Aragon") to Aragon's limited partners, including Rivka, Efrat, Oren, and Ayal. (SAC ¶¶ 14, 85-86). Amir and Noga used the monies from Aragon, other ill-gotten proceeds of Amir's unlawful trading, and other [*12] funds to complete an all-cash purchase of an apartment in New York City. (See Ozaruk Decl. Ex. 10).

In addition, Noga deposited into her own account two refund checks from the Internal Revenue Service for tax years 2006 and 2007 that were issued jointly to her and Amir. (Id. Ex. 15). Amir does not dispute that Noga deposited these checks. He notes, however, that he did not have a bank account in his name when Noga did so. (Decl. of Amir, dated June 24, 2011 ("Amir Decl."), ¶ 5; Decl. of Noga, dated June 24, 2011 ("Noga Decl."), ¶ 2). Amir further contends that Noga deposited the two checks with his knowledge and that the proceeds were used for his family's living expenses, including childcare expenses and the maintenance fees for their apartment. (Amir Decl. ¶ 5; Noga Decl. ¶ 2).

Subsequently, Amir cashed twenty-five checks between September 2009 and February 2011, totaling approximately $32,000, "the bulk of which appears to represent his interest in 401(k) plans." (Pl.'s Mem. at 5; Ozaruk Decl. Exs. 9a, 9b). According to Amir, he "cashed out" his 401(k) accounts after he was released from prison in September 2009. (Amir Decl. ¶ 6). Amir states that the funds were used for living expenses [*13] for him and his family. (Id.).

3. Oren

Between September 2009 and January 2010, Oren transferred $2,100 each month to Ryan Gordon "for what appears to be rent." (Pl.'s Mem. at 6; Ozaruk Decl. ¶ 4 & Ex. 3). [9] On February 10, 2010, approximately two weeks after the Final Judgment was entered, Oren issued a check to Gordon for $22,800. (Ozaruk Decl. Ex. 4). That check bears the notation "rent" on the "memo" line. (Id.).

> 9   The Commission's memorandum of law indicates that Oren's monthly rent payments during this time were $2,200. (Pl.'s Mem. at 6). The bank statements annexed to the Ozaruk Declaration, suggest, however, that those payments were $2,100 per month. (Ozaruk Decl. Ex. 3).

4. Rivka

In February 2011, Rivka made several transfers shortly after the Commission served subpoenas on financial institutions where she maintained accounts. (See Ozaruk Decl. Ex. 16 (subpoena dated Jan. 31, 2011)). Specifically, on February 17, 2011, $220,207 was transferred from Rivka's E*Trade account into her Wells Fargo account. That same day, $253,050 was transferred from Rivka's Wells Fargo account to an account for the benefit of Solomon Richman PC, a law firm located in Lake Success, New York. (Id. ¶ 14 [*14] & Exs. 14a, 14b).

The Commission first learned about these transfers and the Wells Fargo account through third-party subpoenas that it had issued. (See Pl.'s Mem. at 6). More recently, after serving the TRO on financial institutions where Rivka was known to have accounts, the Commission learned for the first time that Rivka had purchased a house on Long Island and that she had an account at Citibank in the name of a limited liability company. (See July 11, 2011 Tr. 9). Rivka states that she purchased the house as an investment based on Amir's recommendation. (Rivka Decl. ¶ 2). She further explains that Solomon Richman PC was involved in the closing, and that the limited liability company -- of which she is the sole owner and member -- was created to receive rent payments from the tenants and make tax payments. (Id. ¶¶ 3-4).

Finally, the Commission has proffered evidence that Rivka deposited into her individual E*Trade account a joint tax refund check in the amount of $294,368.13 that she and Zvi had received for tax year 2006. (Ozaruk Decl. ¶ 17 & Ex. 17).

5. Efrat

Zvi made several transfers to his daughter, Efrat, totaling more than 1.7 million shekels (over 490,000 U.S. dollars as of July [*15] 19, 2011). (Id. Ex. 5; Suh Decl. ¶ 2). To accomplish these transfers, Zvi wrote checks against his Israeli bank account that Efrat deposited into her Israeli bank account. (Suh Decl. ¶ 2). These transfers apparently were made between July 2006 and November 2007. [10] (Id.).

