**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson**

Civil Action No. 12-cv-869-RBJ

JOHN NIEMI,
ROBERT NAEGELE, III, and
JESPER PARNEVIK,

       Plaintiffs,

v.

MICHAEL FRANK BURGESS,
ERWIN LASSHOFER,
INNOVATIS GMBH,
INNOVATIS IMMOBILIEN GMBH,
INNOVATIS ASSET MANAGEMENT SA,
LEXINGTON CAPITAL & PROPERTY
INVESTMENTS, LLC, and
BARRY FUNT,

       Defendants,

CREDIT SUISSE A.G.,

       Nominal Defendant.

---

**PLAINTIFFS' REPLY TO THE LASSHOFER DEFENDANTS' RESPONSE TO
PLAINTIFFS' MOTION FOR LIMITED DISCOVERY**

---

      The Lasshofer Defendants continue to hide behind their "special appearance."

Again, the Lasshofer Defendants are choosing how and when they will "defend" this

case. They have decided not to comply with this Court's Orders[1] or respond to Plaintiffs' Motion for Summary Judgment. And yet they continue to make requests of this Court. (*See* Response at 14.)

Although the Lasshofer Defendants have had multiple opportunities to raise a standing challenge, the Lasshofer Defendants elected, for whatever reason, to hold their argument back. They now fault Plaintiffs for responding to this argument immediately after it was raised.

The record establishes that Plaintiffs have standing under COCCA. And the Lasshofer Defendants do not even pretend that they did not individually defraud the Plaintiffs. Still, even if Plaintiffs would not otherwise have had standing, they received standing by express assignment on August 2, 2010, acknowledged in the July 2012 Assignment Agreement (Dkt. 85-4). Plaintiffs only moved for discovery on standing to supplement the record with additional evidence of their standing or, in the event the Lasshofer Defendants refuse to comply with an order for discovery, permit this Court to find standing on an alternative basis as a sanction for the discovery violation.

The Lasshofer Defendants, in their Response, also attempt to discredit Plaintiffs with an out-of-context and inaccurate statement that Plaintiffs neither made nor adopted. This attack is as groundless as it is irrelevant to the instant dispute.

---

[1] The Lasshofer Defendants persist in refusing to transfer any funds to Colorado, in violation of this Court's June 1 Order (Dkt. 50 at 21), even as they continue touting "high return products" to prospective investors "which want to enhance their chances to earn money on the markets despite this increasingly difficult environment." INNOVATIS: THE ASSET OF INNOVATION, February 21, 2013 Weekly Newsletter (Attachment A).

**ARGUMENT**

**I.     This Court may decide the merits of the case notwithstanding the pending appeal.**

When an interlocutory appeal is taken from an order granting a preliminary injunction, a district court "retains jurisdiction to act on matters not involved in the appeal." *Colorado v. Idarado Mining Co.*, 916 F.2d 1486, 1490 n.2 (10th Cir. 1990). This enables the district court "to act on the merits of the case pending appeal," *United States v. Power Eng'g Co.*, 10 F. Supp. 2d 1165, 1169 (D. Colo. 1998), and to "proceed with the litigation and permit discovery, enter rulings on summary judgment, or hold a trial on the merits." *Conkleton v. Zavaras*, No. 08-cv-02612-WYD-MEH, 2009 WL 1384166, at *2 (D. Colo. May 15, 2009) (citing *Fairchild Semiconductor Corp. v. Third Dimension*, No. 2009-1168, 2009 WL 790105, at *1 (Fed. Cir. Mar. 25, 2009) (unpublished)). The district court also retains jurisdiction to hold a party in contempt for violating an injunction on appeal. *See Chrysler Motors Corp. v. Int'l Union, Allied Indus. Workers Am.*, 909 F.2d 248, 250 (7th Cir. 1990) (holding that "[a]n interlocutory appeal does not divest the district court of jurisdiction . . ., here, to determine whether the employer violated the injunction—which had not been stayed pending appeal—when it fired the employee the second time").

