UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No.: 12-CV-869-RBJ

JOHN NIEMI,
ROBERT NAEGELE, III, and
JESPER PARNEVIK,

    Plaintiffs,

v.

MICHAEL FRANK BURGESS,
ERWIN LASSHOFER,
INNOVATIS GmbH,
INNOVATIS IMMOBILIEN GmbH,
INNOVATIS ASSET MANAGEMENT, S.A.,
LEXINGTON CAPITAL & PROPERTY INVESTMENTS, LLC, and
BARRY FUNT,

    Defendants.

---

**OBJECTIONS OF DEFENDANTS ERWIN LASSHOFER, INNOVATIS GmBH, INNOVATIS IMMOBILIEN GmBH, AND INNOVATIS ASSET MANAGEMENT, S.A. TO PLAINTIFFS' DESIGNATION OF JOHN NIEMI AS AN EXPERT WITNESS AND TO NIEMI'S OPINIONS, AND MOTION TO EXCLUDE SAME**

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-869-RBJ

JOHN NIEMI,
ROBERT NAEGELE, III, and
JESPER PARNEVIK,

    Plaintiffs,

v.

MICHAEL FRANK BURGESS,
ERWIN LASSHOFER,
INNOVATIS GMBH,
INNOVATIS IMMOBILIEN GMBH,
INNOVATIS ASSET MANAGEMENT SA,
LEXINGTON CAPITAL & PROPERTY INVESTMENTS, LLC, and
BARRY FUNT,

    Defendants,

CREDIT SUISSE A.G.,

    Nominal Defendant.

---

**PLAINTIFFS' EXPERT DISCLOSURE PURSUANT TO FED. R. CIV. P. 26(a)(2)**

---

Plaintiffs John Niemi, Robert Naegele, III, and Jesper Parnevik, by and through their undersigned counsel, provide the following disclosures pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure. These disclosures are made in good faith and are

based on the information currently and reasonably available to Plaintiffs. Plaintiffs make no representation that they are identifying every witness or document, or all evidence, relevant to this action. These disclosures are given without prejudice to Plaintiffs' right to produce additional witnesses, documents, or other evidence that Plaintiffs may later discover or believe to be supportive of their claims. Accordingly, Plaintiffs reserve the right to change and supplement these disclosures as required by FED. R. CIV. P. 26 as additional facts are ascertained, additional witnesses are identified, legal research is completed, and Plaintiffs receive discovery from other parties.

Plaintiffs do not waive their right to object to the production of any document or evidence disclosed herein on the basis of privilege, including attorney-client privilege, the work-product doctrine, relevancy, undue burden, or any other valid objection. Plaintiffs' initial disclosures are also made without waiving: (1) the right to object on the grounds of competency, privilege, relevancy and materiality, hearsay, or any other proper ground; and (2) the right to object on any and all grounds, at any time, to any other discovery request or proceeding involving or relating to the subject matter of these initial disclosures.

A.  Individuals Likely to Have Discoverable Information

In addition to Plaintiffs' other disclosures, Plaintiffs respectfully identify the following individual as an expert witness:

| Name | Subject of the Information | Last Known Contact Information |
|---|---|---|
| John Niemi | Knowledge of particulars and impact of fraud scheme/knowledge about Plaintiffs' damages | Contact through undersigned counsel only |

B.  Witnesses Who Must Provide a Written Report

A written report by Plaintiff John Niemi accompanies these disclosures.

Discovery is ongoing and Plaintiffs reserve their right to supplement this disclosure as additional information becomes available.

DATED this 7th day of May, 2013.

