UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No.: 12-CV-869-RBJ

JOHN NIEMI,
ROBERT NAEGELE, III, and
JESPER PARNEVIK,

             Plaintiffs,

v.

MICHAEL FRANK BURGESS,
ERWIN LASSHOFER,
INNOVATIS GmbH,
INNOVATIS IMMOBILIEN GmbH,
INNOVATIS ASSET MANAGEMENT, S.A.,
LEXINGTON CAPITAL & PROPERTY INVESTMENTS, LLC, and
BARRY FUNT,

             Defendants.

---

## SUBMISSION BY MR. LASSHOFER AND THE INNOVATIS ENTITIES IN OPPOSITION TO PLAINTIFFS' REQUEST FOR RELIEF AND DAMAGES

---

Pursuant to Supreme Court and Tenth Circuit precedent, the Court is precluded from awarding damages or entering a final judgment at this stage of the proceedings. Moreover, because the Court lacks personal and subject matter jurisdiction and venue, the Court lacks authority to award Plaintiffs any relief or damages. Furthermore, for the reasons explained in the attached

Declaration Of John M. Wilhelms, MAI, the damages Plaintiffs seek[1], in connection with property they did not own, are highly speculative and thus not recoverable.

ARGUMENT

I.    THE COURT SHOULD NOT ENTERTAIN PLAINTIFFS' DAMAGES CLAIM AND CANNOT ENTER FINAL JUDGMENT AT THIS POINT

Since at least 1872, the law in federal court has been that

> when multiple defendants are alleged to be jointly liable and fewer that all defendants default [as is the case here[2]], the district court may *not* render a liability determination as to the defaulting parties unless and until the remaining defendants are found liable on the merits.

*Hunt v. Inter-Globe Energy, Inc.*, 770 F.2d 145, 147 (10th Cir. 1985) (emphasis added) (citing *Frow v. De La Vega*, 82 U.S. 552 (1872)). Once again, Plaintiffs have and continue to march the Court down the path of error. Not only is the Court prohibited at this point from entering a final judgment, it also is prohibited at this point from awarding damages.

To avoid any suggestion that the Court was not previously apprised about this issue, Mr. Lasshofer and the Innovatis entities point out that they alerted the Court to this issue in their

---

[1] Plaintiffs seek over $60 million before trebling based on the alleged $2.18 million they claim to have sent Burgess and Prosperity on behalf of AZCO LLC and AZCO II LLC (the "Azco entities").

[2] *See* Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, and Fourteenth Claims For Relief in the Amended Complaint [Doc. No. 85-1; filed 7/24/2012]. Plaintiffs may attempt to claim that the First (RICO) and Fifth (COCCA) claims are asserted only against Mr. Lasshofer and the Innovatis entities, and thus the *Frow* doctrine does not apply. Plaintiffs, however, cannot attempt an end run of the *Frow/Hunt* decisions through creative pleading. For instance, the Second Claim For Relief asserts the very same claim as the First (alleged violation of 18 U.S.C. § 1962(c)), only against the other Defendants; the First Claim and Second Claim not only assert the same violation, they are based on the very same nucleus of alleged facts. Moreover, the Third Claim For Relief also asserts a violation of 18 U.S.C. § 1962(c) against *all* Defendants, again based on the same nucleus of facts. The exact same thing holds true with respect to the Fifth, Sixth, and Seventh Claims for Relief (which assert violations of C.R.S. § 18-17-104(3)). Moreover, the Fourth Claim For Relief asserts another RICO claim against *all* Defendants, and the Eight Claim For Relief asserts another COCCA claim against *all* Defendants.

2

Response In Opposition To Plaintiffs' Motion To Quash Third-Party Subpoenas [Doc. 201; filed 5/8/2013], and do so again now. Should the Court nevertheless elect to proceed with the damages hearing prior to a liability determination with respect to all Defendants, neither Mr. Lasshofer nor the Innovatis entities waive their objection or such error by participating in that hearing.

## II.   SUBJECT MATTER JURISDICTION DOES NOT EXIST FOR THE COURT TO AWARD FURTHER RELIEF OR DAMAGES

At the Show Cause Hearing, the Court erroneously (both as a matter of fact and law) stated that "the bridge of . . . subject-matter jurisdiction has long since been crossed . . . because it was never raised . . . ." Exhibit 1 at 25:8-12. Standing to sue is jurisdictional: a federal court can exercise jurisdiction only when specifically authorized to do so. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir.1994); *Bushnell, Inc. v. Brunton Co.*, 659 F. Supp. 2d 1150, 1157 (D. Kan. 2009). In a federal court case, the *bridge* of subject matter jurisdiction is never fully crossed and is before the court *throughout* the proceedings. Even if a party does not challenge jurisdiction (although Mr. Lasshofer and the Innovatis entities in fact did challenge standing in May and June 2012), "the district court ha[s] an *independent* duty to examine whether it ha[s] subject matter jurisdiction . . . ." *Harris v. PBC NBADL, LLC*, 444 Fed. Appx. 300, 301 (10th Cir. 2011) (emphasis added). *See also* FED. R. CIV. P. 12(h)(3); *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

