UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No.: 12-CV-869-RBJ

JOHN NIEMI,
ROBERT NAEGELE, III, and
JESPER PARNEVIK,

       Plaintiffs,

v.

MICHAEL FRANK BURGESS,
ERWIN LASSHOFER,
INNOVATIS GmbH,
INNOVATIS IMMOBILIEN GmbH,
INNOVATIS ASSET MANAGEMENT, S.A.,
LEXINGTON CAPITAL & PROPERTY INVESTMENTS, LLC, and
BARRY FUNT,

       Defendants.

---

## SUBMISSION BY MR. LASSHOFER AND THE INNOVATIS ENTITIES IN OPPOSITION TO PLAINTIFFS' REQUEST FOR RELIEF AND DAMAGES

### EXHIBIT 2

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-00869-RBJ

JOHN NIEMI, ROBERT NAEGELE III, and JESPER PARNEVIK,

    Plaintiffs,

vs.

MICHAEL FRANK BURGESS, ERWIN LASSHOFER, INNOVATIS GMBH,
INNOVATIS IMMOBILIEN GMBH, INNOVATIS ASSET MANAGEMENT SA,
LEXINGTON CAPITAL & PROPERTY INVESTMENTS, LLC, and BARRY FUNT,

    Defendants.

_____

REPORTER'S TRANSCRIPT
Preliminary Injunction Hearing

_____

    Proceedings before the HONORABLE R. BROOKE
JACKSON, Judge, United States District Court for the District
of Colorado, commencing at 1:02 p.m., on the 25th day of May,
2012, in Courtroom A902, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

Proceeding Reported by Mechanical Stenography, Transcription
    Produced via Computer by Kara Spitler, RMR, CRR,
      901 19th Street, Denver, CO, 80294, (303) 623-3080

John Niemi - Direct

1  I'm going to be staying here as expected until the funding

2  starts, and he said, Well, the funding is not going to start

3  anytime soon.

4          At which point I was extremely surprised.   Rather

5  upset.

6  Q   Did the conversation at this point, at any time talk about

7  how the funding was relating to a development in the state of

8  Colorado?

9  A   Yeah.   That was the beginning of, how is the project, how

10 are things going.   You know, this and that.   Knowing that, you

11 know, things were stalled because of, of, of their delays.

12 Q   And prior to this, had you wired $2 million to Prosperity?

13 A   Yes.

14 Q   And whose money was that?

15 A   It was our money.   But it was, it was provided by Bob

16 Naegele and Jesper Parnevik.

17 Q   And from what bank?

18 A   United Western Bank here in Chicago.

19 Q   Here in Chicago?

20 A   I'm sorry.   In Denver.

21 Q   Now, let's go back to that hotel room.   You were just

22 talking, I think, about the point where you were just asking

23 Mr. Lasshofer when the loan proceeds were going to be

24 delivered; is that right?

25 A   Well, yeah.   I mean, but -- you know, I, I was taken

1    THE COURT:  Maybe it's in the book.

2    I don't think so.  My book ends with 83.

3    MS. SCHRERO:  Here's 83.  I'll bring up 84 as well.

4  BY MR. MADEL:

5  Q   So the numbers on this Exhibit 85 were ones that you came

6  up with, right?

7  A   Yes.

8  Q   The first one, lost project profits, describe that for the

9  Court.

10 A   Well, the cost to pay back the loan, including the

11 interest, would have been $220 million.  The estimated revenues

12 on the project that were estimated based off of existing

13 contracts in place and sales on the project was actually closer

14 to 340 or 350 million, but one could argue -- I lowered that

15 down a little bit to $300 million, and that's the estimate,

16 difference of our revenues versus costs.

17 Q   Now, with respect to that, tell the Court a little bit

18 about phase 1 and how it was sold out and when it was sold out.

19 A   The -- in 2000 -- we started selling in 2008 pretty deep

20 into the recession, as we know it in this country.  And

21 achieved, on the mountain project, which is on the cover of

22 this *Robb Report* from 2009, $55 million in hard, nonrefundable

23 contracts plus about $25 million in reservations.  That was for

24 the mountain component of the project.

25    The river component of the project, which were

John Niemi - Direct

1  individual buildings set up in homes -- duplex homes, we

2  started selling in the middle of 2008 and building and we're

3  selling everything at record pricing for Breckenridge,

4  Colorado, an average of $571 a foot after the mountain, and we

5  sold every unit we had under contract and that we had under

6  construction in 2009, leading up to the Innovatis Prosperity

7  loan.

