**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 12-CV-869-RBJ

JOHN NIEMI,
ROBERT NAEGELE, III, and
JESPER PARNEVIK,

      Plaintiffs,

v.

MICHAEL FRANK BURGESS,
ERWIN LASSHOFER,
INNOVATIS GMBH,
INNOVATIS IMMOBILIEN GMBH,
INNOVATIS ASSET MANAGEMENT SA,
et al.

      Defendants,

CREDIT SUISSE A.G.,
      Nominal Defendant.

---

**CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER**
**REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

---

Nominal Defendant Credit Suisse AG ("Credit Suisse") responds as follows to Plaintiffs'

Motion for Order Requiring Turnover Pursuant to Fed. R. Civ. P. 69(a) and Colo. R. Civ. P.

69(g) or, in the Alternative, Payment Pursuant to Guarantee (Doc. 293, hereinafter "Motion").

## I. SUMMARY OF RESPONSE

Plaintiffs' Motion should be denied for three reasons:

First, Credit Suisse never agreed or "assured" that it would be a general guarantor for

Plaintiffs' judgment against the Lasshofer Defendants or any portion of Plaintiffs' judgment.

There was never any intention (or basis) for Credit Suisse itself to become liable for the

Lasshofer Defendants' judgment if a Swiss court ultimately determined that other creditors of the

Lasshofer Defendants have a right to the account funds.  Rather, Credit Suisse assured:  (1) that

it would maintain $6.8 million in the IAM Account to permit Plaintiffs to pursue enforcement

proceedings in Switzerland; and (2) that it would comply with any Swiss court order directing

distribution of the account funds to Plaintiffs.   Credit Suisse has honored its assurance; Plaintiffs

are not entitled to payment from Credit Suisse pursuant to any "guarantee."

Second, Plaintiffs have mischaracterized the proceedings in Switzerland and the remedies

relating to the IAM Account that have been available to Plaintiffs under Swiss law throughout

this action.  For example, as the Motion reflects, Plaintiffs have been aware of Zurich District

Court debt enforcement proceedings relating to the IAM Account for at least the past seven

months.  However, Plaintiffs have failed to take available steps to protect their rights as creditors

in the Zurich proceedings, such as seeking to intervene as auxiliary parties or as a main party,

either before the judgment entered on August 19, 2015 or thereafter to preserve an appeal.   With

respect to the attachment orders that Mr. De Lange and Innovatis PCC, Ltd. obtained in October

2012 as referenced in the Motion, Credit Suisse (as Plaintiffs knew) was prohibited under Swiss

law from disclosing the existence of the orders or any other information regarding the IAM

Account.  However, Plaintiffs knew of other attachment proceedings in any event because the

Lasshofer Defendants disclosed them in this action in October 2012 at the time they were

initiated.   Under Swiss law, Plaintiffs could (and can) challenge the validity or priority of the De

Lange and Innovatis PCC claims on collusion or similar ground.  Apparently, they have not done

so to date.  Moreover, Plaintiffs have failed to avail themselves of other means to obtain a freeze

**12-CV-869-RBJ:   CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Page 2

or attachment of the IAM Account, such as by initiating criminal proceedings in Switzerland or by seeking a criminal freeze by means of international criminal legal assistance (they indicate they are participants in criminal proceedings against the Lasshofer Defendants in several European countries) or by pursuing attachment of the account funds at the time the Defendants disclosed the existence of other attachment proceedings or even earlier, when this action was commenced.

Each of these matters is addressed in the attached Declaration of Dr. Andrea Meier (See Exhibit 1 ¶¶ 7-22). For reasons known only to Plaintiffs, they pursued collection of the IAM Account funds solely in the United States –despite knowing there were other creditors in Switzerland— and have failed to protect their rights as creditors with respect to the IAM Account funds even after obtaining their final appealable judgment in this action. Plaintiffs are the ones that have made the strategic decisions as to whether, how, and when to pursue collection efforts in Switzerland. There is no basis for Credit Suisse to be personally liable to Plaintiffs if their efforts are not ultimately successful.