> 10   One check signed by Zvi is undated. (Suh Decl. ¶ 2(j)).

Efrat used a "substantial portion" of the assets that Zvi transferred to her to purchase an apartment in Israel while she was living there in 2006 and 2007. (Decl. of Efrat, dated June 24, 2011 ("Efrat Decl."), ¶ 1). Efrat still owns that apartment. (Id. ¶ 2).

### III. Legal Standard

A. Preliminary Injunction

Pursuant to *Section 21(d)* of the Exchange Act, the Commission may seek permanent or temporary injunctive relief when it appears that a person "is engaged or is about to engage in acts or practices constituting a violation of" the securities laws. *15 U.S.C. § 78u(d)*. To obtain that relief, the Commission must make a "proper showing." Id.; *SEC v. Gonzalez de Castilla, 145 F. Supp. 2d 402, 414 (S.D.N.Y. 2001)*.

In the ordinary case, a plaintiff seeking a preliminary injunction must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable [*16] harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*. The Commission is not an "ordinary litigant," however, because it is a "statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *Gonzalez de Castilla, 145 F. Supp. 2d at 414 n.10* (internal quotation marks omitted). The Commission therefore need not satisfy all of the usually-required elements. Id. (Commission does not have to show "likelihood of irreparable injury, favorable balancing of the equities, or the unavailability of a remedy at law"); see also *Unifund SAL, 910 F.2d at 1036* (showing of irreparable injury is not required).

A preliminary injunction freezing a party's assets is an "ancillary remedy that merely assures that any funds that become due can be collected, including disgorgement of profits, penalties equal to three times the profits, and possibly prejudgment interest." *Gonzalez de Castilla, 145 F. Supp. 2d at 415* (internal citations and quotation marks omitted). "In determining whether to order a freeze of assets, the court must [*17] weigh the disadvantages and possible deleterious effect of a freeze against the considerations indicating the need for such relief." *SEC v. Zubkis, No. 97 Civ. 8086 (JGK), 2003 U.S. Dist. LEXIS 16152, 2003 WL 22118978, at *5 (S.D.N.Y. Sept. 11, 2003)* (quoting *SEC v. Manor Nursing Ctrs., Inc., 458*

*F.2d 1082, 1106 (2d Cir. 1972))*.

B. Violation of the Securities Laws

In *Unifund*, the Second Circuit traced the evolution of the legal standard for the issuance of a preliminary injunction in an enforcement action brought by the Commission. *910 F.2d at 1035-1040*. The Second Circuit rejected the *Unifund* defendants' argument that the Commission must establish a "strong prima facie case" to obtain a preliminary injunction, holding, instead, that the Commission's burden is no greater than the "traditional 'likelihood of success' standard." *Id. at 1037*. The court further noted that a district court "should require a more substantial showing of likelihood of success . . . whenever the relief sought is more than preservation of the status quo." *Id. at 1039*. In other words, the Commission's showing with respect to its likelihood of success "varies with the nature of the relief sought." *Id. at 1040*. When it is seeking an injunction [*18] barring a defendant from future violations of the securities laws -- relief that is "significantly more than preservation of the status quo" -- the Commission must "make a substantial showing of likelihood of success as to both [the defendant's] current violation and the risk of repetition." Id. On the other hand, an injunction merely freezing a defendant's assets appears to require a lesser showing. See *id. at 1041*; see also *SEC v. Montle, 65 F. App'x 749, 753 (2d Cir. 2003)*.