Although they never briefed or argued the issue before this Court issued its June 1, 2012 Preliminary Injunction, the Lasshofer Defendants' interlocutory appeal is focused primarily on their newly-raised standing argument. (Response at 4.) This appeal does not affect this Court's ability to order discovery, grant Plaintiffs the relief they seek on the

3

merits of this case, or sanction the Lasshofer Defendants for noncompliance with its Orders. *Am. Carriers, Inc. v. Baytree Investors, Inc.*, No. 88-2067, 1988 U.S. Dist. LEXIS 5052, at *3-5 (D. Kan. May 18, 1988) (Attachment C to Dkt. 164). Like the Lasshofer Defendants, the defendants in *American Carriers* appealed a preliminary injunction order, arguing that the plaintiff lacked standing to seek injunctive relief. *Id.* at *3. The district court in *American Carriers* held, despite the standing challenge, that it had jurisdiction to continue deciding the merits of plaintiff's claims, including plaintiff's request for a permanent injunction, denied defendants' motion for a stay of the proceedings pending appeal, and granted plaintiff's motion to compel compliance with the preliminary injunction that was on appeal. *Id.* at *3, *4, *19.

**II.     The record establishes that Plaintiffs have standing.**

Plaintiffs have COCCA standing. The record supports Plaintiffs' argument— made consistently throughout this litigation—that Plaintiffs were individually defrauded by the Lasshofer Defendants. Even if the record did not bear this out, however, and Mesatex, LLC, AZCO, LLC, and AZCO II, LLC were the real parties in interest, these entities have effectively assigned any and *all* claims to Plaintiffs Niemi, Naegele, and Parnevik.

    **A.     Plaintiffs are the real parties in interest.**

Even under RICO, which has a more stringent standing requirement than COCCA,[2] an individual has standing where the individual is the target of a fraud scheme and

---

[2]     Although cases construing RICO offer guidance in construing parallel COCCA provisions, *Tara Woods Ltd. P'ship v. Fannie Mae*, 731 F. Supp. 2d 1103, 1125 (D. Colo. 2010), interpretations of RICO provisions do not apply where "there exists appropriate Colorado authority on [the] issue." *Tallitsch v. Child Support Servs., Inc.*, 926 P.2d 143,

ultimately pays defendants money as a result of defendants' fraudulent representations. *See Maiz v. Virani*, 253 F.3d 641, 656-57 (11th Cir. 2001). In *Maiz*, the Eleventh Circuit explained that "notwithstanding the general rule that a corporation's creditor lacks RICO standing, it is possible that a pattern of racketeering could be directed specifically at a corporation's creditors." *Id.* at 655 (internal quotation marks and citation omitted). The Eleventh Circuit noted that *Maiz* was such a case, explaining:

> Defendants cite no evidence that after 1991 [i.e., the date Plaintiffs transferred their interests to corporations] their communications and capital calls went solely through the corporations. Indeed, there is evidence that, even after the corporations were formed, Defendants and their agents contacted the individual Plaintiffs and accepted funds from the individual Plaintiffs.

*Id.* at 656. As a result, the Eleventh Circuit held, the individual plaintiffs had standing to sue for harm they suffered as a result of defendants' racketeering activity even after plaintiffs transferred their interests to corporations. *Id.* at 656-57. The Eleventh Circuit reasoned, "[c]oncluding that the Plaintiffs lack standing after 1991 would ignore the record and indefensibly elevate form over substance." *Id.* at 656.

The instant case is analogous to *Maiz*. Plaintiffs have repeatedly demonstrated that they were individually targeted and defrauded by the Lasshofer Defendants' (and their co-conspirators') scheme. Plaintiffs pled, in the Complaint and Amended Complaint, that

---

147 (Colo. App. 1996). Because COCCA standing requires only that the plaintiff be "injured by the conduct constituting the COCCA violation," *Arc of Pikes Peak Region v. Nat'l Mentor Holdings, Inc.*, No. 10-cv-01144-REB-BNB, 2011 WL 1047081, at *2 (D. Colo. Mar. 18, 2011) (internal quotation marks and brackets omitted), whereas RICO standing requires injury to "business or property," *Ivar v. Elk River Partners, LLC*, 705 F. Supp. 2d 1220, 1232 (D. Colo. 2010) (internal quotation marks and citation omitted), RICO's more "restrictive" standing requirement, *id.*, is not applicable to claims brought under COCCA. As explained below, however, even if the more stringent RICO standing requirement were applicable in the instant case, Plaintiffs would satisfy it.