        Respectfully submitted,

        **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

        /s/   Bruce Manning
        Christopher W. Madel
        Bruce D. Manning
        Aaron R. Thom
        2800 LaSalle Plaza
        800 LaSalle Avenue
        Minneapolis, MN 55402
        Telephone: 612-349-8500
        Facsimile: 612-339-4181
        cwmadel@rkmc.com
        bdmanning@rkmc.com
        arthom@rkmc.com

And

Robert N. Miller
**PERKINS COIE LLP**
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Telephone: 303-291-2300
Facsimile: 303-291-2400
rmiller@perkinscoie.com

ATTORNEYS FOR PLAINTIFFS

83899412.1

Expert report of John D. Niemi
*Niemi, et. al. v. Burgess, et. al.*, (Civil Action No. 12-cv-869-RBJ) (D. Colo. 2013)

I, John D. Niemi, have been asked to testify about Plaintiffs' damages in this case. Our damages include, among other things, the value of the certain properties and a related project, formerly known as Fairmont Breckenridge.

I am 47 years old and have been practicing both commercial and residential real estate and development for the past 25 years. More specifically, since 2004, I have been developing residential real estate in and around mountain resorts in Colorado. Besides the activities in Breckenridge, I have completed developments in excess of $55,000,000 of residential real estate in other Colorado mountain resort markets. My overall commercial and residential development experience since 1988 across the U.S. includes projects valued in excess of $2 billion. My resume is at the end of this report.

In early 2006, I began the due diligence process to determine the viability of purchasing the properties in Breckenridge that are the subject of the Lasshofer litigation and would come to be known as Fairmont Shock Hill, Fairmont River Lodge, and Fairmont Residences on the River, collectively known as Fairmont Breckenridge. After conducting six months of due diligence on the properties, I signed a contract for purchase with the seller, deposited over $1.5 million of my own money as a non-refundable deposit, and ultimately purchased the three properties with a combination of equity and debt in late 2006 for a combined $40,900,750 (Fairmont Shock Hill $26,468,750, Fairmont River Lodge $7,216,000, Fairmont Residences on the River $7,216,000). The due diligence included, but was not limited to, analyzing all similar available properties throughout the major Colorado resort markets, a thorough examination of the market from the perspective of our expected buyer(s), and a study to confirm the expected construction costs and budget of the ideal development on the properties. Careful analysis of this information, and the fact that Breckenridge had recently been named the most visited resort in North America and 95% of all the land was built out, confirmed the wisdom of this investment and project.

The legal entities that I established to purchase and own the properties were AZCO II (Fairmont Shock Hill) and AZCO I (Fairmont Residences on the River and the Fairmont River Lodge), which were rolled up to an operating company, Mesatex, LLC. I established Mesatex to develop the properties held by the AZCO entities. I was the signatory for all three entities and the Managing Member of the entities and controlled them from their inception to the point they were closed down. I negotiated and executed the ten-year agreement with Fairmont Hotels. In essence, if there was one individual that most people would refer to as the "owner" of the properties included in this report, it was me.

Expert report of John D. Niemi
*Niemi, et. al. v. Burgess, et. al.*, (Civil Action No. 12-cv-869-RBJ) (D. Colo. 2013)

Due to all of my hands-on work since early 2006 with both the properties and the Fairmont Breckenridge activities on the properties, I am uniquely qualified to provide detail that supports their valuation when we signed the Prosperity/Innovatis Loan Agreement on December 7, 2009 (Attachment F to December 20, 2012 Declaration of John Niemi, Dkt 151-3), and further supports the damages that resulted from the loss of the properties and project due to the Prosperity/Innovatis fraud.

I previously declared, under penalty of perjury, that our damages totaled $62,530,000, based on the bank/lender commissioned appraisals. I stand by this amount and will provide further information, as an expert witness, to support the $62,530,000 damages amount. I respectfully note, and describe more in detail below, that this $62,530,000 damages figure is very conservative.