### A.   Lack Of Subject Matter Jurisdiction Was Demonstrated During The PI Hearing

As demonstrated at the PI Hearing, the Loan Agreement in question is between AZCO LLC and AZCO II LLC (the "Azco entities") and Prosperity International LLC ("Prosperity"), not Mr. Lasshofer or any of the Innovatis entities. Moreover, the loan commitment fee and Collateral Deposit were obligations owed by the Azco entities (not Plaintiffs) under the Loan Agreement. Exhibit 2 at 12:12-16; Exhibit 3 at § 2.1.1(b). Neither Plaintiffs nor Mr. Lasshofer or the Innovatis

entities were parties to the operative agreements, including the Loan Agreement. *See* Exhibit 2 at

79:7-81:17 & 83:2-87:13.[3]   Plaintiffs recognized that standing was at issue, as reflected in the

questions posed on redirect examination in a thoroughly unpersuasive attempt to manufacture

standing. *See id.* at 94:15-22.   Moreover, as the Court observed, four days after the PI Order, Mr.

Lasshofer and the Innovatis entities sought to stay the PI Order because, among other reasons,

Plaintiffs failed to demonstrate standing.   Exhibit 1 at 19:24-20:10; *see also* Emergency Motion To

Suspend [Doc No. 53; filed 6/5/2012], at 4; Reply In Support Of Emergency Motion To Suspend

[Doc. No. 66; filed 6/13/2012], at 7-9.[4]

Because the Court lacks subject matter jurisdiction, it is without authority to award damages.

FED. R. CIV. P. 12(h)(3).

### B.   Subject Matter Jurisdiction Does Not Exist Because Plaintiffs Cannot Sue In Their Individual Capacities

Plaintiffs now are seeking $60+ million (before trebling) in damages based on the purported

$2.18 million advance on behalf of the Azco entities in connection with properties Plaintiffs did not

own.

At the Show Cause Hearing, the Court concluded, albeit erroneously, that Plaintiffs have

standing in their individual capacities and that the Court has subject matter jurisdiction because "in

its June 1, 2012 preliminary-injunction order, the Court found that Mr. Niemi and Mr. Parnevik

personally put up the $2 million up-front collateral deposit."   Exhibit 1 at 25:16-20.   The Court

---

[3] According to Mr. Niemi, the Azco entities each owned a parcel of the property in Breckenridge which they were seeking financing to develop. Exhibit 2 at 83:24-84:6. The Azco entities rolled up into Mesatex LLC ("Mesatex"). *Id.* Mr. Niemi was the Managing Member of Mesatex. *Id.* at 81:10-11.

[4] The Court summarily denied that motion and failed to address or consider the issue of subject matter jurisdiction. *See* Order [Doc. No. 69; filed 6/19/2012].

ruled: "The issue is whether the Lasshofer defendants, in conspiracy with Burgess and in violation of COCCA and RICO, bilked Niemi, Naegele, and Parnevik out of at least $2 million in up-front money . . . and that can be decided completely apart from the loan-agreement issues." *Id.* at 25:24-26:4.  The Court also ruled that the Loan Agreement was irrelevant to standing and subject matter jurisdiction because "this is a lawsuit under COCCA and RICO, not a breach-of-the-loan-agreement lawsuit." *Id.* at 25:21-22.  In addition to the fact that we believe the Court was incorrect in concluding that Plaintiffs have standing to sue in their individual capacities, given the Court's conclusion, and assuming jurisdiction and venue exists, the most at issue in damages could be $2.18 million, not the $60+ million (before trebling) that Plaintiffs now seek (Plaintiffs previously sought $150+ million before trebling).

### 1.    *The Loan Agreement is Central to Every Claim in this Lawsuit*

The Loan Agreement created the obligation for the ***Azco entities*** to send money to ***Prosperity*** and for ***Prosperity*** to lend money to the ***Azco entities***.  Plaintiffs predicate their alleged COCCA and RICO claims on the alleged failure to lend pursuant to the Loan Agreement.  Amended Complaint at 46-65.  *This is no more clearly illustrated than by the damages Plaintiffs claim.  Plaintiffs do not limit their damages claim in this case or on default to the $2.18 million.  Rather, Plaintiffs initially alleged $150 million (before trebling), and now seek over $60 million (before trebling) in damages* (*see* Supplement To Plaintiffs' Motion For Summary Judgment [Doc. 171; filed 3/15/2013], at 2; Plaintiffs' Motion For Default Judgment [Doc. No. 191; filed 4/10/2013]).  Thus, the Loan Agreement not only is relevant to this lawsuit, it is *central* to the issue of jurisdiction to award damages.