8        So we were very fortunate that we had a property that

9  Valuation Consultants, our appraiser, stated was possibly the

10 single best-developed piece of property in the state of

11 Colorado; and fortunately we owned it, and we were fortunate

12 enough to design a product that, in spite of the economy, was

13 doing extremely well.

14 Q   Now, you keep saying "we."  Whose idea was it to buy this

15 property?

16 A   Mine.

17 Q   And whose, whose idea was it to put this entire project

18 together?

19 A   It was mine.

20 Q   And who ran the project?

21 A   I did.

22 Q   Phase 1, in a real estate project, sold out in some of the

23 worst economy that you and I have experienced in our lifetimes,

24 right?

25 A   Yeah.

1  the understanding that he had to approve everything.

2  Q    We're talking about December of 2009, right?

3  A    Yeah.

4  Q    Okay.

5       When was your first conversation with Mr. Lasshofer?

6  A    February.

7  Q    2010, right?

8  A    Yes.

9  Q    Okay.

10      Now, you say in paragraph 91, Specifically they agreed

11 that in return for a $2 million up-front collateral deposit and

12 13 consecutive monthly payments of 1 million, in excess of

13 1 million, 1,016,667, to be made from loan proceeds, Prosperity

14 would work with Innovatis to make the Shamrock securities held

15 by Innovatis available for certain wealth management and

16 trading activity, the proceeds of which would fund the monthly

17 phase 2 loan disbursements, right?  Did I read that right?

18 A    Yes.

19 Q    Okay.

20      Now, you go on in paragraph 96, if I could jump

21 forward, to say that Niemi was originally instructed to wire

22 the up-front collateral deposit to bank officer Trounce at

23 Credit Suisse Dubai for deposit in Innovatis's account, right?

24 A    Yes.

25 Q    And then in paragraph 98, you say that due to logistical

John Niemi - Cross

1  Q   What's the date of that loan agreement?

2  A   December 7, I believe.

3  Q   Okay.

4      Do you recall a confidentiality nondisclosure and

5  noncircumvention agreement?

6  A   I've signed many of them.

7  Q   Let me show you, if I could, what we've marked as Innovatis

8  Defendants' Exhibit 3.

9  A   Thank you.

10 Q   Sure.

11     THE COURT:  This is what?  Innovatis what?

12     MR. EVANS:  It's Innovatis Defendants' Exhibit 3, Your

13 Honor.

14 BY MR. EVANS:

15 Q   Does that agreement look familiar to you, Mr. Niemi?

16 A   Yes.

17 Q   Yes.

18     In fact, it's signed by you on the last page?

19 A   Yes.

20 Q   This agreement was with Lexington Capital, right?

21 A   Yes.

22 Q   It was not with Mr. Lasshofer?

23 A   No.

24 Q   And it was not --

25 A   I don't know.  He did not sign it.

John Niemi - Cross

1  Q   You do not see on the signature page Mr. Lasshofer's name,

2  do you?

3  A   Correct.

4  Q   And you do not see any of the Innovatis entities' names, do

5  you?

6  A   No.

7  Q   Okay.

8        What is, what is Mesatex, LLC?

9  A   It's a operating LLC we had for -- to operate both of the

10 different components of the project at Breckenridge.

11 Q   Who were members of Mesatex?

12 A   I was the managing member.

13 Q   Okay.

14       Do you recall entering into a construction loan

15 request in September of 2009 with Essex Mortgage Capital?

16 A   I don't recall what the name of that . . . .

17 Q   Let me show you what we've marked as Innovatis Defendants'

18 Exhibit 5.

19 A   With Barry Funt.

20 Q   Do you recall this document?

21 A   Yes.

22 Q   What was the purpose for this document?

23 A   To lay out the terms that we had been discussing for a few

24 months for a loan.

25 Q   Okay.

1    When you say "we," who do you mean?  When you said

2  "we"?

3  A   That I had been discussing with their underwriters for

4  Prosperity and Michael Burgess.

5  Q   Okay.

6    You signed this construction loan request, correct, on

7  page 12?