<u>Third</u>, neither Fed. R. Civ. P. 69(a) nor C.R.C.P. 69 permits a turnover order against Credit Suisse. Plaintiffs have never cited any authority for their Rule 69 relief requests other than *United Intern. Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1236 (10th Cir. 2000). As previously explained, *Wharf Holdings* is distinguishable from this case and supports Credit Suisse's position rather than Plaintiffs'. Moreover, this Court is required to apply Colorado law and procedure to Plaintiffs' Rule 69 request. C.R.C.P. 69 does not permit turnover where —as Plaintiffs' Motion has confirmed is the case here— a dispute exists as to the ownership of the property sought to be attached and/or the funds may be subject to valid claims

**12-CV-869-RBJ:  CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Page 3

of other creditors.  *See, e.g., Idaho Pac. Lumber Co., Inc. v. Celestial Land Co. Ltd.,* 348 P.3d 950, 955 (Colo. App. 2013) (citing *Securities Investor Protection Corp. v. First Entertainment Holding Corp.,* 36 P.3d 175, 179 (Colo. App. 2001)); *Fort Collins Prod. Credit Ass'n v. Carrol Dairy,* 553 P.2d 95, 99 (Colo. App. 1976).  Although Swiss law strictly precluded Credit Suisse from voluntarily disclosing information specific to the IAM account, the recent Zurich court judgment Plaintiffs have introduced at Doc. 293-7 (and other documents Plaintiffs have attached to their Motion) reflect that all of the IAM Account funds are subject to claims of other parties and the ownership of a majority of the funds is disputed as those funds  are segregated assets belonging <u>not</u> to Innovatis, but rather to an investment fund referenced by the Zurich court as the "ABC Fund."   This actual ownership dispute and the presence of other creditors with potentially valid claims preclude any turnover order under Federal or Colorado Rule 69.

## II.  BACKGROUND[1]

1.      Plaintiffs filed this action in April 2012, asserting fraudulent and criminal activity by all of the substantive Defendants against Plaintiffs and other victims that had occurred between June 2009 and July 2010, when Burgess was indicted in the United States District Court for the Middle District of Florida on criminal racketeering charges.  See Doc. 1, Complaint, ¶¶ 30-193.  Plaintiffs never asserted substantive claims of any nature against Credit Suisse.

---

[1]      Much of this factual and procedural background has been set forth in previous Credit Suisse filings; however, in light of the relief sought in the present Motion –including an order that Credit Suisse personally pay Plaintiffs' judgment against the substantive Defendants with more than $6,800,000 of its own funds— Credit Suisse is constrained to restate the background facts in this Response.

**12-CV-869-RBJ:  CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Page 4

2.      The Florida criminal proceeding against Burgess involved the same fraudulent

investment scheme that Plaintiffs allege in this action and sought forfeiture of the same $6.8

million Innovatis Asset Management S.A. account at Credit Suisse ("IAM Account") that is the

subject of this action and Plaintiffs' Motion.  Doc. 1 ¶¶ 194, 204-205; Doc. 161-3, Indictment;

*id.* at 10.  In connection with forfeiture orders obtained in the criminal action, the United States

sought assistance of Swiss Authorities pursuant to an international legal assistance treaty

(MLAT) to freeze the IAM Account and to obtain account records to confirm that proceeds

obtained from the fraudulent enterprise had been deposited and remained in the account.  Doc.

161-1, United States Motion, at p. 2, n. 1.

3.      "Upon a thorough review of the bank records," the United States attorney

determined that the funds in the IAM Account "were <u>not</u> the proceeds" of the alleged

Burgess/Innovatis criminal conspiracy for which Burgess had been convicted.  *Id.* at p. 3, ¶ 5

(emphasis in original).  Rather, the United States determined that the funds in the IAM Credit

Suisse Account "belong to other, unknown third parties that are unrelated to defendant's scheme

to defraud."  *Id.*  As a result of this review, the United States determined that there was no basis

for forfeiture of the IAM Account funds, and the Middle District of Florida court issued an order

vacating its order of forfeiture of the account.  *Id.* at 3; Doc. 161-2, Criminal Action Docket

Report, Entry 133.