Despite *Unifund*'s comprehensive analysis of the availability of preliminary injunctions in actions brought by the Commission, the parties to this suit dispute the standard that the Court must apply when considering whether to impose an asset freeze order. According to the Defendants, the Commission must establish a likelihood of success on the merits. (See ECF No. 262 ("Defs.' Mem.") at 16; July 11, 2011 Tr. 9-10). The Commission contends, however, that it need only show a "concern" that a defendant will dissipate his assets and a "basis to infer" that a violation of the securities laws has occurred. (Pl.'s Mem. at 9). The Commission derives its proposed standard from language in *Unifund* analyzing the sufficiency [*19] of the Commission's showing of a securities law violation. (Id.). After holding that the Commission had not presented evidence sufficient for an anti-fraud injunction, the *Unifund* court found that the evidence nevertheless "suffice[d] to warrant some form of freeze order." *Unifund, 910 F.2d at 1041*. In doing so, the court explained:

There is a basis to infer that the [defendants] traded on inside information, and while the Commission is endeavoring to prove at trial the requisite element of trading in breach of a fiduciary duty of which the defendants were or should have been aware, the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged.

Id. (emphasis added).

Under the Commission's reading of *Unifund*, the Commission need only establish a "basis to infer" that a defendant traded on inside information to obtain an asset freeze. It is difficult to accept this interpretation in light of the *Unifund* court's thorough analysis of the history of the preliminary injunction standard and its reaffirmation of the traditional "likelihood of success on the merits" standard only a few pages before the text upon which the Commission relies. See *id. at 1035-40.* [*20] Nonetheless, some judges have, in fact, found a mere "basis to infer" sufficient to justify issuance of an asset freeze order. See *Gonzalez de Castilla, 145 F. Supp. 2d at 415* (citing *Unifund*). Other cases hold that either a "basis to infer" or a "likelihood of success on the merits" suffices. See *SEC v. McGinn, Smith & Co., 752 F. Supp. 2d 194, 205 (N.D.N.Y. 2010)* (SEC must "establish only that it is likely to succeed on the merits, or that an inference can be drawn that the party has violated the federal securities laws") (internal quotation marks omitted); *SEC v. Byers, No. 08 Civ. 7104 (DC), 2009 U.S. Dist. LEXIS 59689, 2009 WL 33434, at *3 (S.D.N.Y. Jan 7, 2009)* (same); *SEC v. Heden, 51 F. Supp. 2d 296, 298 (S.D.N.Y. 1999)* (same). Finally, some courts have articulated the standard as requiring the traditional likelihood of success on the merits. See *Montle, 65 F. App'x at 753*; *SEC v. Cavanagh, 155 F.3d 129, 132 (2d Cir. 1998).*

While there consequently may be some doubt as to the applicable standard, there is no need to resolve that issue in this case because, as discussed more fully below, the Commission's showing is sufficient under either standard.

C. Dissipation of Assets

In addition to establishing a securities [*21] law violation, to secure an injunction the Commission must

show a basis for "concern that defendants will dissipate their assets or transfer them beyond the jurisdiction of the United States." *Gonzalez de Castilla, 145 F. Supp. 2d at 415.* That requirement may be satisfied when a defendant is a citizen and resident of a foreign country and holds accounts at foreign banks. *Id. at 420* (defendant's Mexican citizenship and residency and ownership of accounts at Mexican banks "raise[d] a danger that funds would be dissipated or transferred beyond this Court's jurisdiction"). Nonetheless, a defendant's nationality, in and of itself, is not a sufficient basis for an asset freeze. *Id. at 420-21.*

**IV. Discussion**

A. Securities Law Violation

On February 8, 2007, Zvi and Amir each pleaded guilty to criminal charges arising out of Zvi's disclosure of inside information about Taro to Amir, and Amir's unlawful trading based on that information. (See ECF No. 134 Ex. 6); see also *Aragon Capital Mgmt., 672 F. Supp. 2d at 428-29.* Based on those pleas, the Court awarded the Commission partial summary judgment finding Amir liable for violations of the securities laws in connection with Taro's announcement in [*22] May 2001 that the FDA had approved its product known as CB Cream. *Aragon Capital Mgmt., 672 F. Supp. 2d at 433-34.* Zvi and Amir also were found liable for trades related to Taro's second-quarter 2004 earnings announcement. *Id. at 434.* The Commission thus clearly has shown that Zvi engaged in securities fraud on at least one occasion and that Amir did so at least twice.