"the Fairmont Breckenridge," the project destroyed by Defendants' fraud, "was a joint-venture of Niemi, Plaintiff Naegele, and Plaintiff Parnevik." (Compl. at ¶ 5; Am. Compl. at ¶ 5.) The verified pleadings also establish that "Niemi, Naegele, and Parnevik provided the capital for the $2,000,000 upfront collateral deposit" that Defendants fraudulently obtained and retained. (Compl. at ¶ 94; Am. Compl. at ¶ 95.)

The Lasshofer Defendants did not contest Plaintiffs' standing in challenging the June 1, 2012 Preliminary Injunction. Indeed, the Lasshofer Defendants made a tactical decision not to argue the issue before this Court after the Lasshofer Defendants' cross-examination of Plaintiff Niemi revealed that the Plaintiffs, as individuals, "ha[d] been injured by the conduct constituting the COCCA violation," *Arc of Pikes Peak Region v. Nat'l Mentor Holdings, Inc.*, No. 10-cv-01144-REB-BNB, 2011 WL 1047081, at *2 (D. Colo. Mar. 18, 2011) (internal quotation marks and brackets omitted), and thus met COCCA's standing requirement:

[Evans]: And now, when I say you sent the money, can you help me understand where the money, that 2.18 million, came from? Did it come from your checking account, did it come from Mr. Parnevik – I'm going to butcher it, and I apologize – Naegele, just whose account did it come from, a company bank account?

[Niemi]: It came from Jesper Parnevik and Bob Naegele, but through our bank, United Western Bank.

[Evans]: Who owns that account, United Western Bank; whose name is the account in?

[Niemi]: Well, now the FDIC.

[Evans]: Before.

[Niemi]: Whose name was it?

[Evans]: Right. Who was the signatory on the account? Was it a company account?

[Niemi]: All three of us.

[Evans] It was individual accounts, is that what you're saying?

[Niemi]: It was set up – I don't know if it was individual accounts.

[Evans]: Was there a company that was the owner of that account?

[Niemi]: No.

[Evans]: It was you?

[Niemi]: It was individuals, but I don't know – I don't know how the signatures worked. It was a couple years ago.

[Evans]: And this $2.18 million, you were responsible for transferring that money?

[Niemi]: Yeah.

(5/25/2012 Prelim. Inj. Tr. at 62:16-63:17.) This testimony belies the Lasshofer Defendants' statement that "it was readily apparent from the cross and redirect examination of Mr. Niemi during the preliminary injunction hearing that Plaintiffs were acutely aware at least as of that time of their standing dilemma." (Response at 2 n.2.) Far from putting Plaintiffs on notice of any "dilemma," this testimony resolved any lingering questions regarding Plaintiffs' standing under COCCA, as evidenced by the Lasshofer Defendants' retreat from this line of argument. After Plaintiff Niemi testified, the

Lasshofer Defendants did not revisit the standing issue during the May 25 hearing or in the post-hearing brief they filed on May 30, 2012 (Dkt. 48).[3]

> **B. The limited discovery on standing, requested by Plaintiffs, will either further establish their standing or give this Court an alternative basis for finding standing.**

If the Lasshofer Defendants had evidence in their possession that refuted Plaintiffs' demonstrated standing, they should have submitted it in conjunction with their Rule 12 Motion to Dismiss (which did not argue lack of standing) or in response to Plaintiffs' Motion for Summary Judgment. If the Lasshofer Defendants produce the documents requested by Plaintiffs in their motion seeking limited discovery, this will further establish Plaintiffs' standing. If, on the other hand, the Lasshofer Defendants refuse to comply with an order requiring them to produce the requested documents, this Court may find standing on an alternative basis as a sanction for the discovery violation. Recognizing this, the Lasshofer Defendants oppose Plaintiffs' simple discovery requests.