### A. Loss of Shock Hill (Fairmont Shock Hill):     $37,000,000

I bought this property on September 29, 2006 for $26,468,750. It was appraised by Rocky Mountain Valuation Specialists for $27,500,000 on August 17, 2006. After closing on the property, I began working with the Town of Breckenridge to obtain approval for the specific development I had envisioned and had planned for the site. Local governments in Colorado mountain towns are frequently difficult to work with for new developments. This was also true during our approval process; we met with a high level of public scrutiny, debate, and pushback. The process and effort to move the project forward included, but was not limited to, completing detailed master site plans, traffic studies, environmental impact studies, construction plans, landscape plans, mine-waste remediation plans, and exterior design and related impact plans. The cost to complete all of the pre-approval requirements of the Town of Breckenridge was in excess of $3,500,000. Although the process was extremely costly and time consuming, it was a necessary pre-condition to creating the Fairmont Breckenridge and something I had anticipated. This pre-approval investment, along with the completion of the gondola to the property in early 2007, resulted in the property being appraised by National Valuation Consultants, Inc. for $30,000,000 on August 15, 2007. (The Shock Hill Lodge & Spa Appraisal, completed by National Valuation Consultants, Inc., dated August 15, 2007).

It took approximately 18 months to receive the final approvals from the Town of Breckenridge, but they resulted in the Fairmont Shock Hill property having vested development rights, an additional 40,000 square feet of salable density, and the right to

Expert report of John D. Niemi
*Niemi, et. al. v. Burgess, et. al.*, (Civil Action No. 12-cv-869-RBJ) (D. Colo. 2013)

develop it with a "highest and best use" strategy. As is the case with any successful re-entitlement effort in the Colorado mountain resort markets that overcame formidable obstacles and push back, the property immediately realized a significant increase in value. As can be seen in the previously mentioned appraisals of the property, the re-entitlement efforts and subsequent Town approvals were partially responsible for the properties being re-appraised by National Valuation Consultants, Inc. on March 19, 2008 for **$37,300,000 "as is."** The same appraisal valued the land "upon completion of construction" at $205 million. I relied on this appraisal, among other things, in reaching my conclusion regarding the $37,000,000 damages figure. (*See* "An Appraisal Assignment in a Self-Contained Format of The Shock Hill, Located at Southwest Intersection of Shock Hill Road and Penn Lode Drive Town of Breckenridge, Colorado", dated March 19, 2008 (Ex. 1 to March 15, 2013 Declaration of John Niemi, ("3/15/2013 Niemi Decl."), Dkt. 172-2).

Despite the economic downturn at the time, Fairmont Shock Hill had been successfully selling units up through December 2009, when the Prosperity/Innovatis Loan agreement was signed. There were 25 contracts in place with 15% non-refundable deposits for a total of $55,839,733 at an average of $1,281 per square foot. The square foot price was actually increasing to as high as $1,450 per square foot on the later contracts. The sales prices per square foot were the highest achieved in the history of the Breckenridge area, itself a very expensive real estate market. Based on the price points of the contracts and reservations in place, the expected gross sales on Fairmont Shock Hill (144,000 sellable square feet) were expected to be $184,464,000. Our on-going ownership of the rental program, spa, and restaurant as income in perpetuity were not included in this appraisal.

All design, planning, municipal approvals, and pre-sales were completed when I signed the Prosperity/Innovatis loan agreement. The Fairmont Shock Hill was ready to break ground the first quarter 2010, as in line with the Prosperity/Innovatis loan agreement. It would have been completed eighteen months later in the summer of 2011. Again, the $37,000,000 damages figure only represents the "as is" market value of the land. It does not include what was designed and ready to be built on the property, as well as the profits that would have been realized for that construction on and sales of that property. As stated in the above-cited appraisal, the "upon completion of construction" value was appraised at over $205,000,000. Thus, this damages figure is very conservative.

Expert report of John D. Niemi
*Niemi, et. al. v. Burgess, et. al.*, (Civil Action No. 12-cv-869-RBJ) (D. Colo. 2013)

Based on my extensive knowledge of Colorado real estate in general and this project in particular, I believe that this project, if completed as we planned (and assuming we were not defrauded), would have, at a minimum, generated the expected revenue and corresponding profit. In sum, based on my expertise and the documents I have referenced above and in previous sworn testimony, if we were not defrauded, we would have realized a minimum of $37,000,000 for the Fairmont Shock Hill property, not including prejudgment interest.