5

2.    *For Standing Purposes, the Source of the $2.18 Million is Irrelevant*

How the Azco entities sourced the money used to fulfill their obligation under the Loan Agreement is irrelevant. The only fact of importance is that the obligation under the Loan Agreement belonged to the Azco entities, not Plaintiffs. A party whose alleged injuries result "merely from the misfortunes visited upon a third person by the defendant's acts" lacks standing to pursue a claim under RICO. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992).[5] "In a RICO case 'an indirectly injured party should look to the recovery of the directly injured party, not to the wrongdoer, for relief.'" *Adams-Lundy v. Ass'n of Prof'l Flight Attendants*, 844 F.2d 245, 250 (5th Cir. 1988) (quoting *Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843, 849 (2nd Cir. 1986)). *See also Flynn v. Merrick*, 881 F.2d 446, 449-50 (7th Cir. 1989); *Sparkling v. Hoffman Constr. Co., Inc.*, 864 F.2d 635, 640-41 (9th Cir. 1988).

The issue is not, as the Court ruled, whether Mr. Lasshofer and the Innovaties entities "bilked Niemi, Naegele, and Parnevik out of at least $2 million in up-front money," but whether the Azco entities were bilked out of $2.18 million. Messrs. Niemi, Naegele, and Parnevik do not have standing to seek damages.

## C.    The Loan Agreement Does Not Establish Standing

At the Show Cause Hearing, the Court said:

> The Court finds that the intent of the parties is clear. There is ample evidence [albeit unspecified by the Court] that the Lasshofer defendants knew full well and intended that the money was coming from Niemi and his partners and was not the least bit concerned about the formality of the partnerships [sic] Azco and Azco [sic].

Exhibit 1 at 26:16-20. This finding is inconsistent with the Loan Agreement and Plaintiffs' allegations and testimony.

---

[5] Colorado courts look to RICO case law in COCCA cases. *See Ferris v. Bakery, Confectionery and Tobacco Union, Local 26*, 867 P.2d 38, 46 (Colo. App. 1993).

Under the Loan Agreement, $2 million was to be paid *to Prosperity by the Azco entities* as a "Collateral Deposit." Exhibit 3 at § 2.1.1(b) ("*Lender [Prosperity]* hereby agrees that upon receipt of the Collateral Deposit *from Borrower [the Azco entities]*") (emphasis added). Further, the Amended Complaint claims that Mr. Niemi (the Managing Member of Mesatex, which controls the Azco entities) wired money to Prosperity (not Mr. Lasshofer or the Innovatis entities). *See* Amended Complaint at ¶¶ 68, 100 & 101.[6] There is no mention of any involvement by the other two Plaintiffs.

Moreover, the record shows Mr. Niemi's first direct contact with Mr. Lasshofer occurred months after the money was sent and after Prosperity defaulted (Ex. 2 at 75:5-8), Mr. Naegele and Mr. Parnevik never had contact with Mr. Lasshofer (*id.* at 99:18-20, 100:20-24 & 107:18-24), Innovatis GmbH had no role in the events at all (*see* Declaration of Martina Gsöls [Doc. No. 67-4; filed 6/15/2012], at ¶ 4), and Innovatis Immobilien GmbH did not even exist until June 2011 (*see id.* at ¶ 5). There was no basis for the Court to conclude that Mr. Lasshofer and the Innovatis entities knew and intended money to come from Plaintiffs.

**D.    There Was Not And Could Not Be A Valid Assignment**

*1.    Plaintiffs do not Allege an Assignment in Their Pleadings*

It is a long-standing and well-established point of federal jurisprudence that " '[t]he statement of the facts upon which the existence of federal jurisdiction depends must affirmatively and distinctly appear in the plaintiff's complaint.' " *Diaz v. Grupo Mexico Inc.*, 487 Fed. Appx. 366,

---

[6] The Amended Complaint at Paragraph 94 further alleges that "[t]he Loan Agreement identifies Niemi as Borrower and Guarantor." This is demonstrably *false*. The Loan Agreement identifies the Azco entities as the "Borrower" and Mesatex as the "Guarantor." Exhibit 3 at 1. Despite the fact that this same allegation appeared in the Verified Complaint, which Mr. Niemi verified under penalty of perjury, Mr. Niemi has not been held to account for his false attestation.

367 (9th Cir. 2012) (quotation omitted).  Plaintiffs' Verified Complaint contained *no* allegation of an

assignment.  Neither does the Amended Complaint.[7]  However, to rely upon an assignment as the

basis for federal jurisdiction, a plaintiff must specifically allege the assignment in its pleadings.  *Spine*

*Imaging MRI, L.L.C. v. Liberty Mut. Ins. Co.*, 743 F. Supp. 2d 1034, 1045 (D. Minn. 2010) (dismissing

claims because "failure to specifically plead written assignments render the breach of contract and

unjust enrichment claims implausible. . . .  [S]uch an allegation is a necessary element of [plaintiff's]

standing . . . .").  Plaintiffs' pleading failure alone negates the existence of standing and subject

matter jurisdiction and deprives the Court of jurisdiction to award damages.

### 2.   *The Loan Agreement Prohibits Assignments*

At the Show Cause Hearing, the Court ruled:

> [T]o the extent that the loan agreement is relevant, although I think it is not, but to
> the extent that it is relevant to standing, the Court finds there is an inherent
> inconsistency in the loan agreement between the no-assignment clause on the one
> hand and the definition of the term "borrower" which is defined to included
> "sucessors and assigns" on the other hand.