8  A   Yes, that's my signature.

9  Q   Okay.

10    And what is your title in Mesatex?

11  A   Managing partner.

12  Q   You would agree with me, would you not, that there's no

13  mention of Mr. Lasshofer in this construction loan request?

14  A   I would agree.

15  Q   And there's no mention of any Innovatis defendants in this

16  construction loan request.

17  A   I would agree.

18  Q   If I can get you to turn to section 1, paragraph B.  It's

19  on the first page.  You don't need to turn.

20    It's a letter of credit paragraph that says, on a

21  condition of making the loan, lender -- and if you look above,

22  lender is defined as Prosperity, correct?

23  A   Yes.

24  Q   -- lender will require the delivery at closing of an

25  irrevocable standby letter of credit from a bank with an

John Niemi - Cross

1  A   Yes.

2  Q   Rather than make this a memory test, let me just show you

3  what we've marked as Exhibit 6.

4        Does Exhibit 6 look familiar?

5  A   Yes, it does.

6  Q   This is, again, a September 25, 2009 commitment letter from

7  Prosperity to you on behalf of Mesatex, LLC, correct?

8  A   Correct.

9  Q   This document is signed by you, correct?

10  A   Correct.

11  Q   On page 4.

12        And it's also signed by Mr. Burgess on behalf of

13  Prosperity, correct?

14  A   You said on page 4?

15  Q   Yeah, the first page 4.  So four pages in.  'Cause it

16  attaches --

17  A   Oh, yes.

18  Q   Would you agree with me that Mr. Lasshofer's name is not

19  mentioned in this commitment letter?

20  A   Yes.

21  Q   Would you agree with me that there is not any Innovatis

22  defendant mentioned in this commitment letter?

23  A   Yes.

24  Q   What were Azco LLC and Azco 2 LLC?

25  A   Just the different LLCs for the different components of the

1  project that rolled up into Mesatex.

2  Q    Are they affiliates with Mesatex?

3  A    I don't know what legal --

4  Q    Well, they signed the loan agreement, right?

5  A    There were two different entities that purchased each

6  property.   Then they rolled up into Mesatex.

7  Q    Let me show you what's been marked as Exhibit 8, Innovatis

8  Defendants' Exhibit 8.

9          MR. EVANS:  Sorry to inundate you with paper here.

10         THE COURT:  Well, you have a long ways to go before

11 you catch up with what they did to me.

12         MR. EVANS:  We're almost there.

13 BY MR. EVANS:

14 Q    Does this look familiar, Mr. Niemi?

15 A    Yes.

16 Q    Okay.

17        This is actually the loan agreement that you were

18 referring to earlier today in your testimony?

19 A    Yes.

20 Q    Dated December 7 of 2009, as between Azco, the Azco

21 entities, as borrower, and Prosperity International, LLC.  As

22 lender, right?

23 A    Yes.

24 Q    Okay.

25        And you signed this loan agreement on behalf of the

John Niemi - Cross

1   Azco entities, correct?

2   A    Yes.

3   Q    And that's actually found on page 70 -- the page after

4   page 73, the page that has your signature on it is not

5   numbered.  But you signed on behalf of Azco LLC and Azco II,

6   LLC?

7   A    Yes.

8   Q    And if you flip the page, you see that Mr. Burgess signed

9   on behalf of Prosperity International, LLC, correct?

10  A    Yes.

11  Q    Would you agree with me that Innovatis is not mentioned in

12  here?

13  A    No.

14  Q    Innovatis is mentioned in here?

15  A    In the loan agreement, yes, they are.

16  Q    Innovatis is not mentioned as the borrow -- as the lender,

17  correct?

18  A    Correct.

19  Q    Mr. Lasshofer is not listed as the lender, correct?

20  A    Correct.

21  Q    Prosperity is listed as the lender, correct?

22  A    Correct.

23  Q    Now, there was an amendment to the loan documents, right?

24          Do you recall there being an amendment?

25  A    Yes.

John Niemi - Cross

1    Q    Let me show you what's been marked as Exhibit 9.

2         Does this document look familiar to you?

3    A    Yes.

4    Q    Okay.

5         This is an amendment to loan documents.  This is dated

6    March 9 of 2010.  Again, it's between the Azco entities as

7    borrower and Prosperity International, LLC, as lender, right?

8    A    Yes.

9    Q    And you signed this document on page 5 on behalf of the

10   Azco entities?

11   A    Yes.

12   Q    And Mr. Burgess signed this document on behalf of

13   Prosperity International?

14   A    Yes.

15   Q    And you consented on behalf of Mesatex as well to this

16   document, right?