4.      Although Plaintiffs initially sought damages exceeding $150 million in this action

and ultimately obtained a judgment against the Lasshofer Defendants exceeding $60 million

before trebling, the vast majority of the damages Plaintiffs sought and obtained against the

substantive Defendants were for asserted lost business profits. See Doc. 1, ¶¶ 189-192; Doc. 151-

**12-CV-869-RBJ:  CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER
REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

4, Damages Analysis; Doc. 226, Default Judgment, at 1.  The total of funds actually transferred

by any of the Plaintiffs to the Defendants and lost in the asserted conspiracy was $2,180,000,

representing the collateral deposit and commitment fee Plaintiffs made for the loan that

Defendants never funded.  Doc. 151-2, 05-25-2012 Hearing Transcript, at 62:7-64:9.  All of

Plaintiffs' fund transfers went to JP Morgan Chase bank accounts in the United States, and no

Plaintiff ever transferred any funds to any account at Credit Suisse.  Doc. 1, ¶¶ 98-100, 199; 66,

13.

       5.      In July 2012, Plaintiffs brought Credit Suisse into this action as a proposed

nominal defendant with respect to the IAM Account.  Doc. 85-1, Proposed Amended Complaint,

¶¶ 334-337.   From the time Plaintiffs first sought to join Credit  Suisse, Credit Suisse asserted

that turnover and other relief requested by Plaintiffs directly against Credit Suisse in this Court

(or disclosure of any non-public information regarding the IAM account) would conflict with

international and Swiss law and would cause not only Credit Suisse, but its employees, to violate

Swiss laws carrying criminal penalties.  *See* Doc 100, 7/30/2012 TRO Hearing Transcript at

51:13-52:6; Doc. 124-2, 09-4-2012 Reichart|Meier Declaration, ¶¶ 15-58.

       6.      On October 19, 2012, the Court granted in part Plaintiffs' motion for preliminary

injunction against Credit Suisse and ordered Credit Suisse to either file a statement of assurance

that no funds would be removed from the IAM Account or immediately transfer to Colorado

$2,180,000 from the account (*i.e.,* the amount of Plaintiffs' collateral deposit and commitment

fee) and file a bond.  Doc. 139, Courtroom Minutes, at 3; Doc. 142, Transcript, at 122:17-24.  In

response to that order, Credit Suisse filed its Notice of Assurance that it would maintain funds in

the IAM Account until a final non-appealable judgment was rendered in this action, the Court's

**12-CV-869-RBJ:  CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Page 6

preliminary injunction order was vacated, or further Court order.  *See* Doc. 140, 10-22-2012, Notice of Assurance.

7.      Following entry of default against the Lasshofer Defendants, the Court held a hearing in June 2013 to determine the amount of damages to be awarded in connection with the default and to rule on Plaintiffs' continued request for an order against Credit Suisse for turnover of the IAM Account funds.  In advance of that hearing, Switzerland's Ambassador to the United States, Manuel Sager, sent the Court two letters addressing issues of Swiss and international law and requesting that the Court avoid issuing orders that would create a conflict between the legal requirements of the United States and those of Switzerland. See Docs. 204, 216.  In the first letter, Mr. Sager urged the Court to require Plaintiffs to pursue any discovery of information located in Switzerland via the Hague Convention, explaining Swiss criminal laws which enforce Swiss sovereignty with respect to taking of evidence and which strictly prohibit disclosure of information regarding bank customers or accounts absent authorization of the customer or order of a Swiss judicial authority.  *See* Doc. 204 at 2-3.  In the second letter, Ambassador Sager urged the Court to deny Plaintiffs' request for an order directly against Credit Suisse requiring transfer of the IAM Account funds to the United States as conflicting with both Swiss and international customary laws.  Doc. 216 at 1-2.