Although the additional instances of insider trading alleged in the SAC were not addressed in the partial summary judgment motion, the Commission has established a basis to infer that those additional trades were unlawful, and that it is likely to succeed on the merits. Indeed, the Commission's allegations of numerous instances of insider trading between 2001 and 2005 all involve the same pattern of unlawful conduct, in which Zvi gave his sons inside information about Taro, and Amir (and sometimes Oren and Ayal) traded on that information with knowledge that Zvi had violated his fiduciary duty to Taro. (See, e.g., SAC ¶¶ 51, 55, 67, 71). Although Zvi subsequently has urged a narrow interpretation of his guilty plea, during his allocution he stated, in no uncertain terms: "Between 2001 and 2005, I disclosed material, non-public [*23] information concerning Taro to Amir Rosenthal, my son, knowing

that with this information he may trade in Taro securities." (ECF No. 134 Ex. 6). Amir similarly admitted during a deposition that he and his father spoke frequently, and sometimes daily, during that time period and often discussed Taro. (Suppl. Decl. of Mr. Ozaruk, dated July 6, 2011 ("Ozaruk Suppl. Decl."), Ex. 4). Amir further admitted that Zvi told him in 2004 that Zvi had "heard that Taro would be lucky to break even that quarter." (Id.). Amir's distributions of the proceeds of his unlawful trading to family members in 2006 and 2007, before he was charged criminally, also raise an inference of his wrongdoing. See *United States v. Hatfield, 685 F. Supp. 2d 320, 327 (E.D.N.Y. 2010)* (pretrial ruling that defendant's transfer of assets abroad "tend[ed] to show [his] consciousness of guilt").

The Defendants contend that the Commission has not satisfied its burden with respect to Oren because it has proffered no evidence warranting an inference that Oren violated the securities laws. The Defendants are correct that, unlike Zvi and Amir, Oren was not charged criminally for any of the trades alleged in the SAC. (See Defs.' [*24] Mem. at 13). Nonetheless, the Commission has shown that it is likely to succeed on the merits of its claims against Oren. At the outset, as noted in the Memorandum Decision and Order bearing today's date concerning the Defendants' motion to dismiss, the Commission has sufficiently pleaded the elements of its claims against Oren. Thus, the Commission has raised a plausible inference that (a) Zvi possessed inside information about Taro; (b) Zvi disclosed that information to Oren; (c) Oren traded in Taro securities while in possession of that information; (d) Oren knew or should have known that Zvi disclosed that information in violation of his fiduciary duty to Taro; and (e) that Oren benefitted from Zvi's disclosure of that information.

Moreover, the Commission has proffered evidence that raises an inference that Zvi disclosed material, nonpublic information to Oren. Oren testified at his deposition that Zvi asked him on several occasions to proofread draft emails that Zvi had written about Taro. (Ozaruk Suppl. Decl. Ex. 1). In his deposition testimony, Zvi confirmed that he gave such draft emails or letters about Taro to Oren "once, maybe twice." (Id. Ex. 3). One email that Oren proofread [*25] and edited for Zvi, concerning "forecast changes" in Canada, noted that Taro had "many products with very low forecast and very low actual sales." (Id. Ex. 2 (email from Oren to Zvi, dated June 16, 2002); see id. Ex. 3). Contrary to Oren's

contention, this conduct supports an inference that he and his father violated the securities laws and, thus, the conclusion that the Commission is likely to succeed on the merits. See *Byers, 2009 U.S. Dist. LEXIS 59689, 2009 WL 33434, at *3 n.5* (citing *Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985))* ("To show likelihood of success on the merits, the party seeking the injunction 'need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt.'").

The Defendants further contend that the Commission has not met its burden because the trades alleged in the SAC do not raise an inference of insider trading. In particular, they urge the Court to find that certain trading positions allegedly held by the Insider Trading Defendants made no economic sense in light of the inside information about Taro that Zvi allegedly disclosed to his sons. (Defs.' [*26] Mem. at 5-6). The Defendants further claim that the Commission intentionally ignored the Insider Trading Defendants' unprofitable trades. (Id. at 6 (trading by Amir in 2005 led to a net loss of more than $250,000 in the Aragon account)). The Defendants will be permitted to develop these theories further at later stages of this case. At this juncture, the mere fact that the Insider Trading Defendants occasionally lost money is not enough to establish that there was no insider-trading scheme.