> **C. The Assignment Agreement executed on July 2, 2012 would have effectively transferred standing even if Mesatex, AZCO, and AZCO II were the real parties in interest and all claims belonging to these entities had not been earlier assigned.**

Shortly after the Lasshofer Defendants began arguing, in June of 2012, that the true defrauded party was Plaintiff Niemi's entity or entities, rather than the individual Plaintiffs, Plaintiffs filed an Assignment Agreement, executed by Plaintiff Niemi on July 2, 2012, acknowledging that any and all claims belonging to Mesatex, LLC, AZCO,

---

[3] The Lasshofer Defendants also chose not to move to dismiss for lack of standing in their Rule 12 Motion to Dismiss, filed on June 15, 2012. (Dkt. 67.)

LLC, or AZCO II, LLC, had been expressly assigned to Plaintiffs Niemi, Naegele, and Parnevik. (Dkt. 85-4.)

The Lasshofer Defendants make much of the fact that this Assignment Agreement does not specify the date on which the express oral assignment occurred. Plaintiffs have since provided the date. (*See* Dkt. 159-1 at ¶ 2.) Even if Plaintiffs had not provided the date of the assignment, however, and the assignment had not occurred until July 2, 2012, this would not affect Plaintiffs' standing.

It is well-established that an "assignment can give the assignee proper standing as the real party in interest 'even when the claim is not assigned until after the action has been instituted.'" *Winn v. Amerititle, Inc.*, 731 F. Supp. 2d 1093, 1099 (D. Utah 2010) (quoting *FDIC v. Main Hurdman*, 655 F. Supp. 259, 267 (E.D. Cal. 1987)). To determine whether a post-filing assignment transfers standing from the real party in interest to the plaintiff, several factors are analyzed. *Id.* The first factor is whether the assignment transferred the right to bring the claim in question. *Id.* The second is whether the plaintiff "had any interest in the cause of action at the time he filed suit and before he received the assignment." *Id.* The third is whether assignment of standing would prejudice the defendant in preparing a defense. *Id.* The fourth is whether assignment will "ensure that the defendant litigates this action only once." *Id.* at 1100.

Even assuming, *arguendo*, that Mesatex, LLC, AZCO, LLC, and AZCO II, LLC were the real parties in interest, and also assuming, *arguendo*, that the assignment was not executed until July 2, 2012, the assignment would nevertheless be effective to transfer standing to the individual Plaintiffs because all of the above factors favor the

transfer. With respect to the first factor, the transfer was sufficiently broad ("each and every claim and cause of action") to include all COCCA claims. With respect to the second factor, the individual Plaintiffs each had an interest in recovering the funds they individually lost through the $2.18 million fraudulently obtained upfront deposits. *See id.* at 1099 (concluding that "[a]lthough he may not technically have had standing at the time he filed suit, Winn had a strong $100,000 monetary interest in the cause of action"). With respect to the third factor, the assignment has not caused the Lasshofer Defendants "to lose any of [the] potential defenses" that they could have asserted against Mesatex, LLC, AZCO, LLC, or AZCO II, LLC, if any of these entities "had decided to bring suit." *Id.* at 1100. In fact, the Lasshofer Defendants have elected to present no defense at all on the merits of this case. With respect to the fourth factor, the assignment ensures that the Lasshofer Defendants will litigate this case only once. By its terms, the assignment bars Mesatex, LLC, AZCO, LLC, and AZCO II, LLC from bringing any claim they might otherwise have had against the Lasshofer Defendants related to the instant fraud in the future. As was the case in *Winn*, the July 2012 Assignment Agreement, even if it were not an acknowledgement of a preexisting oral assignment, would have "efficiently consolidated this action . . . and therefore, effectively transferred standing" to the individual Plaintiffs. *Id.*

### III. The Lasshofer Defendants' renewed attempts to establish that Plaintiffs have "mislead [*sic*] this Court" fail.

In an attempt to discredit Plaintiffs, the Lasshofer Defendants have pulled out of its context a single sentence from an email sent by attorney Rob Schumann to Bruce Weiner

10

and to Plaintiff Naegele.[4] The Lasshofer Defendants attribute Schumann's statement to Plaintiff Naegele and represent that this sentence establishes "that Plaintiffs falsely testified and mislead [*sic*] this Court and the Tenth Circuit." (Response at 11.) The Lasshofer Defendants are wrong.