### B. Loss of River Duplex (Fairmont Residences on the River):    $12,350,000

This property was along the Blue River with rare private river frontage and access. We bought this property on December 1, 2006 and added to the property with an additional purchase on November 21, 2007 for a total of $8,616,000. Upon closing on the property, I immediately began working with the Town of Breckenridge in order to seek approval for the specific development I had envisioned and had planned for the site. The process and effort to re-entitle the property included, but was not limited to, completing a detailed master site plan, traffic study, environmental impact study, Blue River impact study, construction plans, landscape plan, and exterior design and related impact plans. The cost to complete all of the planning and pre-approval requirements of the Town of Breckenridge was in excess of $500,000. After receiving approval from the Town of Breckenridge, we spent in excess of $600,000 to complete the infrastructure required for the site. After completing all of the entitlement and planning work, the lender/bank-commissioned appraisal performed by National Valuation Consultants, Inc. valued the property at **$11,100,000 on May 23, 2007 and, based on signed contracts, $12,350,000 on March 19, 2008**. I relied on these appraisals, among other things, in reaching my conclusion regarding this $12,350,000 figure. *See* An Appraisal Assignment in a Self-Contained Format of Shores at the Highlands 30 Finished Duplex Lots (60 Home Sites) dated March 19, 2008 (Ex. 2 to 3/15/2013 Niemi Decl., Dkt. 172-10); The Shores at the Highlands Appraisal, completed by National Valuation Consultants, Inc., dated May 23, 2007.

We began construction in late 2007, and, as of the date I signed the loan agreement with Prosperity/Innovatis (December 7, 2009), we had completed and sold eight homes at a total purchase price of $11,795,900, had four homes under construction, and one contract in place for the sale of a future home in the project totaling $1,555,000. The sold units and contracts in place averaged $580 per square foot and were trending upward to $700 per square foot, based on a closing that occurred on August 27, 2009. These were record Breckenridge price points for off-mountain residential real estate.

Expert report of John D. Niemi
*Niemi, et. al. v. Burgess, et. al.,* (Civil Action No. 12-cv-869-RBJ) (D. Colo. 2013)

We had sold every unit before completion and had 48 more homes to sell at the time Prosperity and Innovatis defrauded us. Based on the price points of the closed units and units under contract, the expected gross sales of the Fairmont Residences on the River (150,000 sellable square feet) was expected to be $87,000,000. Again, the $12,350,000 damages figure only represents the "as is" market value of the 13.66-acre property with existing full entitlements for 150,000 square feet of saleable residential area. It does not include what was designed and ready to be built on the property, as well as the profits that would have been realized for that construction on and sales of the units on that property. Thus, this damages figure is very conservative.

Based on my extensive knowledge of Colorado real estate in general and this project in particular, I believe that this project, if completed as we planned (and assuming we were not defrauded), would have, at a minimum, generated the expected revenue and corresponding profit. In sum, based on my expertise and the documents I have referenced above and in previous sworn testimony, if we were not defrauded, we would have realized a minimum of $12,350,000 for the Fairmont Residences on the River property, not including prejudgment interest.

### C. Loss of Fairmont River Lodge:            $11,000,000

This project, the Fairmont River Lodge, was adjacent to the Fairmont River Residences and also shared the unique private Blue River frontage and access. We bought the properties for the Fairmont River Lodge on December 1, 2006 and added to the property with an additional purchase on November 21, 2007. We paid a total of $8,616,000 for the properties.