Exhibit 1 at 26:5-11.  Based upon this finding, the Court declared the Loan Agreement ambiguous

and the non-assignment clause void.  In so doing, the Court deviated from time-honored rules of

contract interpretation.

---

[7] At the Show Cause Hearing, the Court criticized Mr. Lasshofer, the Innovatis entities, and their counsel for not raising the issue of the non-assignment clause prior to the PI Hearing. Exhibit 1 at 20:1-5. The Court stated: "That, I presume, was because the technical argument hadn't yet dawned on the Lasshofer defendants. The light bulb, apparently, finally went off because on June 5, 2012, the Lasshofer defendants did bring the issue up, buried in their so-called emergency motion for stay . . . ." *Id.* at 20:5-9. The Court's statement is contradicted by the facts and the record.  In fact, while Mr. Lasshofer and the Innovatis entities did assert lack of standing in the June 5, 2012 Motion, they did not address the non-assignment clause, *and for a very good reason*. Plaintiffs did not suggest until July 24, 2012 – *two months after the PI Hearing* – that an assignment allegedly occurred, *and they still have not pleaded it.*  In light of these facts, we are at a loss to understand what possibly could have prompted such harsh and inaccurate remarks by the Court. How could the light bulb have gone off previously when there was no socket?

The provisions of the Loan Agreement that the Court found contradictory are i) the definition of "Borrower" in the Introductory Paragraph, and ii) Section 10.21, which prohibits Borrower from making assignments. Borrower is defined as "AZCO LLC, a Colorado limited liability company and AZCO II LLC, a Colorado limited liability company, (collectively, together with its *permitted successors and assigns*, 'Borrower')." Exhibit 3 at 1 (emphasis added). Section 10.21 states: "Borrower may not assign its rights, title, interests or obligations under this Loan Agreement or under any of the Loan Documents." *Id.* at 72, § 10.21. There is nothing inconsistent or ambiguous about these provisions. Unless the Azco entities received *permission* to assign their rights and obligations, they were prohibited from doing so. Plaintiffs have not and cannot show any permission for Azco to assign (and, of course, they do not plead permission to assign).[8]

The Court also voided the non-assignment clause because it found that "[t]he primary draftsman in this case . . . was Burgess and his allies." Exhibit 1 at 27:2-4. The Court then applied "the rule of construction, that an ambiguity in a contract is to be construed against the draftsmen . . . and voids the no-assignment clause." *Id.* at 27:1-5. (It deserves noting that the Court made no finding that an assignment actually occurred.) However, in keeping with the facts and the record, there is no evidence that Burgess and his unidentified "allies" were the primary draftsmen of the Loan Agreement. Even if they were, the Loan Agreement unequivocally provides: "*The parties hereto acknowledge that each is represented by separate counsel in connection with the*

---

[8] Accordingly, the Court's interpretation of the Loan Agreement violates the principle that a court must interpret a contract " 'in its entirety with the end in view of seeking to *harmonize and to give effect to all provisions* so that none will be rendered meaningless.' " *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009) (quoting *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo. 1984) (emphasis added)).

*negotiation and drafting of the Loan Documents[⁹] and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them.*" Exhibit 3 at 72, § 10.18 (emphasis added).   Thus, because the Loan Agreement prohibits the assignment in question here, the Court cannot award damages to Plaintiffs individually.

### III.   THE COURT DOES NOT HAVE PERSONAL JURISDICTION OR VENUE OVER MR. LASSHOFER AND THE INNOVATIS ENTITIES

Mr. Lasshofer and the Innovatis entities previously raised and argued the law and facts establishing that the Court does not have personal jurisdiction or venue over Mr. Lasshofer and the Innovatis entities.   While we understand that the Court ruled against Mr. Lasshofer and the Innovatis entities[10], those same reasons demonstrate why the Court lacks authority to award relief and damages, and we incorporate those arguments herein.

### IV.   PLAINTIFFS' DAMAGES CLAIM IS HIGHLY SPECULATIVE, AND IS BASED UPON DISCREDITED EVIDENCE

A default judgment does not force a defendant " 'to concede liability for the amount of damages that a plaintiff has claimed.' " *Tebbets v. Price Sec.*, No. 93-2129-JW, 1995 WL 28967, at *3 (D. Kan. Jan. 20, 1995) (quoting *Shepherd v. Am. Broad. Cos.*, 862 F. Supp. 486, (D.D.C. 1994)).   "In order to fulfill its' obligation to ensure that damages are appropriately awarded, the court must do more than merely accept at face value the movant's statement of damages." *OTO Software, Inc. v. Highwall Tech., LLC*, No. 08-CV-01897-PAB-CBS, 2011 WL 3236049, at *5 (D. Colo. Jul. 5, 2011) (citing *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2nd Cir.1997)). "Damages may be awarded only if the record adequately reflects the basis for award . . . ." *Adolph Coors Co. v. Movement Against Racism & The Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985). "*[A] plaintiff*

---

[9] "Loan Documents" are defined to include the Loan Agreement.   *See* Exhibit 3 at 7.