17   A    Yes.

18   Q    And again, this document defines the lender as Prosperity,

19   right?

20   A    Yes.

21   Q    Does not define the lender as Mr. Lasshofer, correct?

22   A    Correct.

23   Q    Does not define the lender as Innovatis, any Innovatis

24   entity, correct?

25   A    Correct.

1  Q   Mr. Niemi, did any of the plaintiffs in this case, to your

2  knowledge, including yourself, enter into a signed agreement

3  with Mr. Lasshofer?

4  A   Not that I'm aware of.

5  Q   To your knowledge, did any of the plaintiffs, including

6  yourself, enter into any signed agreement with Innovatis GmbH?

7  A   No.

8  Q   Did any of the plaintiffs, to your knowledge, enter into a

9  signed agreement with Innovatis Immobilien GmbH?

10  A   No.

11  Q   Did any of the plaintiffs, to your knowledge, enter into

12  any signed agreement with Innovatis Asset Management SA?

13  A   No.

14         MR. EVANS:  Your Honor, I would move to, for purposes

15  of today's hearing, to admit the exhibits that we have shown to

16  Mr. Niemi.

17         Those being Exhibit 3, Exhibit 5, Exhibit 6,

18  Exhibit 8, and Exhibit 9.

19         And I have no further questions at this time, Your

20  Honor.

21         THE COURT:  All right.  Any objection to those?

22         MR. MADEL:  No, Your Honor.

23         THE COURT:  They're admitted.

24      (Exhibit 3 admitted.)

25      (Exhibit 5,6 admitted.)

John Niemi - Redirect

1    effect?

2    A    Yes.  Along with other things.

3    Q    Was there a point at one point that you did go to some

4    other lender?

5    A    In what respect?

6    Q    To ask them, is there a way that they could loan you money,

7    but you gave them this agreement?

8    A    Not formally.  I had friends in banks and this and that.

9    And having this loan in place caused -- would cause another

10   bank too much trouble to get involved.  And for that matter, it

11   was going to cause me too much trouble.  I was not in a

12   situation where I could look at it and say, okay, let's get

13   into a big legal fight about the validity of this, what I

14   thought was a legitimate loan document.  So I was handcuffed.

15   Q    With respect to the questions regarding Mesatex and Azco,

16   these LLCs, are those LLCs in business today?

17   A    No.

18   Q    Are they essentially out of commission?

19   A    Yes.

20   Q    Have you acceded to their claims along with Mr. Parnevik

21   and Mr. Naegele?

22   A    Yes.

23   Q    Do you know Mr. Lasshofer's relationship to Innovatis GmbH?

24   A    He runs all of the Innovatis companies.

25   Q    Does Mr. Lasshofer run the three defendants, the Innovatis

1   Breckenridge project?

2   A   I was on one call with Mr. Burgess.  John asked me to get

3   on the phone call, just so he could have another set of ears

4   listening to Mr. Burgess, to verify that he wasn't crazy, that

5   these guys had intended to fund and were working diligently to

6   make it happen.

7   Q   And when was that?

8   A   I want to say, you know, January, February 2010.

9   Q   Can you tell the Court some of the specific parts of that

10  conversation, if you remember?

11  A   You know, I'm, I'm not a finance expert.  I didn't ever,

12  because I'm not in that business, fully understand the

13  mechanism they were using.  You know, we relied on them, we

14  trusted them.  I trusted John.  He did extensive due diligence

15  in the process.  And, you know, I have a 30-year relationship

16  with a guy that's like my brother that I trusted, and counsel

17  that we relied upon as well.

18  Q   Have you had any other contact with Mr. Lasshofer since

19  that phone conversation?

20  A   I never had any contact with Mr. Lasshofer.  I had contact

21  with Mr. Burgess only.

22  Q   Did you recently in May send him a letter or an e-mail?

23  A   Oh, sorry.  I did.  In an effort to get Mr. Lasshofer to

24  Colorado, I wrote him a letter and an e-mail asking him and

25  requesting his presence here so that he could be here to

Robert Naegele - Direct

1  represent and tell us his story.  I told him I'd pay for his

2  hotel, his flight, and his accommodations if he would come.