8.      At the June 2013 hearing, Swiss criminal law expert Dr. Lorenz Erni testified regarding the implications of this Court entering a transfer order directly against Credit Suisse, in particular criminal liability to which any involved Credit Suisse employees would be subject under Article 271 of the Swiss Criminal Code relating to Swiss sovereignty.  *See, e.g.,* Doc. 231, Transcript, at 12:20-21:4.  Dr. Erni explained that the Credit Suisse assurance given in October

**12-CV-869-RBJ:  CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Page 7

2012 was not a violation of Article 271 because Credit Suisse did not freeze the account pursuant to a foreign court order but, rather, gave a voluntary assurance that it would maintain account funds while this action was pending. *Id.* at 19:11-19. As Dr. Erni testified, the purpose of the assurance was to maintain the status quo and prevent Lasshofer or Innovatis from withdrawing the funds before Plaintiffs could attempt to secure a Swiss court order directing that the money be transferred. *Id.* at 26:24-29:7; 32:6-15.

9.      At the hearing, Credit Suisse agreed to extend its assurance and committed that it would comply with any Swiss court order Plaintiffs might obtain directing release of the funds to Plaintiffs:

> THE COURT: All right. So that money, whether it's Credit Suisse's money or Lasshofer's money, is good as gold and <u>if these guys get the proper order from a Swiss court</u>, they get it, either from Lasshofer or from you, your bank, right?
>
> MS. CRAIGMILE: Because of the difficult implications of Swiss law, that is what my client has committed.
>
>        * * *
>
> THE COURT: <u>If you get the proper order</u>. You just heard what she said. <u>If you get an order from a Swiss court</u> to pay some or all of that money, that $6.8 million, to you, it will be honored. Period. They're not going to take you to court, they're not going to object, they're not going to gripe about it. They're going to pay it. And I'm accepting counsel's word on that. On behalf of the client.
>
>        * * *
>
> MS. CRAIGMILE: Your Honor, I don't know that I can say it any better than that. But <u>if a Swiss court orders Credit Suisse to turn over the funds</u>, Credit Suisse will comply with that order.
>
> MR. MADEL: Right.
>
> THE COURT: Whether it's Lasshofer's money or Credit Suisse's money.
>
> MR. MADEL: But how do I get that Swiss order?

**12-CV-869-RBJ:  CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Page 8

THE COURT: That's your problem. I'm not here to give you legal advice on
Swiss procedures.

*Id.* at 48:3-51:19 (emphasis added).   Credit Suisse agreed to comply with a Swiss court order

directing distribution of all or part of the account funds to Plaintiffs; Credit Suisse **never** agreed

to be personally liable (or to become a substitute debtor) for Plaintiff's anticipated judgment.

### III. RESPONSE TO PLAINTIFFS' FACTUAL ASSERTIONS

10.     Plaintiff's Motion relies on the declarations of Mr. Thom (Plaintiffs' U.S.

counsel), Mr. Niemi, and Mr. Caratsch, a Swiss attorney who Plaintiffs indicate they retained in

September 2015 to replace their previous Swiss counsel, Dr. Pachmann and the Pachmann law

firm.  A number of the statements in the declarations submitted by Plaintiffs are made without

personal knowledge, without proper foundation or without sufficient detail to permit any

response by Credit Suisse; they should be disregarded on those bases.  *See, e.g,*, Doc. 293-1;

293-8; Doc. 293-10.

11.     In responding to the Motion and these declarations, Credit Suisse directs the

Court principally to the Declaration of Dr. Andrea Meier referenced above and attached as

Exhibit 1.  Dr. Meier's declaration responds in detail to most of the matters raised in Plaintiffs'

declarations, including with respect to the Swiss debt enforcement options that have been

available to Plaintiffs with regard to the IAM Account but which Plaintiffs have failed to pursue.

See pp. 2-3 above and Exhibit 1 at ¶¶ 7-22.  Credit Suisse does not repeat those options here.