In sum, the Commission has satisfied its burden in establishing an inference that the Insider Trading Defendants violated the securities laws and that it is likely to succeed on the merits of its claims.

B. Dissipation of the Defendants' Assets

Although the Defendants attempt to mitigate the significance of the asset transfers identified by the Commission, it appears that wholesale efforts to dissipate their assets are underway. For example, Rivka apparently made withdrawals from Zvi's IRA accounts -- which at one point were worth over $200,000 in the aggregate (see ECF No. 206 Ex. F) -- throughout 2010 for groceries, meals, gasoline, and other expenses. (See ECF No. 267 (Zvi's IRA account statements)). [*27] Also, with respect to Amir's assets, the Commission has proffered evidence that Noga deposited her and Amir's joint income tax refund into a bank account held in her name only, and that Amir has liquidated at least a portion of his interest in his 401(k) plans. (See Ozaruk Decl. Exs. 9b, 15). Oren

similarly prepaid his rent in a single lump sum soon after judgment was entered against him in 2010. (See id. Ex. 4).

The Defendants do not dispute that these asset transfers occurred. They maintain, however, that the transfers were necessary to pay basic household and living expenses. For example, according to the Defendants, Rivka made withdrawals from Zvi's IRA accounts to "pay certain living expenses" while Zvi has been incarcerated. (Defs.' Mem. at 10). The Defendants similarly contend that the proceeds from Noga's and Amir's joint tax refund and Amir's 401 (k) accounts were used to pay household expenses. (Id. at 10-11; Amir Decl. ¶ 6). These explanations of the Defendants' use of their assets do not justify the denial of the Commission's application for an asset freeze. Regardless of the Defendants' characterization of the transfers, the fact remains that the assets are no longer in [*28] their possession or control.

Even more troubling are Zvi's transfers to a real estate developer abroad for the purchase of an apartment for Rivka and his transfers to other family members, including Efrat. (See Suh Decl. ¶2). Efrat has offered to return the funds that she received from Zvi in the event that the transfers are found to be unlawful under United States or Israeli law so that he can use them to pay part of the judgment against him. (Efrat Decl. ¶ 2). Rivka makes a similar offer with respect to the monies that Zvi contributed for the purchase of her apartment in Israel. (Rivka Decl. ¶ 5). Notably, however, neither Efrat nor Rivka offers to return such monies to the Commission. (See Efrat Decl. ¶ 2; Rivka Decl. ¶ 5). In any event, whether the transfers were lawful is simply not dispositive in the absence of any evidence that Efrat and Rivka gave fair consideration for the transfers that Zvi made for their benefit. The Commission's showing -- in conjunction with Efrat's and Rivka's concession that such transfers occurred -- is thus sufficient to support a freeze order against them. See Byers, 2009 U.S. Dist. LEXIS 59689, 2009 WL 33434, at *2 (to obtain asset freeze against relief defendant, Commission must [*29] show that she "received ill-gotten funds" and "does not have a legitimate claim to those funds") (internal quotation marks omitted).

The recent transfers out of Rivka's bank accounts provide even greater support for an asset freeze. Within days of the Commission's service of a subpoena on her financial institutions, Rivka engaged in a flurry of transfers from one account to another and to third parties. (See Ozaruk Decl. ¶ 14 & Ex. 14a). Earlier this year, Rivka also purchased a house on Long Island and created a limited liability company associated with that property -- matters that she did not disclose to the Commission in response to its discovery requests and about which it learned only a few weeks ago. (See July 11, 2011 Tr. 9). An order freezing Rivka's assets and those of the limited liability company that she controls is warranted in light of these transfers and her ongoing lack of disclosure to the Commission.