*First*, not only did Plaintiff Naegele not make the statement that the Lasshofer Defendants attempt to attribute to him (or to Plaintiffs generally), but both Plaintiff Naegele and his adversary in *Weiner v. Naegele*, No. 11-855 (DSD/AJB), 2012 WL 2906299 (D. Minn. July 16, 2012), Weiner, immediately rejected the opinion that Schumann expressed in his email. During his September 14, 2011 deposition, Weiner explained that neither he nor Plaintiff Naegele agreed with Schumann's suggestion that the Fairmont Breckenridge project had problems; to the contrary, both Weiner and Plaintiff Naegele remained comfortable purchasing the project's mezzanine (mid-level) debt:

> Q.   The email from Mr. Schumann, one of the Leonard Street and Deinard lawyers, in the middle of that email it says "It shows that the project is in significant trouble and Niemi is scrambling to keep creditors back, keep his investors optimistic and raise additional capital." Do you see where I'm reading?
>
> A.   Yes.
>
> Q.   And you [*sic—should be Schumann*] says, quote, "I believe you all are aware of this and are comfortable moving forward, but I wanted to at least forward these items to you," close quote.
>
> Were you aware of these problems at the project prior to receiving Mr. Schumann's email?

---

[4]   At the time he sent the email at issue, Schumann was advising Weiner and Plaintiff Naegele during the due diligence they conducted before Weiner and Plaintiff Naegele together decided to invest $3 million in the Fairmont Breckenridge project.

> A. We were aware of the status of the project at the time prior to receiving Mr. Schumann's email.
>
> Q. And it was as Mr. Schumann describes it, right?
>
> A. We had discussed all of those situations with Mr. Niemi. Both Bob and my team had discussed all of those situations with Mr. Niemi and received answers that, as Mr. Schumann says here, made us comfortable moving forward.

Deposition of Bruce Weiner, Ex. 8 to Jan. 13, 2012 Kerbaugh Declaration, *Weiner v. Naegele*, No. 11-855 (DSD/AJB), at 223:14-224:11 (D. Minn. filed Jan. 13, 2012), ECF. 32-4. Weiner and Plaintiff Naegele both rejected Schumann's remark as an inaccurate account of the project's status, and they decided to invest $3 million in the project at this time.[5] The Lasshofer Defendants' attempt to attribute to Plaintiff Naegele a statement that he neither made nor adopted fails.

*Second*, Schumann's statement, read in context, does not mean what the Lasshofer Defendants take it to mean. The statement relates to specific mezzanine debt held by Merchants Bank. Merchants was pressing Plaintiff Niemi for payoff in early 2009 because Merchants was in default on a packaged loan, included within which was the Fairmont Breckenridge mezzanine loan. JP Morgan, the primary lender for the Fairmont Breckenridge, had "scrapp[ed] residential construction loans under review" due to a shift in "the general direction of the bank" as a result of the recession, requiring Plaintiff Niemi to refinance and preventing Merchants from being paid off early. Ex. 20 to Jan. 13, 2012 Kerbaugh Declaration, *Weiner v. Naegele*, No. 11-855 (DSD/AJB), at Bates-labeled

---

[5] Indeed, Schumann himself minimized the significance of the issue he was identifying: "I believe you all are aware of this and are comfortable moving forward, but I wanted to at least forward these items to you." *Id.* at 223:22-25.

page RN005449 (D. Minn. filed Jan. 13, 2012) (Attachment B). While this frustrated Merchants' expectations, the Fairmont Breckenridge remained financially sound overall, as evidenced by the willingness of Weiner and Plaintiff Naegele to take over Merchants' mezzanine debt.