After closing on the property, we immediately began working with the Town of Breckenridge in order to seek approval for the specific development envisioned and planned for the site. The process and effort to re-entitle the property included, but was not limited to, completing a detailed master site plan, traffic study, environmental impact study, Blue River impact study, construction plans, landscape plan, and exterior design and related impact plans. The cost to complete all of the planning and pre-approval requirements of the Town of Breckenridge was in excess of $400,000. After completing all of the entitlement and planning work, the lender/bank-commissioned appraisal performed by Rocky Mountain Valuation Services valued the property at $9,000,000 on June 5, 2007. The property was again appraised by Wildrose Appraisal,

Expert report of John D. Niemi
*Niemi, et. al. v. Burgess, et. al.*, (Civil Action No. 12-cv-869-RBJ) (D. Colo. 2013)

Inc. on March 19, 2008 for **$11,000,000**. I relied on this appraisal, among other things, in reaching my conclusion regarding this $11,000,000 figure. *See* "Summary Report of a Real Property Appraisal The Shores at Highlands", dated Dec. 29, 2008 (Ex. 3 to 3/15/2013 Niemi Decl., Dkt. 172-17); West Braddock Subdivision, Tracts C and D (The Shores at Highlands Tract C Appraisal), completed by National Valuation Consultants, Inc., dated June 5, 2007.

We would have been ready to break ground in 2010, in line with the Prosperity/Innovatis loan agreement requirements. The expected gross sales of the Fairmont River Lodge (82,000 sellable square feet) were expected to be $61,716,000. It would have been completed in the fall of 2011. But again, the $11,000,000 damages figure only represents the value of the property. It does not include what was designed and ready to be built on the property, as well as the profits that would have been realized for that construction on and sales of the units on that property. Thus, this damages figure is very conservative. Based on my extensive knowledge of Colorado real estate in general and this project in particular, I believe that this project, if completed as we planned (and assuming we were not defrauded), would have, at a minimum, generated the expected revenue and corresponding profit.

In sum, based on my expertise and the documents I have referenced above and in previous sworn testimony, if we were not defrauded, we would have realized a minimum of $11,000,000 for the Fairmont River Lodge, not including prejudgment interest.

### D. Loss of Prosperity/Innovatis Collateral Deposit:     $2,180,000

Bob Naegele, Jesper Parnevik and I paid $2,180,000 in cash to Prosperity/Innovatis. These funds were described to us and formalized in the letter of intent and subsequent loan agreement as funds that would be used for due diligence on our project ($180,000) and funds that were required by Prosperity/Innovatis to secure our right to the "beneficial use" of certain securities (Infinity Shamrock Bonds) that would be monetized to fund our loan. No portion of this $2,180,000 has ever been returned to any of us, even though Mr. Burgess stated that Mr. Lasshofer promised to return this money to us.

**Total Losses A, B, C, D above (before trebling):     $62,530,000**

Expert report of John D. Niemi
*Niemi, et. al. v. Burgess, et. al.*, (Civil Action No. 12-cv-869-RBJ) (D. Colo. 2013)

**Real Estate Market Decline in 2008/09-2010/2011:**

Although I stand by the figures and valuations in this report, there was a market decline in U.S. real estate values beginning in or around 2008. This decline slowed and eventually stabilized in this area in or around 2011. Depending on the method of measurement, the high-end real estate market in Summit County, Colorado declined by approximately 10-15% during this time. The only other new high-end project (which was contructed with a significantly lesser finish level than what was planned for the Fairmont Breckenridge), One Ski Hill Place on Peak 8 in Breckenridge, sold 49 units in 2010/2011 at an average of $1,219/square foot. More recently, they have sold 13 units since December 2012.

Based on the Fairmont Breckenridge's sales activity in 2008 and 2009 at average price points of $1,281 per square foot and trending to $1,450 per square foot, Fairmont Breckenridge could have easily absorbed a 10-15% reduction in sales prices and the damages presented here would remain reasonable and accurate. That is, in part, because my damages described herein, excludes profits from much of the project that would have been realized had Lasshofer/Innovatis not defrauded us. Based on the pro-forma (that was approved by Prosperity/Innovatis), we only needed to sell the remaining 60 units over a five year period at approximately $900 per square foot to break even. Again, we were scheduled to break ground in early 2010 with 25 pre-sold units, resulting in $55 million in non-refundable contracts, as well as over $20 million in reservations. Sales activity and velocity would have increased even more if construction had actually begun.