[10] Those issues too have been preserved for appeal.

10

*cannot recover damages that are speculative.*" *OTO Software*, 2011 WL 3236049, at *5 n.5 (emphasis added).

In their Motion For Default Judgment ("Motion For Default") [Doc. No. 191; filed 4/10/2013], Plaintiffs previewed their damages claim and the evidence upon which they rely to support it. For their purported $2.18 million advancement of fees and deposits owed by the Azco entities to Prosperity, Plaintiffs seek on behalf of themselves four categories of damages totaling over $60 million (before trebling): Plaintiffs seek: (1) $37.3 million for the alleged value of the Shock Hill property (which they did not own); (2) $12.35 million for the alleged value of the River Duplex property (which they did not own); (3) $11 million for the alleged value of the River Lodge property (which they did not own); and (4) the $2.18 million that Plaintiffs claim they provided to Burgess on behalf of the Azco entities. Motion For Default at 8-9.

For discussion purposes, these alleged damages can be broken into two groups: (1) the alleged property value damages, and (2) the $2.18 million. The evidence does not entitle Plaintiffs to the damages they are seeking.

A.  **The Law Rejects Plaintiffs' Efforts To Collect Over $60 Million (Before Trebling) On Their Purported $2.18 Million Advance**

    1.  *Despite what Plaintiffs Claim, the Methodology Used to Compute Alleged Property Value does Include a Speculative Profit Component*

Plaintiffs have said that they intend to rely in large measure on outdated 2008 hearsay appraisals in an effort to prove property value (again, of property they did not own). Moreover, even though Plaintiffs pretend that the method used by the appraisers in 2008 to reach the value reflected in the 2008 hearsay appraisals did not include a profit consideration, as explained by MAI and Colorado certified appraiser John M. Wilhelms and discussed below, Plaintiffs' suggestion simply is not true. Accordingly, and for the reasons explained below, Plaintiffs' claimed property

value is highly speculative and thus not recoverable (even if Plaintiffs could recover the value of property they did not own).

Case law (including cases involving allegations and claims similar to those made here) demonstrate that Plaintiffs' alleged damages are speculative and not recoverable.  For instance, in *3947 Austin Boulevard Assocs., LLC v. M.K.D. Capital Corp.*, No. 04 Civ. 8596(NRB), 2007 WL 1575265 (S.D.N.Y. May 30, 2007), the plaintiff's claims arose out of its plans to develop and operate business property.  One of the defendants represented itself as a lender able to provide multimillion dollar loans to finance development projects.  That defendant agreed to provide the plaintiff with a credit facility in the amount of $5.9 million, and the plaintiff tendered to the defendant a $59,000 commitment fee.  For months, the defendants sent the plaintiff reassurances via mail, telephone conversations and email that they were close to securing funding, and the plaintiff accrued a variety of expenses in anticipation of the loan.  The defendants never provided the funding, and the project never came to fruition.  Default judgment was entered against certain of the defendants, but the court "delayed assessing damages [as required] at that time to await the disposition of the claims against all defendants."  2007 WL 1575265 at *1.  When it did consider damages, the court said:

> Projections of future profits which are made on the basis of a "multitude of assumptions" that require "speculation and conjecture" with few known factors do not provide the requisite certainty for recovery. . . .  In addition, evidence of lost profits for a new business venture must receive greater scrutiny in light of the fact that there is no business history or track record upon which to base any estimate of lost profits. . . .

> *       *       *

>      . . . [F]or the reasons discussed above in the context of the breach of contract, we believe that the estimates provided by plaintiff with regard to potential future profits are too speculative to support a lost profit recovery in the civil RICO context.

*Id.* at 2-3 (citation omitted). *See also LaVay Corp. v. Dominion Fed. Savs. & Loan Assoc.*, 830 F.2d 522 (4th Cir. 1987).

Colorado courts also recognize that "[l]ost profits are not recoverable if either the amount of the profit that would have been earned or the fact that the plaintiff would have earned them is too speculative, remote, imaginary, or impossible to ascertain." *Master Palletizer Sys., Inc. v. T.S. Ragsdale Co.*, 725 F. Supp. 1525, 1535 (D. Colo. 1989) (citing *Republic Nat'l Life Ins. v. Red Lion Homes, Inc.*, 704 F.2d 484 (10th Cir. 1983)). Numerous other courts have said the same thing. *E.g., In re Taxable Municipal Bond Sec. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995) ("Anderson's claimed damages would have required extensive speculation and would not simply entail a calculation of present, actual damages. Such speculative damages are not compensable under RICO . . . ."); *The Knit With v. Knitting Fever, Inc.*, Civil Action Nos. 08-4221, 08-4775, 2012 WL 2938992, at *12 & 14 (E.D. Pa. July 19, 2012) ("The burden . . . falls on the plaintiff to establish that the profits are both specific and identifiable, and are not speculative in nature. * * * Plaintiff has failed to show lost profits that go beyond the most basic level of speculativeness. . . . As speculative lost profit damages are insufficient to confer RICO standing, Plaintiff cannot rest its case on this element of damages.").