3  And I never heard back from him.

4  Q   Have you ever, since the day you talked to him on the phone

5  back in 2010, ever talked to him again?

6  A   You're talking about Burgess?

7  Q   Yes.

8  A   No.

9  Q   Or Lasshofer?

10 A   Never.  He never tried to contact me after the -- after the

11 e-mail and letter I sent to him.

12         MR. MILLER:  No further questions.

13         THE COURT:  Cross.

14         MR. EVANS:  Just a few, Your Honor.

15                     **CROSS-EXAMINATION**

16 BY MR. EVANS:

17 Q   Mr. Naegele, did I hear you say that you're best friends

18 with Mr. Niemi?

19 A   Long-time, 30-year relationship, yes.

20 Q   You never met my client Mr. Lasshofer, right?

21 A   I never did.

22 Q   And before this lawsuit was filed, you never spoke or

23 communicated with Mr. Lasshofer, right?

24 A   Never did.

25 Q   Did anyone ask you to send that e-mail to Mr. Lasshofer?

Jesper Parnevik - Direct

1  Erwin Lasshofer when you talked to him that day?

2  A    No, it was a part of he's from Europe and that that's where

3  ultimately the money was going to come from.  And not really

4  any detail, about what he did and so on.  They tried to explain

5  a little bit, but I realized soon that I would not understand.

6  Q    Did you learn later that the money in fact was not funded?

7  A    Well, that took a while.  I mean, we started to get a

8  little bit worried -- actually, we thought the 21st of

9  December was going to be the first that part of the loan was

10  going to get paid.  And that didn't happen, but that was not

11  any default on the contract.

12          So when 21st of January happened and no money showed

13  up, that's when we started getting worried.  And that's when we

14  decided that John is going to go to Europe to see if he could

15  actually get the funding.

16  Q    And that's the 21st of January of 2010?

17  A    Yes.

18  Q    Have you had any contact with Mr. Lasshofer since then?

19          Let me rephrase that.

20          Have you ever had any contact with Mr. Lasshofer?

21  A    No.  I was not involved in that level.

22  Q    Has he ever reached out to you to explain what happened in

23  the funding of this project?

24  A    No.  I'm not sure he knows even who I am.

25  Q    How much money did you ultimately lose because this project

154

1  stay in effect for a week?

2        MR. EVANS:  Subject to the conditions that we talked

3  about, the release to pay me 25,000 to bring me current so I

4  can continue to represent the guy.

5        THE COURT:  All right.  It will stay in effect for a

6  week, the freeze, everything, minus 25.

7        MR. MILLER:  Understood.

8        THE COURT:  I'll read what you file, if you file

9  something, and I'll get you something within a week.  One way

10 or the other.

11       And it is five o'clock on the nose.  How did we do

12 that.

13    (Recess at 5 p.m.)

14                  REPORTER'S CERTIFICATE

15       I certify that the foregoing is a correct transcript

16 from the record of proceedings in the above-entitled matter.

17 Dated at Denver, Colorado, this 30th day of May, 2012.

18

19                       s/Kara Spitler_____
                              Kara Spitler

20 ARGUMENTS

21    By Mr. Madel                              32

22    By Mr. Evans                              34

23    By The Court                             35

24 WITNESSES

25    JOHN NIEMI

1        Direct Examination By Mr. Madel          5

2        Cross-examination By Mr. Evans          29

3        Redirect Examination By Mr. Madel       31

4     John Niemi

5        Direct Examination By Mr. Madel         47

6        Cross-examination By Mr. Evans          61

7        Redirect Examination By Mr. Madel       88

8        Recross-examination By Mr. Evans        95

9     ROBERT NAEGELE

10       Direct Examination By Mr. Miller        95

11       Cross-examination By Mr. Evans         100

12    JESPER PARNEVIK

13       Direct Examination By Mr. Miller       103

14       Cross-examination By Mr. Evans         109

15                    DEFENDANTS' EXHIBITS

16  Ex. No.      Offered    Received

17  3               87         87

18  5,6             87         87

19  8,9             87         87

20  ARGUMENT RE JURISDICTION AND VENUE

21     By Mr. Madel                              32

22     By Mr. Evans                              34

23     Court's Ruling                            35

24  CLOSING ARGUMENTS

25     By Mr. Madel                             111

156

1     By Mr. Evans                          127

2     Rebuttal Argument By Mr. Madel        141