12.     In their Motion, Plaintiffs assert that they first learned of "purported debt

acknowledgements" attached as Exhibits 1 and 2 to Mr. Thom's declaration in early 2015 and

that they "asked Credit Suisse to apprise the Court of this information, but Credit Suisse

**12-CV-869-RBJ:  CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Page 9

refused." Motion at 5, Thom Decl. Ex. 5, 3/31/2015 correspondence (Doc. 293-6). As explained in Dr. Meier's declaration, while Plaintiffs are not prohibited by Swiss law from disclosing these documents, Swiss law strictly forbids Credit Suisse from disclosing such documents or other information regarding the IAM Account (or any Credit Suisse banking relationship). Exhibit 1 ¶ 3. These prohibitions imposed on Credit Suisse had been described in detail in multiple Credit Suisse filings as well as in Ambassador Sager's May 1, 2013 letter, which explained that Credit Suisse cannot disclose this or any other account information absent an order from a Swiss court. See Exhibit 1 ¶¶ 3-4; Doc. 204[2]; Docs. 124-3, 133, 134-1, 166-1. Notably, Plaintiff's Swiss counsel have never taken the position that Credit Suisse can disclose Swiss banking information or information regarding Swiss proceedings absent a Swiss court order or consent of the account owner. *Id.* ¶ 4. Credit Suisse is not hiding behind Swiss law. Rather, Plaintiffs are well aware of Credit Suisse's Swiss law obligations and are attempting to leverage those obligations into an order compelling Credit Suisse to pay several million dollars of Plaintiffs' judgment with its own funds.

13.    Plaintiffs' Motion suggests Plaintiffs had no knowledge of the Swiss attachment orders issued in October 2012 and knew nothing of attachment efforts of other creditors or orders

---

[2]    The Swiss Criminal Code also protects Swiss judicial sovereignty and the national economy by prohibiting ... the disclosure of trade or business secrets to foreign authorities or private parties. This prohibition is enforced with criminal sanctions.

In addition, the Swiss Banking Act prohibits employees of Swiss banks from disclosing customer information without consent from the customer, unless directed to disclose such information by the competent Swiss judicial authority. This prohibition is intended to protect privacy of individuals and is strictly enforced in criminal procedures.

Doc. 204 at 2 (footnotes omitted).

**12-CV-869-RBJ:  CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Page 10

until February 2015, after the Tenth Circuit issued its opinion and the Amended Final Judgment entered.  Motion at 5.  However, as noted in Dr. Meier's declaration (Exhibit 1 ¶¶ 11-12), in October 2012, the Defendants themselves advised Plaintiffs of the existence of other creditors and at least one attachment proceeding in Zurich with respect to the IAM Account.  Specifically, Mr. Douglass, the Lasshofer Defendants' United States counsel, apprised all parties of the attachment efforts during a telephonic hearing in this action on October 16, 2012:

> MR. DOUGLASS: If I may at the outset, I know time is short. I just want to alert the Court that we were informed yesterday -- and this may just generally affect the proceedings concerning the Credit Suisse accounts -- that an order has been issued by a Swiss authority against this account in favor of one of the beneficial owners. I'm not an expert on Swiss law and don't understand the proceedings entirely, but I am informed by Swiss counsel that this attachment order will supercede any foreign freezing order irrespective of whether the ordered is enforceable in Switzerland or not.  I just want to inform the parties of that and then I'll just back up and listen.

Doc. 145, Transcript, at 3:22-4:8; see also *id.* at 4:9-5-7. As explained in Dr. Meier's declaration, Credit Suisse was prohibited by Swiss law from confirming or denying the existence of such orders, but raised the issue of Defendants' disclosure of them in its February 2013 summary judgment filings. Exhibit 1 ¶ 12; Doc 161 at 11-12, ¶ 34, n.4 (citing Doc. 133 ¶ 12 and Doc. 161-8 ¶ 13, n. 1).