Finally, while not dispositive, the Defendants' ties to Israel also weigh in favor of an asset freeze. Zvi and Efrat each maintain, or previously have had, Israeli bank accounts. It also is undisputed that Rivka and Efrat each currently own an apartment in Israel. According [*30] to the Commission, the Defendants -- except Noga -- also are citizens of Israel. (See Pl.'s Mem. at 10). These factors heighten the risk that the Defendants' assets will be "dissipated or transferred beyond this Court's jurisdiction if [their] account[s do] not remain frozen." See Gonzalez de Castilla, 145 F. Supp. 2d at 420.

In sum, there is a significant risk that, if the Commission obtains judgment in its favor, money will not be available to satisfy that judgment. Accordingly, an order freezing the Defendants' assets is necessary to preserve the status quo.

C. Repatriation

The Commission contends that the Defendants should be ordered to repatriate any assets held abroad because it cannot "monitor [the Defendants'] compliance with any order with respect to [those assets]." (Pl.'s Mem. at 12). The Commission has proffered evidence that raises an inference that some of the unlawful proceeds of the Insider Trading Defendants' trading activities are, or have been, held abroad. For example, in 2006, Efrat received a $500,000 distribution from the Aragon account, which included ill-gotten gains, while she was living in Israel. (See Pl.'s Mem. at 7; Efrat Decl. ¶ 1). Moreover, the Defendants [*31] have, or at least had, significant assets overseas: Rivka and Efrat each currently own an apartment in Israel, and Zvi and Efrat own or have owned bank accounts in Israel.

Finally, the Defendants have not controverted the Commission's assertion that these assets held abroad are

necessary to satisfy the monetary relief it seeks in this case, (see ECF No. 264 ("Pl.'s Reply Mem.") at 2; Ozaruk Decl. Ex. 21 (Commission's calculation of monetary relief)). In these circumstances, a repatriation order is warranted. See *SEC v. Illarramendi, No. 11 Civ. 78 (JBA), 2011 U.S. Dist. LEXIS 65919, 2011 WL 2457734, at *7 (D. Conn. June 16, 2011)* (citing *FTC v. The Crescent Publ'g Grp., Inc., 129 F. Supp. 2d 311, 325-26 (S.D.N.Y. 2001))* ("Ordering repatriation of foreign assets is necessary and appropriate to preserve and keep intact such funds to satisfy future disgorgement remedies.").

D. Expedited Discovery

The Commission's final request is for expedited discovery concerning the Defendants' assets. In light of the evidence the Commission has proffered regarding recent asset transfers, there is a basis for reconsideration of my ruling of May 24, 2011, denying the Commission such relief in connection with its application for a TRO.

For [*32] over a year, the Commission has sought discovery concerning the Defendants' assets. The Defendants have produced certain bank statements but have refused to answer several of the Commission's discovery requests. (See July 11, 2011 Tr. 17-20). By way of example, earlier this year, Rivka objected to the Commission's discovery requests concerning her bank accounts and failed to provide responsive information to the Commission. (Id. at 17). As a consequence, it was only through the service of the TRO on Rivka's financial institutions that the Commission learned of her purchase of a house in the name of a limited liability company. (See id. at 9). According to Rivka's counsel, "[s]he didn't

have to [provide that information to the Commission]" because she objected to the Commission's discovery requests and her objections never were brought to the Court for resolution. (Id. at 17). Although it is true that the Commission has not burdened the Court with every discovery dispute that has arisen in this case, from this and other similar efforts at obfuscation, it seems clear that limited expedited discovery concerning the Defendants' assets is warranted.

**V. Conclusion**

For the foregoing reasons, [*33] the motion for a preliminary injunction extending the asset freeze is granted. Additionally, the Defendants will be directed to repatriate any assets held abroad, and the Commission will be permitted to conduct limited expedited discovery concerning the Defendants' assets. The asset freeze shall remain in effect pending a final resolution of this matter. Should any of the Defendants seek a modification of the asset freeze based on a claim of hardship, the application will be heard expeditiously.

SO ORDERED.

Dated: New York, New York

July 25, 2011

/s/ Frank Maas

FRANK MAAS

United States Magistrate Judge