*Third*, Schumann's statement is inaccurate. Consistent with Plaintiffs' testimony throughout this litigation, the project was thriving until the Lasshofer Defendants and their co-conspirators promised and withheld funding in mid-2009. Indeed, contracts for Phases I and II of the Shock Hill project "were fully reserved on July 24, 2007," the very day they were put on the market. Ex. 20 to Jan. 13, 2012 Kerbaugh Declaration, *Weiner v. Naegele*, No. 11-855 (DSD/AJB), at Bates-labeled page RN005469 (D. Minn. filed Jan. 13, 2012) (Attachment C). The project remained successful even as the economic downturn set in, and on February 26, 2009, another of Weiner's advisors in the due diligence process encouraged Weiner to invest in the Fairmont Breckenridge, calling the project "an A+ property in the prime location in Breckenridge." Ex. 24 to Jan. 13, 2012 Kerbaugh Declaration, *Weiner v. Naegele*, No. 11-855 (DSD/AJB), at 1 (D. Minn. filed Jan. 13, 2012), ECF. 32-10 (Attachment D). The advisor added that a third advisor to Weiner "became comfortable" with the proposed investment in Fairmont Breckenridge "in part because an acquaintance of his assured him that Shock Hill is to be built in the best land available in Breckenridge." *Id.*

Actual sales figures further establish that the Fairmont Breckenridge was thriving in late 2008 and early 2009. By December 5, 2008, about half the Fairmont residences at Shock Hill had presold. *The Fairmont Residences, Shock Hill*, N.Y. TIMES, Dec. 5, 2008,

at D6 (Attachment E). In early 2009, the Fairmont Breckenridge was featured on the cover of The Robb Report Collection and described in an article spotlighting preeminent winter getaways. Kim Fredericks, *Great Escapes*, THE ROBB REPORT COLLECTION, Jan. 2009, at 36, 37, 38, 40 (Attachment F). Contrary to the Lasshofer Defendants' suggestion, the project was successful until the Lasshofer Defendants and their co-conspirators induced Plaintiffs to rely solely on them and pay over $2 million to obtain funding that Defendants had no intention of providing.

The Lasshofer Defendants' repetition of a single sentence, irrelevant in the present context, and which was generally recognized by Plaintiff Naegele and others to be inaccurate at the time it was made, does not establish that Plaintiffs have misled anyone in the instant litigation.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Limited Discovery (Dkt. 159).

DATED this 4th day of March, 2013.

        Respectfully submitted,

        **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

        */s/Christopher W. Madel*
        Christopher W. Madel
        Bruce D. Manning
        2800 LaSalle Plaza
        800 LaSalle Avenue
        Minneapolis, MN 55402
        Telephone: 612-349-8500

        Facsimile: 612-339-4181
        cwmadel@rkmc.com
        bdmanning@rkmc.com

        And

        Robert N. Miller
        **PERKINS COIE LLP**
        1900 Sixteenth Street, Suite 1400
        Denver, CO 80202-5255
        Telephone: 303-291-2300
        Facsimile: 303-291-2400
        rmiller@perkinscoie.com

        ATTORNEYS FOR PLAINTIFFS

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 4, 2013, I electronically filed the foregoing PLAINTIFFS' REPLY TO THE LASSHOFER DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR LIMITED DISCOVERY with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Justine Victoria Beyda**
  jbeyda@cravath.com,mao@cravath.com
- **Kathleen E. Craigmile**
  kec@benningtonjohnson.com,dtb@benningtonjohnson.com, man@benningtonjohnson.com,tlp@benningtonjohnson.com, afa@benningtonjohnson.com
- **Kevin D. Evans**
  kdevans@s-elaw.com,pdouglass@s-elaw.com,sjoshi@s-elaw.com, tbaksay@s-elaw.com
- **Christopher William Madel**
  cwmadel@rkmc.com,dclandis@rkmc.com,dmvanalstine@rkmc.com, ELBecker@rkmc.com,arthom@rkmc.com
- **Robert Nolen Miller**
  rmiller@perkinscoie.com,rmiller-efile@perkinscoie.com
- **Julie Anne North**
  jnorth@cravath.com,mao@cravath.com

*/s/Christopher W. Madel*
Christopher W. Madel
Bruce D. Manning
**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
Telephone: 612-349-8500
Facsimile: 612-339-4181
cwmadel@rkmc.com
bdmanning@rkmc.com

ATTORNEYS FOR PLAINTIFFS

83723614.1