In summary, although there was a real estate market decline, a combination of factors would have allowed the Fairmont Breckenridge to continue the success of 2008 and 2009. Among other things, it was the only project with private gondola access, it was the first global, high-end branded (Fairmont) project at the most visited ski resort in the U.S.,it had unmatched 180 degree unobstructed views, it was setting record sales prices for Breckenridge, and it was located in the most visited ski resort in the U.S. I consequently believe that even though the United States experienced a decline in real estate market values in 2009 through approximately 2011, this decline would not have significantly impacted the market values (and thus the damages) I have described in this report. And even assuming, for the sake of argument only, that the real estate market decline would have negatively impacted these market values, it would only have negatively impacted those values by 10-15% at the most. The project would still have been significantly profitable even if sales prices were reduced by 15%.

Expert report of John D. Niemi
*Niemi, et. al. v. Burgess, et. al.*, (Civil Action No. 12-cv-869-RBJ) (D. Colo. 2013)

**Other sworn testimony:**

I also respectfully refer the reader to my other sworn testimony and exhibits filed in this lawsuit, including my damages declaration and associated documents filed in conjunction with our motion for summary judgment, which I hereby incorporate by reference (3/15/2013 Niemi Decl., Dkt. 172-1).

**Criminal Case- United States vs. Michael Frank Burgess:**

I was a critical witness on behalf of the United States in the United States' criminal case against Michael Burgess in 2010 and 2011. (I say I was a "critical witness" because the Assistant U.S. Attorney ("AUSA") in charge of the case at the time told me so.) In May 2012, Mr. Burgess pleaded guilty to conspiracy to commit wire fraud and money laundering for, among other things, his conduct in defrauding Bob Naegele, Jesper Parnevik, me, and our companies. In the process of his guilty plea and sentencing, Mr. Burgess specifically identified Erwin Lasshofer and his Innovatis entities as his conspirators.

As part of my involvement in *U.S. v. Burgess*, a different AUSA was required to define my damages for sentencing and restitution purposes. The AUSA went through an extremely detailed process to determine our damages, explaining that in a criminal case, the only damages that can be recognized were direct losses and that we could not claim for lost future profits or the value of lost assets above the equity and debt in each asset. As a result, based on DOJ's accounting exercise, the AUSA determined that our damages were limited to only the cash equity and remaining debt obligations resulting from the fraud. They did not take any of the true market values of any of the properties into account when determining our losses, only the cash equity invested (and lost) plus debt still owed. This amount was formalized in a final restitution order filed by the U.S. District Court for the Central District of Florida in the amount of $45,990,300 in my name.

Mr. Burgess is 70-years old and serving a 15 year term. There is zero expectation that any of this amount will be realized. To date, we have received no indication from the DOJ that they intend to pursue this case any further.

I have used the U.S. District Court for the Central District of Florida's restitution amount as a "check" to ensure that my damages analysis here is accurate. Based on my review

Expert report of John D. Niemi
*Niemi, et. al. v. Burgess, et. al.*, (Civil Action No. 12-cv-869-RBJ) (D. Colo. 2013)

and understanding of that court-ordered restitution amount, my estimation of the Total Losses above is accurate.

## Previous expert testimony

My previous expert testimony: None.

## Compensation

I am not being compensated for the time spent providing this report or for my testimony.

## Resume

My resume is below for the reader's convenience.

Expert report of John D. Niemi
*Niemi, et. al. v. Burgess, et. al.*, (Civil Action No. 12-cv-869-RBJ) (D. Colo. 2013)

# John D. Niemi
## CEO
## Mesa Homes Development

History:

John has been in commercial and residential real estate for his entire 25 year career. Prior to founding Mesa Homes Development Company, John was the Executive Vice President and one of the original founders of Equis Corporation, a global commercial real estate services firm. He was instrumental in growing the company from a lone presence in Chicago to over 30 offices around the world. He managed Equis' ten largest markets, while being a practice leader in commercial real estate from 1988-2005. He has orchestrated commercial and residential transactions and projects in over 30 states for a value in excess of $2.0 billion. After 17 years at Equis, John was key member of the 4 person Executive Management team that ultimately sold the company to United Group Limited out of Australia. The company is now called UGL Equis.