As explained in the Declaration Of John M. Wilhelms, MAI, attached hereto as Exhibit 4 ("Wilhelms Dec."), the "as is" valuation approach relied on by Plaintiffs is based significantly on a profit component, Mr. Niemi's suggestion notwithstanding. Mr. Wilhelms, who unlike Mr. Niemi is a licensed and certified appraiser with substantial appraisal experience in connection with resort developments, explains that

> [t]he Niemi Report relies on the "as-is" values of the above [2008] appraisals as the basis for the estimates of damages claimed. The dated nature of these reports and the severe economic and market downturn that followed thereafter nullify their usefulness for a more current value estimate than their effective dates. Each of the reports uses a subdivision development technique to arrive at the "as-is values" and

13

those values have been adopted by the Niemi Report as the current estimate of damages.  The subdivision development technique is a type of approach that produces a land residual value.  It is applied by estimating all of the component revenue and costs of a project except for the land contribution, *including an acceptable profit for the developer*.  The land value then becomes the only missing component and it is solved for using a discounted cash flow analysis. . . .

. . . A weakness of the technique is that it is very sensitive to changes in elements of: estimated pricing, absorption and *how much profit should be deducted.*  Estimates of these components require speculative projections and changes are magnified because the land value is a relatively small percentage of the overall project.  *Small changes in such things as the percentage of estimated profit relative to gross revenue produce a much greater percentage change in the land value.*  The same would be true for estimated revenue (pricing and absorption), but *the profit is typically the most subjective of the estimates*.

\*        \*        \*

. . . The "as-is" land values in the appraisals he [Niemi] references were based on attaining total *profits* of 15% of gross sales for the Shock Hill project, 16% for the Shores Duplex project and 10% for the Shores Lodge project.  Clearly the "as-is" land values would decline using the developmental approach if the gross sales were reduced.  *An acceptable profit is an important component of the approach* and the reduced revenue would certainly reduce the indicated potential land contribution to value.

\*        \*        \*

. . . Even small changes in assumptions for gross sales revenue, absorption time and *profit* to the developer have magnified influences on the resulting land value estimates.  The approach is predicated on a reasonable market expectation of being able to receive an acceptable level of *profit* as of the effective date of the appraisal.

Wilhelms Dec. at ¶¶ 8, 11 & 13, pp. 5-6, 17 & 19 (emphasis added).

Mr. Wilhelms also goes to great lengths to explain the significant impact that the severe

economic downturn beginning in the latter half of 2008 had and continues to have on prices and

profits associated with resort development property, including the very property in question here.

*Id.* ¶¶ 9, 10 & 14, pp. 6-16 & 20-21.  Thus, Mr. Wilhelms, applying established and well recognized

industry criteria (unlike Mr. Niemi), demonstrates just how speculative Plaintiffs' "as is" value claim

is.  And, once again, it deserves noting that Plaintiffs seek these over $60 million (before trebling) in

damages based on the purported 2008 valuation of property they never owned.

> **2.    Because the Transaction was not Completed, and Mr. Lasshofer and
> the Innovatis Entities were not Parties to the Agreements, Plaintiffs
> are Limited to Pecuniary Loss**

*Elliot v. Aspen Brokers, Ltd.*, 811 F. Supp. 586, 591 (D. Colo. 1993), also precludes what

Plaintiffs attempt to do here:

> Similarly, if the plaintiff does not actually complete the transaction or if he
> seeks damages for misrepresentation from a defendant not a party to the transaction,
> the plaintiff may recover only his pecuniary loss.  *See* Restatement, *supra*, § 549 cmt. g
> (damages limited to out-of-pocket loss "[w]hen the plaintiff has not entered into any
> transaction with the defendant but has suffered his pecuniary loss through reliance
> upon the misrepresentation in dealing with a third person") . . . .

This is the very situation that Plaintiffs have alleged.   The transaction in question was not

completed.  Moreover, all negotiations leading up to and interactions immediately after execution of

the loan documents were with Burgess and the other named Defendants.  Neither Mr. Lasshofer nor

any Innovatis entity is a party to any loan document, including the Loan Agreement, and the first

time that any Plaintiff ever communicated with Mr. Lasshofer was well after execution of the Loan

Agreement.  Moreover, none of Plaintiffs entered into any transaction with Mr. Lasshofer or any

Innovatis entity.  Thus, as to Mr. Lasshofer and the Innovatis entities, Plaintiffs are limited to

seeking out-of-pocket losses.[11]

---

[11] Again, even these damages are precluded because the Court lacks jurisdiction and venue.

**B.    In Addition To The Speculative Profit Component, Plaintiffs' $60+ Million Damages Methodology Is Fundamentally Flawed And Unreliable**

Plaintiffs say they will rely on the testimony of Mr. Niemi, whom they claim to be an expert[12], and that Mr. Niemi will rely in large measure on 2008 hearsay appraisals.[13] Thus, Plaintiffs are attempting to rely upon outdated documents of *potential* valuation in an effort to prove their $60+ million claim for property they did not own.