14.     Plaintiffs raise the issue of the August 19, 2015 Zurich District Court Judgment, an English translation of which is attached to Mr. Thom's declaration at Doc. 293-7 (hereinafter "Zurich Judgment").  As set forth in Dr. Meier's declaration, while the Plaintiffs are not restricted from disclosing this judgment to this Court or other third parties, Credit Suisse is forbidden under Swiss law from disclosing the Zurich Judgment (or any other non-public information regarding the proceeding) for the same reasons as are addressed in Ambassador

**12-CV-869-RBJ:  CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Page 11

Sager's letter (Doc. 204) and in Dr. Meier's previous declarations. Exhibit 1 ¶¶ 5, 16; *see also* Doc 124-2 ¶¶ 34-51; Doc. 134-1 ¶¶ 7-14.

15.     As Plaintiffs have now put the Zurich Judgment into the public record, Dr. Meier addresses it (including the finding with respect to Credit Suisse's claim in that proceeding) at Paragraphs 5, 6 and 24-28 of her declaration. The Zurich Judgment confirms that there are claims of other creditors as to all of the IAM Account funds. It also confirms a dispute exists as to the ownership of $4,348,842 of the funds as: (i) those funds belong to the "ABC Fund"; (ii) they are "outside the discretionary power" of the formal account holder (i.e., Innovatis Asset Management); and (iii) they are therefore separate from the Innovatis assets. See *id.* ¶ 26; Zurich Judgment Sec. V.2.

<h3 style="text-align:center">IV. ARGUMENT AND AUTHORITY</h3>

Plaintiffs seek a turnover order pursuant to Fed. R. Civ. P. and C.R.C.P. 69 and, in the alternative, direct payment from Credit Suisse pursuant to Credit Suisse's purported "guarantee." There is no basis for either request.

**A.      NEITHER FED. R. CIV. P. 69(A) NOR C.R.C.P. 69 PERMITS PLAINTIFFS' REQUESTED TURNOVER.**

With respect to their Rule 69 argument, Plaintiffs concede that the Court is bound by Colorado procedures for judgment collection as set forth in C.R.C.P. 69. Motion at 15-16.

*1.      Wharf Holdings does not permit or support a turnover request against Credit Suisse.*

Plaintiffs again cite *Wharf Holdings,* 210 F.3d 1207 (10th Cir. 2000), as the basis for their request that the Court issue a Rule 69 turnover order against Credit Suisse. Motion at 16-17.

**12-CV-869-RBJ:  CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Page 12

As Credit Suisse has previously explained, *Wharf Holdings* supports Credit Suisse's position rather than Plaintiffs'. *See, e.g.,* Doc. 217, 06-04-2013 Hearing Memorandum, at 4-6.

In *Wharf Holdings,* the Tenth Circuit affirmed a C.R.C.P. 69(g) order against a substantive defendant requiring the defendant to transfer $150 million of assets it held abroad, principally in Hong Kong.  210 F.3d at 1234-36.  In rejecting the defendant's comity arguments under the facts of that case, the court reasoned that "Wharf has not offered a compelling reason to justify overruling the turnover order on comity grounds.  Compliance with the turnover order did not require Wharf to violate Hong Kong law, nor did it preclude Wharf from satisfying its obligations elsewhere." *Id.* at 1236.  In reaching its conclusion, the Tenth Circuit specifically recognized that denial of relief under C.R.C.P. 69(g) would be appropriate on grounds of comity where there were assertions of sovereignty under international law: "Comity 'counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law.'" *Id.* (quoting *United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 8 (1st Cir. 1997)).