Major projects include the development of headquarters facilities for companies such as SBC Communications, MCI, Daimler Chrysler and Qwest.

Other clients include:

AT & T

Blue Cross Blue Shield

Royal Bank of Canada

State of Wisconsin

State of California

Expert report of John D. Niemi
*Niemi, et. al. v. Burgess, et. al.*, (Civil Action No. 12-cv-869-RBJ) (D. Colo. 2013)

U.S. General Services Administration

Relevant Experience:

### Recent Residential Development

Project:    *Aidan's Meadow*

Role:       Owner

Scope:      74 unit residential development in Eagle, CO, 25 minutes from Vail. The project included 56 single family homes priced between $600,000 and $800,000 and 18 duplex homes priced between $400,000 and $540,000. This development has been orchestrated from the ground up, including responsibility for entire infrastructure improvements; design of all homes and on through full completion of vertical construction. Total cost of the project is approximately $40,000,000. Aidan's Meadow projected that all of the properties for this project would sell over a period of four years. The project bagan in 2005 and was completed in 2010. Aidan's Meadow is the result of strong collaboration between Mesa Homes and the Town of Eagle, Colorado.

Project:    *Aidan's Landing*

Role:       Owner

Scope:      6 custom, high end residential units in Eagle Ranch, CO. These homes were priced between $800,000 and $1,200,000. Total cost of the project was approximately $5,000,000.

Project:    *Grande View at Stoney Ridge*

Role:       Owner

Scope:      117 unit residential development in Silt, CO, near Glenwood Springs, CO. The project includes 99 single family homes priced between $300,000 and $450,000 and 18 duplex homes priced between $225,000 and $300,000. Mesa Homes was responsible for the entire development including

Expert report of John D. Niemi
*Niemi, et. al. v. Burgess, et. al.*, (Civil Action No. 12-cv-869-RBJ) (D. Colo. 2013)

infrastructure, design of all homes, marketing/sales and vertical construction.

## Other Commercial Development

Project: State of Wisconsin Data Center – Madison, WI

Scope: 80,000 square foot state of the art data center designed and built from the ground up for the State of Wisconsin. Total construction cost of the project was approximately $16,000,000 with a $25,000,000 long term lease.

Project: SBC Corporation Call Center – Schaumburg, IL

Scope: 110,000 square foot in-bound call center built from ground up. Total cost of the project was approximately $16,500,000.

Project: SBC Chicago Headquarters – Chicago, IL

Scope: 120,000 square foot downtown high rise development with SBC as lead tenant. Total value of project was $85,000,000.

Project: Daimler Chrysler Financial – Southfield, MI

Scope: 210,000 square foot headquarters for Daimler's auto finance group. Total value of project was $90,000,000.

Project: Heska Pharmaceuticals – Fort Collins, CO

Scope: 60,000 square foot new headquarters and laboratory. Total value of the project was approximately $18,400,000.

Expert report of John D. Niemi
*Niemi, et. al. v. Burgess, et. al.*, (Civil Action No. 12-cv-869-RBJ) (D. Colo. 2013)

Project:   Qwest – Phoenix, AZ

Scope:    540,000 square foot regional headquarters, data and call center. Total value of the project was approximately $202,000,000.

**Fairmont Residences– Breckenridge, CO**

John led the entire acquisition, planning and development process for the

Fairmont Residences Breckenridge, including land acquisition, master planning, entitlements, design & architecture, marketing/sales and construction. For a description and virtual tour of the project, please go to www.fairmontshockhill.com.

John is 47 years old and resides with his wife and three children in Castle Rock, CO.