As Mr. Wilhelms explains:

> As a licensed appraiser and an MAI, all appraisal and appraisal consulting work is required to be in compliance with the Uniform Standards of Professional Appraisal Practice ("USPAP") promulgated by the Appraisal Foundation.  USPAP defines an appraisal as the act or process of developing an opinion of value and that all appraisals need to be prepared in compliance with the Standards.  This would include estimates of value such as the "as is" values from the referenced appraisals.  Of utmost importance is the effective date of value as the appraisal represents market conditions and expectations as of that date only.

> The Niemi Report provides estimates of value but has not been prepared in compliance with USPAP. . . .  The Niemi Report does not comply with USPAP guidelines and, as will be discussed, does not correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal.  In other words, the techniques and reporting that are contained in the Niemi Report would not be acceptable to any licensed or designated appraiser as they would clearly violate USPAP.

*          *          *

> . . .  Mr. Niemi acknowledges the market decline after 2008 but does not make any adjustments to the value that had been estimated in 2008.  He states that the decline slowed and eventually stabilized in the Summit County Area in or around 2011.  He states for each of the three properties that, if completed as planned, they would have, at a minimum, generated the expected revenue and corresponding

---

[12] For the reasons explained in the next section, Mr. Niemi is not qualified to testify as an expert.

[13] These appraisals do show that the properties upon which Plaintiffs' speculative damages claim is based did not belong to Plaintiffs.  The Shock Hill property belonged to AZCO II LLC (*see* Doc. No. 172-2 (filed 3/15/2013) at 15 of 37), the River duplex property belonged to AZCO LLC (*see* Doc. No. 172-10 (filed 3/15/2013) at 8 of 39), and the River Lodge property belonged to AZCO LLC (*see* Doc. No. 172-17 (filed 3/15/2013) at 26 of 101).

profit. Yet he acknowledges that: *Depending on the method of measurement, the high-end real estate market in Summit County, Colorado declined by approximately 10-15% during this time.* Mr. Niemi further states that even though *the United States experienced a decline in real estate values in 2009 through approximately 2011, this decline would not have significantly impacted the market values (and thus the damages) I have described in this report.*

There is no support for the above contention that a decline in the market would not have impacted the projects. While the Niemi Report discusses the strong market demand that the projects appeared to have prior to the downturn, the same could be said for numerous projects in other areas including those that were discussed earlier in this declaration. . . .

\*     \*     \*

Mr. Niemi did not rely on sufficient data, research or analysis to arrive at his opinion. His opinion of value is solely dependent on the 2008 appraisals. Those appraisals were based on an approach that there was a market expectation that the property could be developed **at that time** and yield an acceptable profit from the revenues that were then being projected. While he acknowledges the significant market downturn, he does nothing to adjust the land values that had been based on a much stronger market period. His report ignores that impact of the negative market changes in absorption and price levels, the lack of availability of both construction and end loan financing, supply and demand for development land and other critical factors that would have significantly influenced a land value estimate at any time after 2008. . . .

The methodology employed in the Niemi Report is flawed and totally unacceptable as a credible valuation. In general, the report and the methodology are not at all compliant with the Uniform Standards of Professional Appraisal Practice. . . . Any subsequent valuations of the properties addressed in those [2008] appraisals would (under USPAP) need to be new assignments and all of the relevant components would need to be reanalyzed and new data researched.

\*     \*     \*

. . . The Niemi Report fails to address virtually all of these important requirements of USPAP as well numerous other requirements. These substantial flaws in the methodology negate any usefulness of the Niemi Report as an opinion of value.

Wilhelms Dec. at ¶¶ 7, 11, 12 & 13, pp. 4, 16-17, 18 & 19-20. Thus, as is evident from the

Declaration of Mr. Wilhelms, Plaintiffs utterly fail to demonstrate their entitlement to over $60

million (before trebling) in damages in connection with the property they did not own.

Moreover, Judge David S. Doty's opinion in *Weiner v. Naegele*, No. 11-855(DSD/AJB), 2012 WL 2906299 (D. Minn. July 16, 2012), reinforces that the appraisals should not be relied upon in this case to construct any damages. In that opinion, Judge Doty provides insight into the economic conditions facing the properties approximately 4 and 12 months after the respective appraisals were done. He noted:

> [A]s early as April 2, 2009 [over two months before Plaintiffs claim in this case to have been introduced to Burgess and his company Prosperity], Minnesota counsel told Weiner and Naegele that the Breckenridge project "is in significant trouble" and that Niemi is scrambling to keep the creditors back.

2012 WL 2906299, at * 2 (emphasis added). Plaintiffs never apprised the Court of this fact.[14]

### C. Mr. Niemi Is Not Qualified To Provide Expert Testimony

For the reasons set forth in the Objections Of Defendants Erwin Lasshofer, Innovatis GmbH, Innovatis Immobilien GmbH, and Innovatis Asset Management, S.A. To Plaintiffs' Designation Of John Niemi As An Expert Witness And To Niemi's Opinions, And Motion To Exclude Same, filed contemporaneously herewith and incorporated herein, Mr. Niemi's testimony regarding valuation of the Breckenridge properties is not admissible and cannot be considered.