In this case, Plaintiffs seek a turnover order against a nominal defendant of a foreign nation whose government has made clear that such an order would violate the foreign nation's law.  See Doc. 216, Ambassador Sager letter, pp. 1-2.  Under the Tenth Circuit's reasoning in *Wharf Holdings* and this Court's previous holdings*,* any turnover order would be improper.[3]

---

[3]     In making their *Wharf Holdings* arguments, Plaintiffs raise arguments they assert Credit Suisse made in the Zurich Proceeding, claiming: (i) those arguments reflect that Credit Suisse is capable of complying with a U.S. turnover order; and (ii) a U.S. turnover order would "presumably permit" Credit Suisse to argue to a Swiss court that it is entitled to a lien on IAM's funds under Article 402 of the Swiss Code of Obligations. *E.g.,* Motion at 16-17.  Dr. Meier addresses Plaintiffs' assertions in this regard at Paragraphs 24-28 of her declaration.  As Credit

**12-CV-869-RBJ:  CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Page 13

    *2.    Because Plaintiffs' Motion and declarations establish the existence of other creditors with potentially valid claims, as well as a dispute over the ownership of a large portion of the IAM Account funds, C.R.C.P. 69 prohibits the requested turnover order.*

Irrespective of principles of comity or of the application of *Wharf Holdings* to Plaintiff's Motion, the requested turnover order is not permitted by C.R.C.P. 69.

As Colorado courts have consistently held, C.R.C.P. 69(g) does not permit turnover where the ownership of the property sought to be attached is disputed:

> When there is an actual dispute as to ownership of property, the court may not try such an issue in a C.R.C.P. 69 proceeding, because the purpose of a C.R.C.P. 69 proceeding is to discover what property the judgment debtor has that is subject to execution, not to try contested title as to such property.

*Securities Investor Protection Corp., supra,* 36 P.3d at 179 (citing *Walker v. Staley,* 1 P.2d 924 (Colo. 1931) and *Equisearch, Inc. v. Lopez,* 722 P.2d 426 (Colo. App. 1986)).  Thus, "under C.R.C.P. 69, an ownership dispute effectively ends the trial court's ability to proceed...."  *Securities Investor Protection Corp.*, 36 P.3d at 179.  Again, while Swiss law strictly precluded Credit Suisse from disclosing information specific to the IAM account, the Zurich Judgment Plaintiffs have introduced (Doc. 293-7 ) and other documents Plaintiffs have attached to their Motion (Docs. 293-2, 293-3, 293-5, 293-9, 293-10  ¶¶ 5-10)) reflect that: (i) all of the IAM Account funds are subject to other attachment proceedings, and thus the ownership of those funds may be in dispute; and (ii) with respect to $4,348,842 of the IAM Account funds, those funds have been determined to belong to the "ABC Fund" (as referenced in the Zurich judgment,

---

Suisse has repeatedly pointed out –and as Ambassador Sager has confirmed— complying with a turnover order would violate Swiss law, and the order itself would not be enforceable in Switzerland. See Exhibit 1 ¶ 28; Doc. 216.

**12-CV-869-RBJ:  CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Doc. 293-7 at Sec. V.2 (pp. 8-13)), to be "outside of the discretionary power" of Innovatis and to be "separate" from any Innovatis assets. *Id.* This Court cannot determine contested title to the IAM Account assets, whether the dispute involves Mr. De Lange, Innovatis PCC, or the "ABC Fund." In addition, even where assets sought are not subject to an actual ownership, if they "may be subject to valid claims of other creditors," the priority of those claims "must be established in an appropriate proceeding." *Fort Collins Prod. Credit Ass'n v. Carroll Dairy, supra,* 553 P.2d at 99 (Colo. App. 1976). The appropriate proceeding(s) in this instance are the Zurich debt enforcement proceedings in which Plaintiffs have participated and may continue to participate. C.R.C.P. 69 does not permit a turnover order in any event.[4]

**B.    PLAINTIFFS ARE NOT ENTITLED TO PAYMENT FROM CREDIT SUISSE OF ITS OWN FUNDS PURSUANT TO A PURPORTED GUARANTEE.**

Putting aside Plaintiffs' creative wordsmithing, Credit Suisse's voluntary assurance was never an agreement to personally guarantee any portion of the Lasshofer Defendants' debt; was never an agreement to become a substitute debtor for any substantive defendant in this action; and was never an agreement to assume liability for $6.8 million of Plaintiffs' judgment if Plaintiffs did not ultimately prevail in Swiss enforcement proceedings. Rather, Credit Suisse's assurance was intended to preserve the *status quo* with respect to the IAM Account while Plaintiff attempted to have its judgment recognized and enforced in Switzerland. As set forth in Section II above, to the extent Credit Suisse made any "guarantee," that was to comply with any