### D. The Court Should Not Credit Plaintiffs' Testimony

Given Plaintiffs' representations in this case, the Court should not credit their testimony or Niemi's Declaration on damages. For example:

---

[14] Plaintiffs further suggest that the Court should rely upon the criminal restitution order entered against Burgess in the Middle District of Florida as proof that the appraisals are acceptable. Motion For Default at 9. Such reliance would be wholly inappropriate. *Rhodes v. Meyer*, 334 F.2d 709, 718 (8th Cir. 1964) (recovery of a "substantial judgment" by default in a prior action lacked "any persuasive effect" in suit against different defendants "brought upon the same basic cause of action"). Moreover, there is no suggestion that the Middle District of Florida considered evidence and information such as that presented by John M. Wilhelms, MAI, here. In addition, as explained above, Plaintiffs are not entitled as a matter of law to recover the $60+ million (before trebling) that they seek from Mr. Lasshofer and the Innovatis entities.

➢ In Paragraph 93 of the *Verified* Complaint and Paragraph 94 of the Amended Complaint, Plaintiffs state: "The Loan Agreement identifies Niemi as Borrower and Guarantor, Prosperity as Lender, and Innovatis as Beneficiary." Plaintiffs conspicuously avoided attaching the Loan Agreement to either *Verified* or Amended Complaint, and for obvious reasons. Plaintiffs' representation, *verified* by Niemi under penalty of perjury, is *false*. The Borrower under the Loan Agreement is defined as Azco LLC and Azco II LLC, and the Guarantor is defined as Mesatex, LLC. The only time Mr. Niemi's name appears is when he signs on behalf of the Azco entities as Managing Member.

➢ Right out of the box, Plaintiffs told the Court that service of process by Federal Express in Austria was not prohibited. The Court relied on Plaintiffs' misrepresentation in entering the *ex parte* TRO. In fact, we presented the Court with a declaration from an Austrian Supreme Court Justice, a July 3, 2012 letter from the Austrian Federal Ministry For European And Austrian Affairs, and *Baker Hughes Inc. v. Homa*, No. H-11-3757, 2012 WL 1551727, at *16-17 (S.D. Tex. Apr. 30, 2012), all demonstrating that Plaintiffs' representation was *false*.

➢ Plaintiffs also said in the Verified and Amended Complaints and during their testimony at the PI Hearing that the Breckenridge project was very successful before Plaintiffs were introduced to Burgess. *See* Amended Complaint at ¶¶ 29 & 32; Exhibit 2 at 51-52. Plaintiffs *neglected* to share with this Court (as Judge Doty found) that Mr. Niemi was "scrambling to keep the creditors back" before Burgess and Prosperity entered the picture.

➢ Mr. Niemi asserted in a Declaration under penalty of perjury that "[t]hese three entities [the Azco entities and Mesatex] have lapsed into a delinquent status." *See* Response [Doc. No. 162; filed 2/19/2013] at 7-8. Mr. Niemi's statement under oath in a futile effort to

demonstrate standing was *false*. All three entities were in good standing in August 2010, and

AZCO II LLC is in good standing today. *Id.*

At some point, the assorted false representations and testimony by Plaintiffs has to mean something,

and it should result in the Court discrediting what Plaintiffs say during their quest for damages.

CONCLUSION

WHEREFORE, Mr. Lasshofer and the Innovatis entities respectfully request that the Court

decline to entertain Plaintiffs' request for damages and relief at this point, decline to enter final

judgment, and deny Plaintiffs' request for damages and further relief.

Dated: May 30, 2013.                        Respectfully submitted,

                                            *s/Kevin D. Evans*

                                    By:     _____

                                            Kevin D. Evans
                                            Phillip L. Douglass
                                            STEESE, EVANS & FRANKEL, P.C.
                                            6400 S. Fiddlers Green Circle
                                            Suite 1820
                                            Denver, Colorado 80111
                                            Telephone:    720.200.0676
                                            Facsimile:    720.200.0679
                                            Email:  kdevans@s-elaw.com
                                                    pdouglass@s-elaw.com

                                    Attorneys for Defendants
                                    ERWIN LASSHOFER, INNOVATIS GmbH, INNOVATIS
                                    IMMOBILIEN GmbH, and INNOVATIS ASSET
                                    MANAGEMENT, S.A.

### CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of May, 2013, I caused the foregoing **SUBMISSION BY MR. LASSHOFER AND THE INNOVATIS ENTITIES IN OPPOSITION TO PLAINTIFFS' REQUEST FOR RELIEF AND DAMAGES** to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to the following attorneys of record:

Robert N. Miller
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Telephone:      303.291.2300
Facsimile:      303.291.2400
Email:  rmiller@perkinscoie.com

Christopher W. Madel
Bruce D. Manning
Aaron R. Thom
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
Telephone:      612.349.8500
Facsimile:      612.339.4181
Email:  cwmadel@rkmc.com
        bdmanning@rkmc.com
        arthom@rkmc.com

*s/Theresa Baksay*

Theresa Baksay