---

[4]     In *Wharf Holdings*, there was no dispute as to the ownership of the foreign bank accounts and stock certificates that were the subject of the turnover order, nor any evidence of other creditors with claims to those assets. In light of the ownership dispute and existence of other claims involved here, there could be no turnover order under the holding of *Wharf.*

**12-CV-869-RBJ:   CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Page 15

Swiss court order directing that Credit Suisse distribute the IAM Account funds to Plaintiffs.

Credit Suisse maintained its assurance as the Court has directed and has always stood by its

commitment to comply with any Swiss court order the Plaintiffs might obtain.  Credit Suisse did

not agree –nor would there be any basis for it to agree—to personally pay Plaintiffs if their

collection efforts prove unsuccessful.

## CONCLUSION

Plaintiffs are not entitled to a turnover order (as the Court already determined in 2013),

nor are they entitled to payment of Credit Suisse's own funds under a supposed "guarantee."

Once again, Credit Suisse remains committed to comply with any Swiss court order Plaintiffs

may obtain directing distribution to Plaintiffs of the IAM Account funds.  However, it is the

responsibility of Plaintiffs (not Credit Suisse) to protect their rights as creditors.  Plaintiffs'

requests for a turnover order and/or personal payment by Credit Suisse are without basis, and

their Motion should be denied. [5]

Dated:  October 26, 2015

---

[5]     For the reasons addressed in this Response, the Declaration of Dr. Meier, and Ambassador Sager's first letter to the Court (Doc. 204), Credit Suisse continues to be prohibited by Swiss law from disclosing information regarding the IAM Account or any proceedings relating to the account without a Swiss court order or consent of the account holder, Innovatis Asset Management.  As Plaintiffs have no banking relationship or other obligation of confidentiality to Innovatis, they are not subject to the same non-disclosure requirements under Swiss law.  *See* Exhibit 1 ¶¶ 3, 5.  Thus, to the extent that the Court requires (or desires) updates as to the status of the Swiss debt enforcement proceedings, Credit Suisse requests that such information be sought from Plaintiffs rather than from Credit Suisse.

**12-CV-869-RBJ:  CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Page 16

s/ Kathleen E. Craigmile

_____

Kathleen E. Craigmile
Pryor Johnson Carney Karr Nixon, P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, CO 80111
Telephone:  (303) 773-3500
kcraigmile@pjckn.com

*Attorneys for Nominal Defendant Credit Suisse AG*

**12-CV-869-RBJ:  CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Page 17

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 26, 2015, a copy of the foregoing **CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)** was served on the following parties via the CM/ECF filing system:

Christopher William Madel
Bruce D. Manning
Aaron R. Thom
Robins Kaplan LLP
800 LaSalle Avenue, #2800
Minneapolis, MN 55402
CWMadel@rkmc.com
BDManning@rkmc.com
AThom@RobinsKaplan.com

Phillip L. Douglass
RoweLaw, LLC
5290 DTC Parkway, Suite 170
Greenwood Village, CO 80111
pdouglass@rowe-colaw.com

Julie North
Justine Beyda
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
jnorth@cravath.com
jbeyda@cravath.com

Robert Nolen Miller
Perkins Coie LLP
1900 16th Street, #1400
Denver, CO 80202-5255
rmiller@perkinscoie.com

Kevin D. Evans
Armstrong Teasdale, LLP-Denver
6400 South Fiddlers Green Circle, Suite 1820
Denver, CO 80111
kdevans@armstrongteasdale.com

*s/ Marie Newberger*

_____

**12-CV-869-RBJ:  CREDIT SUISSE A.G.'S RESPONSE TO PLAINTIFFS' MOTION FOR ORDER REQUIRING TURNOVER OR PAYMENT (DOC. 293)**

Page 18